GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California
MARA K. GOLDMAN
GRAHAM ARCHER
Assistant Federal Public Defenders
55 South Market Street, Suite 820
San Jose, CA 95113
Telephone: (408) 291-7753
Facsimile: (408) 291-7399
Email: Mara_Goldman@fd.org

Counsel for Petitioner ALEJANDRO TOLEDO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ALEJANDRO TOLEDO MANRIQUE,

Petitioner,

v.

DONALD O'KEEFE, United States Marshal for the Northern District of California,

Respondent.

Case No.

**PETITION FOR WRIT OF HABEAS CORPUS [28 U.S.C. § 2241]**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

THE MAGISTRATE COURT RECORD ..... 2

PROCEDURAL HISTORY ..... 2

BACKGROUND ..... 3

I. Dr. Toledo's Personal History ..... 3

II. Dr. Toledo's Presidency and the Southern Interoceanic Highway Project ..... 4

III. Proceedings in Peru ..... 6

JURISDICTION AND STANDARD OF REVIEW ..... 8

CLAIMS PRESENTED ..... 9

I. Extradition Is Prohibited Because Peru Has Not Charged Dr. Toledo With Either of the Alleged Offenses ..... 9

- A. This Court Construes the Treaty De Novo, Applying Ordinary Principles of Statutory Construction ..... 10
- B. The U.S.-Peru Treaty Requires Formal Charges as a Prerequisite for Extradition ..... 11
  - 1. Unlike the Treaties in *Emami* and *Assarsson*, the U.S.-Peru Treaty Requires the Requesting Country to Produce the Charging Document ..... 11
  - 2. The Drafters Added the Charging Document Requirement in the U.S.-Peru Treaty in Response to *Emami* and *Assarsson* ..... 13
  - 3. The Term "Sought for Prosecution" in Article VI Refers to Individuals Who Are Already Charged ..... 14
  - 4. The "Technical Analysis" Does Not Compel a Different Result ..... 16
- C. Dr. Toledo Has Not Been Charged With Either of the Alleged Offenses ..... 17

II. Extradition Is Prohibited Because Peru Has Failed to Produce the Charging Document, as Required by Article VI of the Treaty ..... 18

- A. Article VI Requires Peru to Produce a Copy of the Formal Charging Document ..... 19
- B. Copies of Peru's Prosecutor's Decisions Do Not Satisfy Peru's Obligation to Include a "Copy of the Charging Document" ..... 20

III. Extradition Is Prohibited Because There Is No Probable Cause to Believe that Dr. Toledo Committed the Alleged Offenses ....22

A. The Allegations Against Dr. Toledo ....23

1. Collusion ....23

2. Money Laundering ....24

B. The Magistrate Court Erroneously Refused to Consider Explanatory Evidence ....25

1. The Magistrate Court Erred in Refusing to Consider the Collaboration Agreement ....26

2. The Magistrate Court Erred in Refusing to Consider the February 2, 2012 Nominee Agreement Between Ecoteva and Merhav ....27

3. The Magistrate Court Erred in Refusing to Consider a Portion of Maiman's January 22, 2020 Testimony ....28

C. There Is No Probable Cuase to Believe that Dr. Toledo Engaged in Collusion ....29

1. There Is No Credible Evidence that Dr. Toledo Solicited the Bribes or Participated in the November 4, 2004 Negotiations ....31

2. Maiman's Claim that Dr. Toledo Said to Expect $20 Million Is Not Credible ....33

3. Dr. Toledo Did Not Perform the Unlawful Acts Maiman Had Promised Odebrecht ....34

D. There Is No Probable Cuase to Believe that Dr. Toledo Engaged in Money Laundering ....34

1. The Complaint's Allegations Are Based on Outdated and Incorrect Information from Peru ....35

2. Maiman Was the True Owner of Ecostate and Ecoteva ....36

3. Eva Fernenbug Acted at Maiman's Direction, for Maiman's Benefit ....37

4. There Is No Credible Evidence that Dr. Toledo Ever Asked Barata or Maiman for the Money ....37

5. Maiman Is the True Beneficiary of the Bribery Scheme ....38

CONCLUSION ....39

# TABLE OF AUTHORITIES

## Federal Cases

*Abbott v. Abbott,*
560 U.S. 1 (2010) .......... 16

*Aguasvivas v. Pompeo*,
405 F. Supp. 3d 347 (D.R.I. 2019) .......... 12

*Aguasvivas v. Pompeo*,
984 F.3d 1047 (1st Cir. 2021) .......... *passim*

*Ahmad v. Wigen*,
910 F.2d 1063 (2d Cir. 1990) .......... 22

*Air France v. Saks*,
470 U.S. 392 (1985) .......... 10

*Barapind v. Enomoto*,
400 F.3d 744 (9th Cir. 2005) (en banc) .......... 25, 26

*Basic v. Steck*,
829 F.3d 897 (6th Cir. 2016) .......... 22

*Charleston v. Kelly*,
229 U.S. 447 (1913) .......... 28

*Collins v. Loisel*,
259 U.S. 309 (1922) .......... 25

*Emami v. U.S. Dist. Court for the Northern Dist. of Calif.*,
834 F.2d 1444 (9th Cir. 1987) .......... 11, 12, 21

*Factor v. Laubenheimer*,
290 U.S. 276 (1933) .......... 10

*Greci v. Birknes*,
527 F.2d 956 (1st Cir. 1976) .......... 0

*Grin v. Shine*,
187 U.S. 181 (1902) .......... 11

*In re Assarsson*,
635 F.2d 1237 (7th Cir. 1980) .......... 11, 12, 21

*In re Extradition of Ben-Dak*,.
No. 06 Mag. 1540 (GWG), 2008 WL 1307816 (S.D.N.Y. Apr. 11, 2008) .......... 29

*In re Extradition of Chavez*,
408 F. Supp. 2d 908 (N.D. Cal. 2005) .......... 25

*In re Extradition of Nava Gonzalez*,
305 F. Supp. 2d 682 (S.D. Tex. 2004) .......... 29

*In re Extradition of Okeke*,
No. 96-7019P-01, 1996 WL 622213 .......... 22

*In re Extradition of Platko*,
213 F. Supp. 2d 1129 (S.D. Cal. 2002) .......... 22

*In re Extradition of Sainez*,
No. 07- MJ-0177 JMA, 2008 WL 366135 (S.D. Cal. 2008) .......... 10, 22

*In re Extradition of Strunk*,
293 F. Supp. 2d 1117 (E.D. Cal. 2003) .......... 9

*In re Kaine*,
55 U.S. (14 How. 103 (1852)) .......... 8

*Johnson v. Brown*,
205 U.S. 309 (1907) .......... 10

*Luna v. O'Keefe*,
No. 17-CV-02129-LHK, 2018 WL 784783 (N.D. Cal. Feb. 8, 2018) .......... 9, 29

*Mainero v. Gregg*,
164 F.3d 1199 (9th Cir. 1999) .......... 23

*Matter of Extradition of Luna*,
No. 16-xr-90095 NC, 2017 WL 1036732 (N.D. Cal. Mar. 17, 2017) .......... 29

*Matter of Extradition of Mackin*,
668 F.2d 122 (2d Cir. 1981) .......... 8

*Merck & Co., Inc. v. Reynolds*,
569 U.S. 633 (2010) .......... 13

*Muscogee (Creek) Nation v. Hodel*,
851 F.2d 1439 (D.C. Cir. 1988) .......... 13

*Prasoprat v. Benov*,
421 F.3d 1009 (9th Cir. 2005) .......... 9

*Quinn v. Robinson*,
783 F.2d 776 (9th Cir. 1986) .......... 9, 11, 23

*Sacirbey v. Guccione*,
589 F.3d 52 (2d Cir. 2009) .......... 13

*Santos v. Thomas*,
830 F.3d 987 (9th Cir. 2016) (en banc) .......... *passim*

*Shapiro v. Ferrandina*,
355 F. Supp. 563 (S.D.N.Y. 1973) .......... 9

*Skaftouros v. United States*,
667 F.3d 144 (2d Cir. 2011) .......... 22

*Tucker v. Alexandroff*,
183 U.S. 424 (1902) .......... 11

*United States v. Alvarez-Machain*,
504 U.S. 655 (1992) .......... 10

*United States v. Doherty*,
786 F.2d 491 (2d Cir. 1986) .......... 9

*United States v. Fiorillo*,
186 F.3d 1136 (9th Cir. 1999) .......... 10

*United States v. Kin-Hong*,
110 F.3d 103 (1st Cir. 1997) .......... 29

*United States v. Lettiere*,
640 F.3d 1271 (9th Cir. 2011) .......... 19

*United States v. Van Cauwenberghe*,
827 F.2d 424 (9th Cir. 1987) .......... 10

*United States v. Wells*,
519 U.S. 482 (1997) .......... 16, 17

*United States v. Wenner*,
351 F.3d 969 (9th Cir. 2003) .......... 10

*Valentine v. United States ex rel. Neidecker*,
299 U.S. 5 (1936) .......... 14

*Vo v. Benov*,
447 F.3d 1235 (9th Cir. 2006) .......... 8

**Treaties**

Extradition Treaty Between the Government of the United States of America and the Government of Belize,
U.S.-Belize, Mar. 30, 2000, S. Treaty Doc. No. 106-38, 2000 WL 33366018 .......... 14, 15

Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea,
U.S.-Korea, June 9, 1998, S. Treaty Doc. No. 106-2, 1998 WL 1788076 .......... 14, 15

Extradition Treaty Between the United States of America and the Republic of Peru,
U.S.-Peru, July 26, 2001, S. Treaty Doc. No. 107-6, 2001 WL 1875758 .......... *passim*

Extradition Treaty Between the United States of America and the Republic of Peru,
U.S.-Peru, Sept. 12, 1870, 18 Stat. 719 (1874), 1874 WL 16904 .......... 13

Extradition Treaty,
U.S.-Japan, Mar. 3, 1978, 31 U.S.T. 892, 1980 WL 309098 .................................................... 14, 15

*Treaty Between the United States of America and the Republic of Peru Providing for the Extradition of Criminals,*
U.S.-Peru, Nov. 28, 1899, 31 Stat. 1921 (1901), 1901 WL 16233 ................................................ 13

**Miscellaneous**

M. Cherif Bassiouni,
*International Extradition: United States Law and Practice* (6th ed. 2014) .................................... 23

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* (2012)...................................................................... 17

## INTRODUCTION

The Republic of Peru seeks the extradition of former president Alejandro Toledo Manrique in connection with allegations of collusion and money laundering. Peru claims that, during Dr. Toledo's presidency, the Brazilian construction behemoth Odebrecht paid him tens of millions of dollars in bribes in return for favorable treatment in the bidding process for contracts to build the Peru-Brazil Southern Interoceanic Highway. Dr. Toledo is innocent. It is true that Odebrecht paid at least $34 million in bribes, but Dr. Toledo did not know about the bribes, much less solicit them; and he did not give Odebrecht any preferential treatment. Instead, the bribes were paid to the late Josef Maiman, a corrupt Israeli businessman who falsely told Odebrecht that he was acting on Dr. Toledo's behalf. Although Maiman was both the architect and the true beneficiary of the bribery agreement, Peru allowed him to escape prosecution by entering into an "effective collaboration" agreement. Under the terms of this agreement, Maiman promised to pay Peru $7 million in fines and restitution, and to assist Peru in its efforts to prosecute Dr. Toledo. In return, Maiman not only received immunity for himself, his family, and his closest employees, but he was allowed to keep more than $20 million of the bribes paid by Odebrecht.

Peru submitted its extradition request to the United States on May 25, 2018. On September 28, 2021, the Honorable Thomas S. Hixson issued a certification of extraditability to the Secretary of State. Pursuant to 28 U.S.C. § 2241, Dr. Toledo seeks a writ of habeas corpus on three grounds:

First, extradition is prohibited under Article I of the U.S.-Peru extradition treaty, which limits extradition to individuals who have been charged, convicted, and/or sentenced for an extraditable offense in the requesting country. Because Peru has not yet formally charged Dr. Toledo with either of the alleged offenses, its extradition request must be rejected.

Second, extradition is prohibited under Article VI of the U.S.-Peru extradition treaty, which requires the requesting country to produce the charging document. In Peru, the charging document is the *Orden de Enjuiciamiento* (Order of Prosecution). Because Dr. Toledo has not yet been charged, no Order of Prosecution has been issued, making it impossible for Peru to comply with Article VI.

Finally, extradition is prohibited because the government has failed to satisfy its burden of establishing probable cause to believe that Dr. Toledo committed the alleged offenses.

## THE MAGISTRATE COURT RECORD

This § 2241 habeas petition arises from the magistrate court case *In the Matter of the Extradition of Toledo Manrique*, No. 19-mj-71055 MAG (TSH) (N.D. Cal.). The record in the underlying case is voluminous, with close to 200 docket entries. In addition, both Peru's Extradition Request and its Supplemental Extradition Request were filed manually due to their size. Dr. Toledo respectfully requests that the Court issue an order deeming the entire record from case No. 19-mj-71055 MAG (TSH) to be part of the record in the present case.

Throughout this petition, docket entries from the underlying extradition case are cited as "MJ Dkt. No. ___." The Extradition Request is cited as "ER," and the Supplemental Extradition Request is cited as "SER." For the Court's convenience, Dr. Toledo will provide a courtesy copy of the exhibits to the petition.

## PROCEDURAL HISTORY

On May 25, 2018, the Republic of Peru submitted an extradition request to the United States pursuant to the Extradition Treaty Between the United States of America and the Republic of Peru, U.S.-Peru, July 26, 2001, TIAS No. 03-825, S. Treaty Doc. No. 107-6, 2001 WL 1875758 ( "U.S.-Peru Treaty"). MJ Dkt. No. 81. The Request sought Dr. Toledo's extradition in connection with allegations of collusion, influence peddling, and money laundering. *Id.*

A year later, on July 16, 2019, the government filed a complaint seeking the provisional arrest of Dr. Toledo with an eye toward extradition to Peru. MJ Dkt. No. 1. Dr. Toledo made his initial appearance before the Honorable Thomas S. Hixson the same day. MJ Dkt. No. 4.

On July 20, 2020, Dr. Toledo moved the magistrate court to deny Peru's extradition request on the grounds that: (1) the alleged offenses did not fall within the Treaty because Dr. Toledo had not been "charged" with any of the offenses; (2) Peru had not complied with the requirements of the Treaty because it failed to produce a copy of the charging document; and (3) the influence peddling allegation was precluded under the Treaty's criminality requirement. *See* MJ Dkt. No. 137. The magistrate court denied the motion on September 4, 2020. MJ Dkt. No. 147.

On August 19, 2020, the government filed a letter from Peru stating that the influence peddling allegation had been "eliminated." *See* MJ Dkt. No. 142.

On July 8, 2021, Dr. Toledo moved the Court to deny Peru's extradition request for lack of probable cause.  MJ Dkt. No. 170.

On August 12, 2021, the government filed Peru's Supplemental Extradition Request.  MJ Dkt. No. 171.

On September 28, 2021, the magistrate court denied the probable cause motion and issued a certification of extraditability to the Secretary of State with respect to the collusion and money laundering allegations.  MJ Dkt. No. 188.

## BACKGROUND

### I.  Dr. Toledo's Personal History

Alejandro Toledo refers to his extraordinary life as a "statistical error."  He was born in 1945 in the remote Peruvian mountain village of Cabana.  The son of indigenous Quechuan farmers, he grew up in extreme poverty.  He is one of sixteen siblings, seven of whom died in their first year of life.  When Dr. Toledo was five, his family moved down from the Andes to the port city of Chimbote.  From the time he was six years old, he helped support his family by working as a shoe shine boy, and selling newspapers and lottery tickets to sailors.  His life changed when Peace Corps volunteers came to Chimbote.  They helped him learn English and, after he won a scholarship to study in the United States, they helped him obtain a visa and find work in America.

Dr. Toledo arrived in the United States in 1965.  After earning his undergraduate degree from the University of San Francisco, Dr. Toledo went to Stanford, where he earned a Master's Degree in Economics and a Ph.D. in International Education.  In the decades that followed, he returned to Stanford several times, as a visiting scholar, consulting professor, and visiting fellow.  Over the years, he has also been affiliated with Harvard, the Brookings Institute, and Johns Hopkins.  He has lectured in more than 49 countries on issues such as economic growth, the reduction of poverty and inequality.  He is the author of dozens of scholarly articles, as well as several books, including *Economic Growth for Social Inclusion: Five Years in Which We Planted the Future* (2014), and *The Shared Society: A Vision for the Global Future of Latin America* (2015).  When he was arrested in connection with Peru's extradition request, he was a Visiting Research Scholar at Stanford, working on his recently published book, *Education & the Future of Latin America*.

**II.    Dr. Toledo's Presidency and the Southern Interoceanic Highway Project**

While Dr. Toledo has spent considerable time in the United States, he has also returned to Peru for several long stretches, working as an educator and proponent of social justice and reform.  In December of 1994, Dr. Toledo founded the political movement *Perú Posible* and announced his candidacy for Peru's 1995 presidential election.  At the time, Peru was controlled by dictator Alberto Fujimori.  During his decade in power, Fujimori disbanded the Congress, dismissed judges, and suspended the Peruvian Constitution.  *See generally* U.S. State Dept., *Country Reports on Human Rights Practices: Peru*, Mar. 4 2002 ("*Human Rights Rpt.*").[1]  Under the Fujimori regime, military tribunals conducted secret trials in which judges covered their faces with hoods.  Fujimori incarcerated thousands of people without even a pretense of charges or due process, and oversaw the extrajudicial killings of thousands more.  Hundreds of thousands of women, mostly poor and indigenous, were forcibly sterilized.  *See* Declaration of Richard J. Douglas ("Douglas Decl."), attached hereto as Exhibit A; Declaration of Bruce Zagaris ("Zagaris Decl."), attached hereto as Exhibit B; *see also* Nusta Carranza Ko, "Forcibly sterilized during Fujimori dictatorship, thousands of Peruvian women demand justice," *The Conversation*, Mar. 3, 2021;[2] Joshua Partlow & Lucien Chauvin, "Peru's Fujimori Gets 25 Years," *Washington Post*, Apr. 8, 2009.[3]

Dr. Toledo lost the 1995 election.  Undaunted, he challenged Fujimori again in April of 2000. Dr. Toledo was subjected to smear campaigns, tear gas, and death threats, but he refused to back down.  *See* "Toledo Sworn In, Vows to Aid Peru's Poor," *L.A. Times*, July 29, 2001.[4]  Fujimori claimed victory, but objective international observers, including the United States, suspected that Fujimori's "win" was the result of electoral fraud.  *See Human Rights Rpt.* at 18.  By this time, Dr. Toledo had emerged as the leader of a broad democratic coalition.  After repeated protests and calls

---

[1] available at 2009-2017.state.gov/j/drl/rls/hrrpt/2001/wha/8263.htm.

[2] available at http://www. theconversation.com/forcibly-sterilized-during-fujimori-dictatorship-thousands-of-peruvian-women-demand-justice-155086.

[3] available at washingtonpost.com/wp-dyn/content/article/2009/04/07/AR2009040701345.html.

[4] available at https://www.latimes.com/archives/la-xpm-2001-jul-29-mn-27905-story.html.

for a new election, Dr. Toledo was elected president of Peru on June 3, 2001. He was the first indigenous leader of Peru in 500 years.

With Dr. Toledo's election, Peru began "a process of democratic transformation." *See id.* at 1. Dr. Toledo worked to reform the judicial system, which had been "corrupt and inefficient" under the Fujimori regime. *Id.* His efforts to expose Fujimori's wrongdoing ultimately resulted in Fujimori's criminal conviction for human rights violations, crimes against humanity, murder, and kidnapping.[5]

During Dr. Toledo's presidency, the economy grew an average of 7% each year for five consecutive years, the highest growth rate in Latin America. At the same time, the rate of extreme poverty was reduced by 25%. He entered into a bilateral trade agreement with the United States, and signed free trade agreements with Thailand, Singapore, Chile, and Mexico. Under his leadership, Peru served as this country's partner in the fight against narco-trafficking, working to help dismantle Peruvian, Colombian, and Mexican drug trafficking organizations.

From the start of his presidency, Dr. Toledo made the construction of the Peru-Brazil Southern Interoceanic Highway Project a priority of his administration. The highway, which would ultimately stretch across the continent from the Atlantic Ocean to the Pacific, was part of a larger plan designed by a coalition of South American countries to "integrate the region by developing infrastructure for transport, energy, and communications." *See* "A Long Way to the Interoceanic Highway."[6] Dr. Toledo had campaigned on a platform of economic growth and reduction of poverty, and he viewed the Highway Project as the main stimulus for the country's economy. In his July 28, 2003 Presidential Address, Dr. Toledo informed the nation that his administration was committed to building the Southern Interoceanic Highway. The following month, Peru and Brazil entered into a Declaration of Commitment, in which the two countries pledged to make the Highway Project a top priority. *See* Ronald Bruce St. John, *Toledo's Peru: Vision and Reality* (2010) 148-49.

---

[5] Twenty years later, Fujimori's daughter, Keiko Fujimori, lost the presidential election in Peru to Pedro Castillo. Ms. Fujimori responded with an "electoral coup attempt, pushing Peru's democracy to the brink of collapse." Steven Levitsky & Alberto Vergara, "Trumpian Tactics Threaten to Undo Democracy in Peru," *New York Times*, June 23, 2021, available at https:// www.nytimes.com/2021/. 06/23/peru-election-castillo-fujimori.html.

[6] available at https://www.connectas.org/especiales/amazonas/en/vias1.html.

Dr. Toledo was far from alone in his support for the Highway Project. The Interoceanic Highway never could have been built without broad support from the Congress, the business community, and the public. As just one example, the project could not have moved forward without the April 30, 2004, decision of the Congress to declare the project a national priority and to increase the national debt ceiling.

**III. Proceedings in Peru**

Peru alleges that Dr. Toledo engaged in collusion and money laundering in connection with the bidding for construction contracts for the Interoceanic Highway Project. Although Peru's theory has shifted over time, it essentially alleges that in late 2004, Dr. Toledo – through intermediaries – solicited and received $35 million in bribes from the construction conglomerate Odebrecht, in return for favorable treatment in the bidding process for the Interoceanic Highway contracts. According to Peru, Dr. Toledo engaged in collusion by accepting payment in return for influencing the bidding process. Peru claims that Dr. Toledo engaged in money laundering by having Israeli multi-millionaire Josef Maiman receive the payments and then transfer them through a series of accounts, ending in a Costa Rican account nominally controlled by Dr. Toledo's mother-in-law.

In Peru, criminal investigations consist of three distinct phases: (1) the preliminary or investigative phase, during which the prosecutor gathers evidence and determines whether to seek charges; (2) the intermediate or examination phase, during which the court holds a preliminary hearing to determine whether the prosecutor's request for formal charges should be granted; and (3) the trial. *See* Declaration of Moisés Aguirre Lucero ("Aguirre Decl."), attached hereto as Exhibit C, at ¶ 3. On February 3, 2017, Peruvian prosecutors initiated a preliminary investigation of Dr. Toledo, Jorge Barata, and Josef Maiman relating to allegations of influence peddling and money laundering in connection with the contracts for the Interoceanic Highway. *See* Prosecutor's Decision No. 6, attached hereto as Exhibit D.

On February 9, 2017, the judge granted the prosecutors' request for an order of *prisión preventiva* (preventive imprisonment). This practice, which is authorized under Peruvian law, permits the imprisonment of people who are under investigation for up to three years, even if they have never been indicted. *See* Simeon Tegel, "Ex-president's suicide brings more criticism of Peru's

pretrial detentions," *The Washington Post*, Apr. 20, 2019.[7] Increasingly, this practice has come under fire both internationally and within Peru, due to its aggressive use, which allows for years of pre-charge detention, "a term unthinkable in many democracies, even for suspects facing overwhelming evidence of the most heinous crimes." *Id.*

On March 7, 2017, the investigation was expanded to include allegations of collusion. A 36-month time period was set for the preliminary investigation, allowing it to continue until February 3, 2020. *See* Report on the Status of the Investigation ("Status Rpt."), attached hereto as Exhibit E.

On January 31, 2020, the prosecutors requested an extension of time to continue their investigation. On March 4, 2020, the court granted the prosecution an additional three months, continuing the investigation period through June 4, 2020. *See id.* at 2. Later that month, however, a national lockdown was declared in response to the COVID-19 pandemic, and all administrative, public, and private activities were suspended until June 30, 2020. These delays resulted in a further extension of the deadline. *See id.*

On August 6, 2020, the prosecutors requested an additional 78 days to continue the preliminary investigation, signaling that the investigation was expected to continue through at least October of 2020. *See* Douglas Decl., Exh. A, *supra*, at ¶ 7.

On August 11, 2020, the prosecution announced that it had concluded its preliminary investigation. *See* Prosecutor's Decision No. 138, attached hereto as Exhibit F. The same day, lead prosecutor Rafael Vela made a public statement in which he announced that the decision to complete the investigation had been made to "help the extradition process," and to "disrupt" Dr. Toledo's argument "[t]hat he has not been charged by the Public Ministry." *See* Canal N, "Prosecutor Rafael Vela affirmed that the accusation against Alejandro Toledo strengthens the extradition process," Aug. 13, 2020;[8] *see also* Douglas Decl., Exh. A, *supra*, at ¶ 7.

On August 17, 2020, a representative of the Peruvian Embassy wrote to the government to

---

[7] available at https://www.washingtonpost.com/world/theamericas/suicide-of-former-president-brings-criticism-of-perus-pretrial-detentions/2019/04/18/.

[8] available at https://canaln.pe/actualidad/fiscal-rafael-vela-afirmo-que-acusacion-contra-alejandro-toledo-fortalece-proseco-extradicion-n423121.

advise that Peru's prosecutors had filed an *Acusación Fiscal* (Accusation) against Dr. Toledo. *See* Letter from Gonzalo Bonifaz, attached hereto as Exhibit G. As the letter explains, the Accusation is a request for the case to proceed from the preliminary investigative phase to the intermediate phase. *See id.* at 1. The United States later filed the Accusation as part of its Supplemental Extradition Request.

Judge Concepción Carhuancho recently announced that his review of the Accusation would begin on October 21, 2021. *See* "Alejandro Toledo: Judicial Branch will begin prosecution control on October 21 for the Odebrecht Case," *Gestión*, Sept. 29, 2021.[9] It is anticipated that this review process, which must be completed before formal charges can be brought, "could take one or two years." *Id.*

**JURISDICTION AND STANDARD OF REVIEW**

More than 100 years ago, the Supreme Court warned that "'extradition without an unbiased hearing before an independent judiciary ... (is) highly dangerous to liberty and out never to be allowed in this country.'" *Matter of Extradition of Mackin*, 668 F.2d 122, 134 (2d Cir. 1981) (quoting *In re Kaine*, 55 U.S. (14 How. 103, 115 (1852)) (alternations in *Mackin*). For precisely this reason, "[a]uthority over the extradition process is shared between the executive and judicial branches." *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc).

The process begins in the executive branch. The foreign government seeking extradition submits its request to the State Department, which reviews the request to determine whether it appears to fall within the scope of the applicable extradition treaty. *Id.* If so, the United States Attorney files a complaint seeking provisional arrest. *Id.* (citing *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006), and 18 U.S.C. § 3184).

At that point, the process moves to the judicial branch, where a judge must decide whether to certify the extradition. *Id.* Before an extradition request can be certified, the government must establish: (1) that the alleged offense "falls within the terms of the extradition treaty between the United States and the requesting state"; and (2) that "there is probable cause to believe the person

---

[9] available at https://gestion.pe.peru/politica/alejandro-toledo-poder-judicial-iniciara-control-de-acusacion-el-21-de-octubre-por-caso-odebrecht-nndc-noticia/.

committed the crime charged." *Id.* (citations omitted).

If the judge declines to certify the extradition, the case is dismissed and the extraditee must be released. The decision to deny certification is unreviewable. *See In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1140 n.29 (E.D. Cal. 2003) (citations omitted). Once an extradition request has been rejected by the court, "the Government's sole recourse is to submit a request to another extradition magistrate." *United States v. Doherty*, 786 F.2d 491, 492-93 (2d Cir. 1986); *see also Strunk*, 293 F. Supp. 2d at 1140 n.29.

If the judge certifies the extradition, that decision "is not subject to direct appeal but may be challenged collaterally through habeas corpus review" pursuant to 28 U.S.C. § 2241. *Prasoprat v. Benov*, 421 F.3d 1009, 1013 (9th Cir. 2005) (citations omitted). Relief under § 2241 is available even if the petitioner has been granted bail and is not in physical custody. *See Shapiro v. Ferrandina*, 355 F. Supp. 563, 568 (S.D.N.Y. 1973); *see also Luna v. O'Keefe*, No. 17-CV-02129-LHK, 2018 WL 784783 (N.D. Cal. Feb. 8, 2018) (entertaining § 2241 petition where the petitioner had been released on bail). If habeas relief is denied, the extraditee can appeal to the Ninth Circuit. *Santos*, 830 F.3d at 1001; 28 U.S.C. §§ 1291, 2253.

The purpose of habeas review is to determine: "(1) whether the extradition court had jurisdiction to conduct the proceedings over the individual sought; (2) whether the extradition treaty was in force and the crime fell within the treaty's terms; (3) whether there was probable cause that the individual committed the crime; and (4) whether the crime fell within the political offense exception." *Prasoprat*, 421 F.3d at 1013 (citations omitted).

The question whether an alleged offense comes within the treaty is a question of law reviewed de novo. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citation omitted). Factual questions are reviewed for clear error. *Id.* The magistrate's probable cause finding "must be upheld if there is any competent evidence in the record to support it." *Id.* (citations and internal quotations omitted).

## CLAIMS PRESENTED

### I. Extradition Is Prohibited Because Peru Has Not Charged Dr. Toledo with Either of the Alleged Offenses

Article I of the U.S.-Peru Treaty limits extradition to three groups: people who have been "charged with" an extraditable offense; people who have been "found guilty of" an extraditable

offense; and people who have been "sentenced for" an extraditable offense. Treaty, art. I. By its terms, the Treaty prohibits the extradition of individuals who, like Dr. Toledo, have not yet been charged with a crime.

**A. This Court Construes the Treaty De Novo, Applying Ordinary Principles of Statutory Construction**

"In construing a treaty, as in construing a statute," courts "first look to its terms to determine its meaning." *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992); *see also Air France v. Saks*, 470 U.S. 392, 397 (1985) ("The analysis must begin ... with the text of the treaty and the context in which the written words are used."). While "[e]xamination of the plain language" of a statute or treaty "always marks the starting point," courts also "look to the design of the statute [or treaty] as a whole." *United States v. Fiorillo*, 186 F.3d 1136, 1146 (9th Cir. 1999) (citations and internal quotations omitted). In addition, courts must apply the "fundamental canon of statutory construction that a statute should not be construed so as to render any of its provisions mere surplusage." *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003).

Whether an alleged offense is "within the provisions of an extradition treaty" is a question that lies "within the sole purview of the requested state." *United States v. Van Cauwenberghe*, 827 F.2d 424, 429 (9th Cir. 1987) (citing *Johnson v. Brown*, 205 U.S. 309, 316 (1907)). For this reason, the Court cannot simply accept Peru's assertion that Dr. Toledo has been charged with an extraditable offense; instead, "[t]he Court is clearly required to conduct an independent analysis." *In re Extradition of Sainez*, No. 07- MJ-0177 JMA, 2008 WL 366135, *5 (S.D. Cal. 2008) (rejecting government's argument that "the Court may rely upon Mexico's proclamation that the arrest warrant is valid").

Nor can the Court automatically defer to the State Department's interpretation. "[I]f a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933). If, however, "the textual meaning is plain and cannot reasonably bear the government's construction, then we must reject that construction." *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) (citing *Greci v. Birknes*, 527 F.2d 956, 960 (1st Cir. 1976)). As the

Supreme Court explained in *Tucker v. Alexandroff*, 183 U.S. 424 (1902), treaties should be interpreted "in that broad and liberal spirit which is calculated to make for the existence of perpetual amity," but only if "it can be done without the sacrifice of individual rights or those principles of personal liberty which lie at the foundation of our jurisprudence." *Id.* at 437; *see also Grin v. Shine*, 187 U.S. 181, 184 (1902) (cautioning that treaties must be interpreted "with a view to fulfill our just obligations to other powers, *without sacrificing the legal or constitutional rights of the accused*") (emphasis added).

The question whether an offense comes within the scope of a treaty is a question of law that the habeas court reviews de novo. *Quinn*, 783 F.2d at 791; *see also Emami v. U.S. Dist. Court for the Northern Dist. of Calif.*, 834 F.2d 1444, 1448 (9th Cir. 1987) ("Whether a treaty conditions extradition upon the filing of formal charges is a question cognizable on appeal from the denial of a petition for habeas corpus.").

**B. The U.S.-Peru Treaty Requires Formal Charges as a Prerequisite for Extradition**

The plain language of Article I of the U.S.-Peru Treaty restricts extradition to "persons whom the authorities have [1] charged with, [2] found guilty of, or [3] sentenced for, the commission of an extraditable crime." Treaty, art. I. The magistrate court concluded that it did not matter whether Dr. Toledo had been formally charged because the word "charged" in Article I was "used in the generic sense only to indicate 'accused.'" *See* Order re: Motion to Deny Extradition Request ("9/4/20 Order"), attached hereto as Exhibit H, at 3 (citations omitted). The magistrate court's decision was erroneous. The plain language of the Treaty, the legal and historical context in which it was negotiated, and the deliberate differences between the current Treaty and previous versions all indicate that extradition is forbidden unless a person has been formally charged with a crime.

**1. Unlike the Treaties in *Emami* and *Assarsson*, the U.S-Peru Treaty Requires the Requesting Country to Produce the Charging Document**

In its 9/4/20 Order, the magistrate court relied on two cases in support of its interpretation of the term "charged": *Emami*, *supra*, and *In re Assarsson*, 635 F.2d 1237 (7th Cir. 1980). *See* 9/4/20 Order, Exh. H, *supra*, at 3. At first glance, *Emami* and *Assarsson* appear to support the magistrate court's interpretation. In those cases, the courts held that the United States' extradition treaties with

West Germany (*Emami*) and Sweden (*Assarsson*) did not require formal charges, even though both treaties limited extradition to individuals who had been "charged or convicted of" an extraditable offense. *See Emami*, 834 F.2d at 1448; *Assarsson*, 635 F.2d at 1243. In both cases, though, the courts focused on the fact that the treaties did not include any requirement that the charging country produce a copy of the charging document. *See Assarsson*, 635 F.2d at 1243 (noting that charging documents had been omitted from the treaty's list of requirements, and concluding that "[i]f the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided"); *Emami*, 834 F.2d at 1448 (concluding that, as in *Assarsson*, "the parties had not intended to require such a document because the parties could have specifically included such a requirement but did not"). And in both cases, "the inclusion of the charging document in the list of required documents would have resulted in a different outcome." *Aguasvivas v. Pompeo*, 405 F. Supp. 3d 347, 355 (D.R.I. 2019), aff'd in relevant part, 984 F.3d 1047 (1st Cir. 2021).

Unlike the treaties at issue in *Emami* and *Assarsson*, the U.S.-Peru Treaty *does* specifically "include the additional requirement that a formal document called a charge be produced." Article VI of the Treaty lists the documents that the requesting country (here, Peru) must provide in support of its extradition request. The extraditee's status determines which particular documents are required. If the extraditee has already been convicted, Article VI requires "a copy of the judgment of conviction or, if such copy is not available, a statement by a competent judicial authority that the person has been found guilty." Treaty, art. VI § 4(a). If, on the other hand, the extraditee has only been charged, Article VI requires both "a copy of the warrant or order of arrest" and "a copy of the charging document." Treaty, art. VI § 3(a)-(b).

By requiring a copy of the charging document, Article VI § 3 makes it clear that it is not enough for a person to be suspected or under investigation. Nor is it sufficient for the requesting country to state that it intends, at some future date, to bring charges; extradition is precluded unless the person has actually been charged, a fact that the requesting country establishes by providing "the charging document." *See Aguasvivas*, 984 F.3d at 1058 (holding that where a treaty requires the requesting country to provide a copy of the charging document, the treaty cannot be satisfied by "a

request to extradite for arrest and questioning in anticipation of a possible, yet-to-be determined prosecution"). Any other interpretation would violate the "basic canon of statutory interpretation, which is equally applicable to interpreting treaties," that courts must "avoid readings that render statutory language surplusage or redundant." *Sacirbey v. Guccione*, 589 F.3d 52, 66 (2d Cir. 2009); *see also Aguasvivas*, 984 at 1058 (rejecting government's argument that an arrest warrant can do "double duty" as charging document, and explaining that this would render the charging document requirement "entirely superfluous"). If it were enough for the extraditee to be under investigation, this could be verified simply by providing a copy of the arrest warrant. Article VI § 3 requires more; it requires the arrest warrant *and* the charging document.

**2. The Drafters Added the Charging Document Requirement to the U.S.-Peru Treaty in Response to *Emami* and *Assarsson***

The fact that the Treaty requires a copy of the charging document is particularly significant because earlier versions of the U.S.-Peru extradition treaty did not. *See* Extradition Treaty Between the United States of America and the Republic of Peru, U.S.-Peru, Sept. 12, 1870, 18 Stat. 719 (1874), 1874 WL 16904, art. VI (requiring only a copy of "a condemnatory sentence, an order of arrest, or of any other process equivalent to such order"); Treaty Between the United States of America and the Republic of Peru Providing for the Extradition of Criminals, U.S.-Peru, Nov. 28, 1899, 31 Stat. 1921 (1901), 1901 WL 16233, art. III (requiring only a "duly authenticated copy of the warrant of arrest"). "Where the words of a later statute differ from those of a previous one on the same or related subject, Congress must have intended them to have a different meaning." *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988).

It is also significant that the drafters of the current version of the U.S.-Peru Treaty made the decision to add the charging document requirement in 2001, after both *Emami* and *Assarsson* were decided. "[T]he State Department is presumably familiar with the various treaty forms that it has adopted and with circuit law construing those forms." *Aguasvivas*, 984 F.3d at 1060; *see also Merck & Co., Inc. v. Reynolds*, 569 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."). As international extradition expert Bruce Zagaris explains: "The negotiators for the U.S. government of the U.S.-Peru extradition treaty, signed

on June 26, 2001, would have known of the decisions" in *Assarsson* and *Emami*. Zagaris Decl., Exh. B, *supra,* at ¶ 21. Richard J. Douglas, who was Chief Republican Counsel for the Senate Foreign Relations Committee when the current version of the treaty was drafted, confirms that this was, in fact, the case. *See* Douglas Decl., Exh. A, *supra*, at ¶ 16.

**3. The Term "Sought for Prosecution" in Article VI Refers to Individuals Who Are Already Charged**

While Article I of the Treaty limits extradition to individuals who have been "charged," Article VI of the Treaty refers to individuals who are "sought for prosecution." *Compare* Treaty, art. I *with* Treaty, art. VI § 3. The magistrate court concluded that the drafters intended the term "charged" to include anyone "sought for prosecution." *See* 9/4/20 Order, Exh. H, *supra*, at 2-3. This is a misreading of the Treaty.

If the parties had intended to expand Article I to include people who are merely "sought for prosecution," they would have used that language in Article I, as the United States had done in several treaties with other countries. *See, e.g.,* Extradition Treaty Between the Government of the United States of America and the Government of Belize, U.S.-Belize, Mar. 30, 2000, S. Treaty Doc. No. 106-38, 2000 WL 33366018, art. I (authorizing extradition of "persons *sought for prosecution* or convicted of an extraditable offense") (emphasis added); Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea, U.S.-Korea, June 9, 1998, S. Treaty Doc. No. 106-2, 1998 WL 1788076, art. I (authorizing extradition of "any person who is *wanted in the Requesting State for prosecution*, trial, or imposition or execution of punishment") (emphasis added); Extradition Treaty, U.S.-Japan, Mar. 3, 1978, 31 U.S.T. 892, 1980 WL 309098, art. I (authorizing extradition of individuals "*sought by the other party for prosecution*, for trial, or to execute punishment") (emphasis added). "We must assume that the representatives of the United States had these clauses before them when they negotiated the treaty." *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 13 (1936).

The term "sought for prosecution" in Article VI § 3 must be read in conjunction with Article VI 3(b)'s requirement that the requesting country produce "the charging document." Since the charging document is required for every extradition request involving a person "sought for prosecution," it

necessarily follows that an individual is not "sought for prosecution" unless he or she has actually been charged. This is particularly evident when the U.S.-Peru Treaty's list of required documents is compared to the documents required in other treaties. The U.S.-Korea Treaty, for example, calls for "a copy of the charging document, *if any*." U.S.-Korea Treaty, art. 8 § 3 (emphasis added). The U.S.-Belize Treaty does not require an actual charging document; it requires only "a document setting forth the charges." U.S.-Belize Treaty, art. 6 § 3. And the U.S.-Japan Treaty requires only the arrest warrant. U.S.-Japan Treaty, art. VIII § 3. The drafters of the U.S.-Peru Treaty could have adopted the language from any of those treaties, but they chose not to. "[T]he contrast between" these treaties and the U.S.-Peru Treaty "strongly suggests that" the choice of language was deliberate. *Aguasvivas*, 984 F.3d at 1060.

The decision of the parties to depart from the language in these earlier treaties makes sense given that the U.S.-Peru treaty negotiations "occurred in the backdrop of enormous human rights scandals during the Fujimori Administration." Zagaris Decl., Exh. B, *supra*, at ¶ 24. Under the Fujimori regime, military tribunals routinely committed egregious due process violations. Secret courts conducted trials in which judges covered their faces with hoods, and defense lawyers were not allowed to cross-examine witnesses or challenge evidence. *See id.* at ¶ 25. In addition, Fujimori's "practice of incarcerating thousands without even a pretense of charges or due process was well known. The Inter-American Commission on Human Rights ha[d] publicly deplored the practice and the United States government itself ha[d] expressed concern about it." Douglas Decl., Exh. A, *supra*, at ¶ 15.

Because of "the significant human rights concerns in the U.S. and the world with respect to the Peruvian criminal justice system," the United States came to the negotiating table with the goal of "balanc[ing] its desire to have an extradition treaty with Peru with its concerns about not using the treaty to abuse the rights of individual defendants." Zagaris Decl., Exh. B, *supra*, at ¶ 26. It was Peru's history of due process violations that prompted the United States to insist that the Treaty limit extradition to people actually "charged with, found guilty of, or sentenced to a crime." *Id.* at ¶ 27.

Richard J. Douglas, who was a direct participant in the preparation of the U.S.-Peru Treaty for Senate review, confirms that "the selection of the 'persons who have been charged' formulation in

treaty Article I (as opposed to alternatives found in other U.S. extradition agreements approved in the 106th and 107th Congresses like 'investigated persons,' 'wanted persons,' or 'persons found in the requested state') was no accident." Douglas Decl., Exh. A, *supra*, at ¶ 15. The wording of the U.S.-Peru Treaty "reflected concerns by the treaty drafters about the Fujimori practice of summarily and indefinitely imprisoning uncharged persons, a practice which, unfortunately, continues in Peru to the present day." *Id.*

**4. The "Technical Analysis" Does Not Compel a Different Result**

The magistrate court relied on a sentence from the "Technical Analysis" of the Treaty, which states that "the negotiating delegations intended that 'charged' persons include those who are sought for prosecution for an extraditable offense based on an outstanding warrant of arrest, regardless of whether such warrant was issued pursuant to an indictment, complaint, information, affidavit, or other lawful means for initiating an arrest for prosecution under the laws in Peru or the United States." 9/4/20 Order, Exh. H, *supra*, at 3 (quoting S. Exec. Rep. No. 107-12 at 4 (2002)). But the Technical Analysis is not part of the Treaty itself, nor is it part of the Treaty's "diplomatic history." *See Abbott v. Abbott*, 560 U.S. 1, 42 (2010) (Stevens, J., dissenting) (noting that, under *Factor*, only the "diplomatic history – negotiations and diplomatic correspondence of the contracting parties relating to the subject matter – is entitled to great weight"). In contrast to the documents that comprise the Treaty's diplomatic history, the Technical Analysis is merely "a non-binding unilateral Executive Branch document that was not formally endorsed in 2000 by the Peruvian negotiators or by the U.S. Senate." Douglas Decl., Exh. A, *supra*, at ¶ 15.

In this regard, *United States v. Wells*, 519 U.S. 482 (1997), is instructive. In that case, the Supreme Court had to determine whether 18 U.S.C. § 1014, which made it a crime to knowingly make a false statement to a federally insured bank, required that the false statement be material. *Id.* at 484. While the predecessor to § 1014 had included a materiality requirement, no such requirement appeared in the text of § 1014 (which was enacted as part of the 1948 recodification of the federal criminal code). *See id.* at 492-93. The defendant argued that the omission of the materiality requirement was inadvertent, relying on the 1984 Reviser's Note to § 1014, which stated that there had been no "change of substance." *See id.* at 496. The Supreme Court rejected this argument,

noting that the fact that the "staff of experts" responsible for the recodification had apparently "either overlooked or chose[n] to say nothing about" the deletion of the materiality requirement did not alter "the statute as enacted by Congress." *See id.* at 497. Observing that "[t]hose who write revisers' notes have proven fallible before," the Court concluded that "the revisers' assumption that the consolidation made no substantive change was simply wrong." *Id.* (citations omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) at 257 ("The new text is the law, and where it clearly makes a change, that governs. This is so even when the legislative history consisting of the codifiers' report expresses the intent to make no change.").

Just as the revisers' note in *Wells* was impossible to reconcile with the text of the statute, the Technical Argument here is impossible to reconcile with the text of the Treaty. If, as the Technical Analysis suggests, it would suffice to show that the individual was "sought for prosecution ... based on an outstanding warrant of arrest," there would be no reason for the Treaty to require production of the actual charging document.

**C. Dr. Toledo Has Not Been Charged With Either of the Alleged Offenses**

In Peru, a criminal case consists of three distinct stages: first, the preliminary or investigative phase; second, the middle or examination phase; and finally, the trial. *See* Aguirre Decl., Exh. C, *supra*, at ¶ 3; Declaration of Zully Robles Apumayta ("Robles Decl."), attached hereto as Exhibit I, at ¶ 3. During the investigation phase, the "objective is to gather items of evidence that allow the prosecutor to determine whether a crime has occurred, and to decide whether to seek charges against a particular individual." *Id.* at ¶ 3. Once the investigation is finished, the prosecutor must decide either to dismiss the case or to seek formal charges from the Preliminary Investigation Court. *See id.; see also* Aguirre Decl., Exh. C, *supra*, at ¶ 4.

If the prosecutor chooses to pursue a formal charge, the case proceeds to the examination phase. *See id.* at ¶ 5. During this phase, the judge of the Preliminary Investigation Court must hold a preliminary hearing, at which the accused has the right not only to object to the prosecutor's evidence, but also to present his own exculpatory evidence. *Id.* If, at the conclusion of the preliminary hearing, the judge determines that a formal charge is warranted, the judge issues the *Orden de Enjuiciamiento* (Order of Prosecution). *Id.*; *see also* Robles Decl., Exh. I, *supra*, at ¶ 3.

The Order of Prosecution is the formal charging the document that "commences the prosecution and causes the accused to be 'charged.'"  Aguirre Decl., Exh. C, *supra*, at ¶ 5.  Indeed, under the Peruvian Code of Criminal Procedure, "a person is not 'prosecuted' or 'charged' unless the court has issued a writ of prosecution in accordance with Article 353," which lists the requirements for a valid Order of Prosecution.  Declaration of José F. Palomino Manchego, attached hereto as Exhibit J, at ¶¶ 4-5.

As soon as the judge issues the Order of Prosecution, the Preliminary Investigation Court loses jurisdiction, and the case is transferred to the Criminal Judge, who oversees the trial.  *See id.* at ¶ 5.

When Peru submitted its extradition request to the United States, the case against Dr. Toledo was in the preliminary investigation phase.  It was not until August 17, 2020 that the prosecutors in Peru submitted the results of their preliminary investigation – the *Acusación Fiscal* – to Judge Concepción Carhuancho for his review.  Because of various procedural issues and questions about whether the investigation stage was complete, the examination stage did not commence until October 21, 2021.  It appears that the preliminary investigation phase is now finished, but "[e]ven if the prosecution has completed its investigation, there is still no way that Dr. Toledo could be lawfully charged with a crime.  There has not been a preliminary hearing.  He has not been given an opportunity, through his attorney, to challenge the prosecutor's evidence against him.  Nor has Dr. Toledo been given an opportunity, through his attorney, to present exculpatory evidence."  Aguirre Decl., Exh. C, *supra*, at ¶ 7.  "Most fundamentally, Judge Richard Concepcion Carhuancho of the First National Preliminary Investigation Court has not dictated a charging document, as required by Article 353.  Nor has jurisdiction transferred to the trial court."  *Id.*

Unless and until the judge issues a valid Order of Prosecution, Dr. Toledo has not been charged and cannot be extradited.

## II.   Extradition Is Prohibited Because Peru Has Failed to Produce the Charging Document, as Required by Article VI of the Treaty

Even if Peru had actually charged Dr. Toledo with the alleged offenses, extradition still would be prohibited because Peru has failed to submit a copy of the charging document, as required by Article VI § 3 of the Treaty.

**A. Article VI Requires Peru to Produce a Copy of the Formal Charging Document**

When construing a treaty or statute, the language of the document itself "is the first and, if the language is clear, the only relevant inquiry." *United States v. Lettiere*, 640 F.3d 1271, 1274 (9th Cir. 2011). The language of Article VI § 3 is clear and unambiguous: the requesting country must provide both "a copy of the warrant or order of arrest" and "a copy of the charging document." Treaty, art. VI § 3(a)-(b).

The First Circuit construed a similar treaty in *Aguasvivas*, a case involving an extradition request from the Dominican Republic. In that case, the treaty required the requesting country to provide both "a copy of the arrest warrant" and "a copy of the document setting forth the charges against the person sought." *Aguasvivas*, 984 F.3d at 1055 (citations omitted). The Dominican Republic submitted the arrest warrant, but no charging document. *See id.* at 1057-58. The government argued that no formal charging document was necessary; in its view, the arrest warrant "qualifie[d] as 'the document setting for the charges against the person sought'" because it "describe[d] the criminal acts that Aguasvivas is alleged to have committed and lists the Dominican statutes that Aguasvivas is alleged to have violated." *Id.* at 1058. The First Circuit rejected this argument for several reasons, all of which apply equally to the U.S.-Peru Treaty.

First, the Court noted that if the arrest warrant were sufficient, "then the entirety of paragraph 3(b) (requiring 'the document setting forth the charges') would be entirely superfluous" because the arrest warrant would do "double duty." *Id.* at 1058. The same is true here. Like the arrest warrant in *Aguasvivas*, the warrant for Dr. Toledo's arrest lists the offenses for which he is under investigation. *See* Arrest Warrant, attached hereto as Exhibit K. If all that were required was a list of offenses, there would be no need for § 3(b)'s "charging document" requirement; the arrest warrant would suffice.

The Court also noted that the United States and the Dominican Republic were "countries that both customarily employ warrants to arrest and separate documents to charge." *Aguasvivas*, 984 F.3d at 1059. Like those countries, Peru "employs warrants to arrest and separate documents to charge." In Dr. Toledo's case, the arrest warrant clearly states that the "stage of the proceedings" is the "preliminary investigation." *See* Arrest Warrant, Exh. K, *supra*. This cannot possibly be the

"charging document" because the purpose of the preliminary investigation is to "search[] out the facts" and determine whether those facts "support either the liability or the innocence of the accused." *See* Prosecutor's Decision No. 138, Exh. F, *supra*, at 1.

Next, the Court compared the U.S.-Dominican treaty to the treaties at issue in *Assarsson* and *Emami*. Reasoning that the State Department is "presumably familiar with the various treaty forms it has adopted and with circuit law construing those forms," the Court concluded that the U.S.-Dominican treaty's charging-document requirement was drafted in response to *Assarsson* and *Emami*. *Aguasvivas*, 984 F.3d at 1060. The Court found this reasoning particularly persuasive because earlier versions of the U.S.-Dominican treaty did *not* include a charging-document requirement. *Id.* As is discussed in Section I.B.2, *supra*, that is precisely what happened with the U.S.-Peru Treaty.

Finally, the *Aguasvivas* Court observed that its interpretation "only grows stronger when we compare this treaty's supporting document requirements to those present in other recent treaties" drafted in the years following the *Assarsson* and *Emami* decisions. *Id.* The fact that other treaties did *not* add a charging document requirement in response to those decisions "demonstrated that [the State Department] knew how to make the production of [the charging document] optional." *Id.* The same reasoning applies here.

Like the treaty in *Aguasvivas*, the U.S.-Peru Treaty "will not accommodate the United States' interpretation," even when "viewed through a lens of liberal construction favoring extradition." *Id.* at 1061. Ignoring the charging document requirement "would render superfluous a relatively bespoke requirement added to this treaty, the absence of which requirement in other preexisting treaties was twice noted as significant by circuit courts before this treaty was written." *Id.* at 1061-62.

**B. Copies of Peru's Prosecutor's Decisions Do Not Satisfy Peru's Obligation to Include a "Copy of the Charging Document"**

In its 9/4/20 Order, the magistrate court acknowledged that, "under Peruvian law, only an Order of Prosecution under Article 353 of the Peruvian Code of Criminal Procedure constitutes a formal charge." 9/4/20 Order, Exh. H, *supra*, at 4-5. Peru's extradition request does not include an Order of Prosecution nor could it, since none has been issued. Nonetheless, the magistrate court

concluded that Peru has satisfied Article VI's charging document requirement by submitting two different documents:  Prosecutor's Decision No. 6 (entitled "Decision to Extend Formalization and Continuation of Preliminary Investigation"), Exh. D, *supra*; and Prosecutor's Decision No. 8 (entitled "Decision of Specifications and Extension of Preliminary Investigation"), attached hereto as Exhibit L.  *See* 9/4/20 Order, Exh. H, *supra*, at 6-7.  This was error.

First, as their titles make clear, Decision No. 6 and Decision No. 8 are not "charging documents."  They merely serve to memorialize the prosecutor's decision to continue the pre-charge preliminary investigation.  It is true that these documents list the charges for which Dr. Toledo is under investigation.  But the same is true of the arrest warrant.  If a list of charges were all that was required, there would be no need for a charging document; the arrest warrant (or Prosecutor's Decisions) would suffice.

Further support for this conclusion comes from the Treaty itself.  Where an extraditee has been *convicted* of the offense, the Treaty gives the requesting country the option of providing a "statement by a competent judicial authority" instead of the actual "judgment of conviction."  Treaty, art. VI § 4(a).  No such leeway exists under § 3, however.  The only acceptable document is "a copy of the charging document."  Treaty, art. VI § 3(b).

The magistrate court indicated that it was deferring to Peru's claim that it had satisfied Article VI because American courts are "'not expected to become experts in the law of foreign nations.'"  9/4/20 Order, Exh. H, *supra*, at 7 (quoting *Emami*, 635 F.2d at 1244).  But there is no need for the American courts to delve into the particulars of Peruvian criminal law in this case.  It is undisputed that the preliminary investigation stage *precedes* the filing of charges.  According to Peru's own prosecutors,

> the goal of the preparatory investigation is to gather evidence, both inculpatory and exculpatory, that allows the prosecutor to decide if he will bring charges or not and, when applicable, allows the accused to prepare his defense.  In this stage of the proceedings the legislature has entrusted a "complex role" to the prosecutor. ... [I]t means directing the acts of investigation aimed at gathering the elements that point to either the accused's liability or innocence, or either release him from liability or mitigate it.

Prosecutor's Decision No. 138, Exh. F, *supra*, at 2.  It is likewise undisputed that the only formal

charging document recognized in Peru is the Order of Prosecution; that only a judge – not a prosecutor – can issue the Order of Prosecution; and that no Order of Prosecution has been issued here.

In any event, it is appropriate for the extradition court to "review the demanding country's compliance with its own laws" to the extent "necessary to ensure that the provisions of the federal extradition statute and relevant extradition treaty have been met." *Skaftouros v. United States*, 667 F.3d 144, 147 (2d Cir. 2011); *see also Basic v. Steck*, 829 F.3d 897, 901 (6th Cir. 2016) (performing an independent analysis of the procedural requirements under the Criminal Code of Bosnia and Herzegovina); *Sainez*, 2008 WL 366135, *5 (concluding that the court was "required to conduct an independent analysis" of the requesting country's statute of limitations).

Because Peru has not provided an Order of Prosecution, it has failed to comply with the requirements of Article VI and its request for extradition must be denied.

## III. Extradition Is Prohibited Because There Is No Probable Cause to Believe that Dr. Toledo Committed the Alleged Offenses

Before an extradition request can be granted, the court must determine "whether there is evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or, in other words, whether there is probable cause." *Santos*, 830 F.3d at 991 (citations omitted); *see also* Treaty, art. VI § 3(c) (requiring "such evidence as would be sufficient to justify the committal for trial of the person if the offense had been committed in the Requested State"). While the overall extradition process is "shared between the executive and judicial branches," the "probable cause determination has been placed squarely in the judiciary's hands." *Santos*, 830 F.3d at 991, 1007. The court does not "serve merely as a rubber stamp," but must "make an independent determination that the accused committed the crimes alleged." *In re Extradition of Platko*, 213 F. Supp. 2d 1129, 1239 (S.D. Cal. 2002) (citations omitted).

The government bears the burden of offering "evidence that 'will support a reasonable belief that [the extraditee] was guilty of the crime charged.'" *In re Extradition of Okeke*, No. 96-7019P-01, 1996 WL 622213, *5 (D.N.J. Sept. 5, 1996) (quoting *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990)). While "the government's evidence need only be properly authenticated" to be admitted, the

Ninth Circuit has cautioned against "conflat[ing] the admissibility standard with the standard required to satisfy probable cause." *Santos*, 830 F.3d at 1006. "Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause. Were that the case, the judiciary's role in the extradition process would be meaningless." *Id.* Instead, the extradition court must "assess whether, based on the evidence, the person could be brought to trial for the same crime in the United States." *Id.* at 993.

In assessing whether the government has met its burden, "[t]he credibility of witnesses and the weight accorded to their testimony is solely within the province of the extradition magistrate." *Mainero v. Gregg*, 164 F.3d 1199, 1205-06 (9th Cir. 1999) (citations omitted). "The standard is whether the statements in question are truthful or whether they are unreliable, self-contradictory, coerced, uncorroborated by other evidence, or the result of torture." M. Cherif Bassiouni, *International Extradition: United States Law and Practice* (6th ed. 2014) at 901 (citations omitted). On habeas review, the magistrate's finding regarding probable cause "must be upheld if there is any competent evidence in the record to support it." *Quinn*, 783 F.2d at 791 (citations and internal quotations omitted).

### A. The Allegations Against Dr. Toledo[10]

Peru initially sought extradition in connection with allegations of collusion, money laundering, and influence peddling involving the Interoceanic Highway Project. Peru later dropped the influence peddling allegation, and now seeks extradition only with respect to the allegations of collusion and money laundering. *See* Certification of Extraditability to the Secretary of State ("Certification Order"), attached hereto as Exhibit M, at 2.

#### 1. Collusion

The government alleges that sometime toward the end of 2004, Dr. Toledo's chief of security (Avraham Dan On) approached Jorge Barata, who was Odebrecht's superintendent of operations in Peru. Claiming to be acting on behalf of Dr. Toledo, Dan On offered to favor Odebrecht in the

---

[10] The following allegations are taken from the Criminal Complaint, attached hereto as Exhibit N. The Complaint was filed by the government in 2019. Dr. Toledo disputes these allegations, many of which Peru has since modified or abandoned.

awarding of lucrative contracts for the construction of the Southern Interoceanic Highway. In subsequent conversations, Dan On told Barata that if Odebrecht won the contracts, it would have to pay bribes to Dr. Toledo, with Israeli businessman Josef Maiman acting as intermediary.

The Complaint alleges that on November 4, 2004, Barata met in Brazil with Dr. Toledo, Maiman, Dan On, and two of Maiman's executives: Sabih Saylan and Gideon Weinstein. According to the Complaint, Dr. Toledo told Barata at this meeting that "he wanted Odebrecht to win the Highway contracts, and would ensure that the schedule for the tenders was not delayed and that the terms of the tenders would be modified to make it difficult or impossible for other companies to participate in them." *See* Complaint, Exh. N, *supra*, at 4. Saylan and Weinstein told Barata that if Odebrecht were awarded the contracts, it would need to pay $35 million to various companies owned or controlled by Maiman. They told Barata that Maiman would be receiving the payments on Dr. Toledo's behalf.

The bidding process for the Highway contracts was handled by Proinversion, a government agency created to promote private investment in public infrastructure projects. On December 22, 2004, Dr. Toledo attended a meeting of Proinversion's board of directors, during which he allegedly asked if it was possible to have an expedited bidding process.

On June 23, 2005, Proinversion decided to award Odebrecht the contracts for Sections 2 and 3 of the Highway Project. The public signing ceremony was scheduled for August 4, 2005. On the morning of the signing ceremony, the Comptroller General's office delivered a letter to the Proinversion board claiming that Odebrecht was ineligible to bid for the contracts due to pending litigation with the Republic of Peru. After the letter was reviewed by several attorneys, it was determined that Odebrecht was *not* ineligible, and the signing ceremony went forward.

The Complaint alleges that even though Odebrecht won the contracts, Barata decided to pay only $20 million instead of $35 million, because Dr. Toledo failed to modify the bidding terms or do anything to discourage or impede bids from other companies.

**2. Money Laundering**

The Complaint alleges that Odebrecht paid $20 million in bribes, with $16,370,255.98 going to Dr. Toledo. According to the Complaint, Odebrecht paid $20 million into three accounts controlled

by Maiman: Warbury and Co., Trailbridge Ltd., and Merhav Overseas. From there, Maiman transferred the money in the Warbury account to Confiado International Corp., another company he owned. Maiman then transferred $17,527,000 from Confiado to Ecostate Consulting S.A. ($9,052,650) and Milan Ecotech Consulting S.A. ($8,474,350). According to the Complaint, Maiman did not control either of these accounts. Instead, the Complaint alleges, these were "companies which had been designated by Dan On for receiving the funds." *See* Complaint, Exh. N, *supra*, at 9. A total of $16,370,255.98 was then transferred from Ecostate and Milan Ecotech to Ecoteva Consulting Group S.A., "the chairman of which was nominally Eva Fernenbug ('Fernenbug'), Toledo's mother-in-law." *See id.* at 9-10. Finally, the government alleges that the funds were distributed, "at Fernenbug's direction," as follows: $3.45 million for the purchase of a house in Las Casuarinas; $882,4000 for the purchase of an office at Torre Omega; $217,007 to pay off the mortgage on Dr. Toledo's home; and $277,309 for mortgage and interest payments on Dr. Toledo's vacation home.

**B. The Magistrate Court Erroneously Refused to Consider Explanatory Evidence**

While a party seeking to avoid extradition "is not permitted to introduce evidence on the issue of guilt or innocence," *In re Extradition of Chavez*, 408 F. Supp. 2d 908, 911 (N.D. Cal. 2005), he *can* "present his own evidence to explain away the requesting government's evidence of probable cause," *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) (en banc). As a general rule, "explanatory" evidence is admissible, but "contradictory" evidence is not. *Santos*, 830 F.3d at 992. Broadly speaking, this means that an extraditee may present "evidence rebutting probable cause," but cannot present "evidence in defense." *Collins v. Loisel*, 259 U.S. 309, 316 (1922). Thus, for example, the accused may not present alibi evidence or evidence of an affirmative defense like insanity. *Santos*, 830 F.3d at 993.

In this case, the magistrate court erroneously refused to consider the following explanatory evidence: (1) Josef Maiman's collaboration agreement; (2) a Nominee Agreement between Ecoteva and Merhav; and (3) a portion of Maiman's January 22, 2020 deposition. *See* Certification Order, Exh. H, *supra*, at 7-12.

### 1. The Magistrate Court Erred in Refusing to Consider the Collaboration Agreement

Josef Maiman was the main witness against Dr. Toledo.[11] On December 26, 2019, the judge of the preliminary investigation court in Peru issued an order entitled "Judgment of Effective Collaboration," which outlined and approved the terms of Maiman's cooperation with Peru's prosecutors. *See* Judgment of Effective Collaboration ("Collaboration Agreement"), attached hereto as Exhibit O. Dr. Toledo submitted the Collaboration Agreement as explanatory evidence.

The magistrate court declined to consider the Collaboration Agreement, on the ground that it was contradictory, rather than explanatory:

> The government's evidence states that Maiman "did not profit in any way from receiving money on behalf of Alejandro Toledo." ER 489; *see also* ER 514 ("I did not receive any cash from Alejandro Toledo Manrique, Odebrecht, or Camargo Correa."). [The Collaboration Agreement] makes clear that Maiman profited handsomely from receiving money on behalf of Toledo and absolutely received cash from Odebrecht and Camargo Correa. ... Much of this document is devoted to the payments Maiman has to make returning the money that he received.

Certification Order, Exh. M, *supra*, at 7-8. This was error.

The Ninth Circuit has "described 'contradictory' evidence as evidence 'the credibility of which could not be assessed without a trial.'" *Santos*, 850 F.3d at 993 (citing *Barapind*, 400 F.3d at 749-50). But Peru does not dispute any of the information that the magistrate court characterized as "contradictory." On the contrary, the Collaboration Agreement includes an affirmative statement from Peru's Public Prosecutor that the document contains "corroborated information on six points: i) the agreement in Brazil; ii) receiving the money; iii) handling of the accounts; iv) creation of companies; v) asset transfers; vi) transactions linked to the Camargo y Correa company and Odebrecht." Collaboration Agreement, Exh. O, *supra*, at ¶ 1. The significance of the Collaboration Agreement is not that Maiman's admissions contradict some of his earlier claims; it is that *Peru has determined that these admissions are credible*.

---

[11] Maiman died on October 9, 2021. *See* "Israeli businessman Josef Maiman dies aged 75," *Globes*, Oct. 10, 2021, available at https://en/globes.co.il/en/article-israeli-businessman-josef-maiman-dies-aged-75-1001386685.

The portion of the Collaboration Agreement detailing the terms of the agreement is also explanatory, rather than contradictory. Peru's extradition request refers to Maiman's decision to enter into a collaboration agreement, but does not outline the terms of that agreement. *See* ER 31. By setting for the specific terms of Maiman's cooperation, the Collaboration Agreement helps "explain[] ambiguities." *Santos*, 850 F.3d at 993 (citation omitted). In addition, the Collaboration Agreement actually *confirms* portions of Maiman's 2020 testimony. For example, Maiman admitted in 2020 that he and Odebrecht agreed that Maiman would receive "a commission, on a percentage for services." *See* 1/22/20 Testimony of Josef Maiman ("Maiman 1/22/20"), attached hereto as Exhibit P, at ¶ 125.

**2. The Magistrate Court Erred in Refusing to Consider the February 2, 2012 Nominee Agreement Between Ecoteva and Merhav**

On February 2, 2012, Ecoteva Consulting S.A. entered into a Nominee Agreement with the Merhav Group (an entity controlled by Maiman). *See* Nominee Agreement, attached hereto as Exhibit Q. Even though the Nominee Agreement is referred to several times in the extradition request, the request does not include a copy of the Nominee Agreement. Dr. Toledo submitted the Nominee Agreement as explanatory evidence.

The magistrate court declined to consider the Nominee Agreement, on the ground that Dr. Toledo intended to use it to contradict Peru's evidence:

> The government's evidence includes Maiman's 2017 testimony that the beneficiary of the money laundering scheme was Toledo, and that the receipt of the money by Ecoteva, a company owned by Toledo's mother-in-law, is further evidence of that. ER 489. The government's evidence also includes Maiman's 2017 testimony that his 2013 testimony to the contrary was untrue and was given as a favor to Toledo. ER 495-96. The Nominee Agreement is being offered in an attempt to show that the mother-in-law's ownership in Ecoteva was nominal in nature and that true control over the company was exercised by Merhav, a company under Maiman's control, which tends to undermine Maiman's 2017 testimony that Toledo was the beneficiary of the scheme.

Certification Order, Exh. M, *supra*, at 9. The magistrate court's decision was erroneous.

As the magistrate court acknowledges, Maiman's 2013 testimony contradicts his later testimony. In 2013, Maiman testified that the Nominee Agreement gave him exclusive "control of the funds and assets" of Ecoteva, as well as "the decision-making power regarding investment in

various projects or in business of any nature whatsoever." *See* 7/5/13 Statement of Josef Arieh Maiman Rapaport ("Maiman 7/5/13"), attached hereto as Exhibit R, at ¶¶ 15, 23. In 2017, however, Maiman denied any knowledge of Ecoteva's transactions. *See* 2/27/17 Deposition of Collaborator Josef Maiman ("Maiman 2/27/17"), attached hereto as Exhibit S, at ¶ 13. This contradiction is not created by the Nominee Agreement; it exists within the evidence presented by Peru in its extradition request. The Nominee Agreement is explanatory evidence because it helps create context and explain ambiguities concerning the content and nature of a document that is discussed in Peru's evidence. *See Santos*, 830 F.3d at 992 ("Evidence that may be admitted is evidence that 'explain[s] matters referred to by witnesses for the government[.]'") (quoting *Charleston v. Kelly*, 229 U.S. 447, 461 (1913)).

**3. The Magistrate Court Erred in Refusing to Consider a Portion of Maiman's January 22, 2020 Testimony**

On January 22, 2020, Josef Maiman testified at a hearing before Judge Concepción Carhuancho. *See* Maiman 1/22/20; *see also* 1/22/20 Testimony of Josef Maiman – Defense Translation ("Maiman 1/22/20 Defense Translation"), attached hereto as Exhibit T.[12] Excerpts from this testimony were included in Peru's supplemental extradition request. *See* Certification Order, Exh. M, *supra*, at 11. Dr. Toledo submitted the Maiman 1/22/20 Transcript to ensure that Maiman's excerpted statements could be considered within the context of his complete testimony. Dr. Toledo submitted the Maiman 1/22/20 Defense Translation because, unlike the government's version, it included "objections by counsel, legal arguments by counsel, [and] the judge's evidentiary rulings." Certification Order, Exh. M, *supra*, at 12.

The magistrate court admitted some, but not all, of this evidence. With respect to the Maiman 1/22/20 Transcript, the court concluded that the direct examination was admissible because "these sections provide foundation for how and why Maiman came to know certain things, they provide useful context and detail, and they provide a narrative concerning his involvement in the facts of the

[12] Exhibit P is the version of Maiman's 1/22/20 testimony produced by the government to defense counsel. Exhibit T is a translation from the original Spanish transcript, prepared by a court-certified interpreter, of the cross-examination portion of Maiman's 1/22/20 testimony. *See* Declaration of Graham Archer, attached hereto as Exhibit U.

case that allows the Court to better understand the portions quoted in the SER." Certification Order, Exh. M, *supra*, at 11. The court refused to consider the cross-examination portion of the transcript, however, because "Toledo is again offering this evidence to support his defense that Maiman, not he, committed the crimes at issue." *See id.* at 12. The court also declined to consider the Defense Transcript, because it was a transcript of the cross-examination portion of the hearing. *Id.*

The magistrate court's refusal to consider the complete transcript was error. Extradition courts routinely admit and consider such evidence. For example, in *Matter of Extradition of Luna*, No. 16-xr-90095 NC, 2017 WL 1036732, *4 (N.D. Cal. Mar. 17, 2017), the two key witnesses were interviewed by Mexican authorities in 2009, and again in 2012. Mexico's extradition request, however, omitted the 2009 interviews and included only excerpts of the 2012 interviews. *See id.* Luna submitted complete transcripts of the 2009 and 2012 interviews, and the extradition court admitted them into evidence. *See id.* at *4-*5; *see also Luna*, 2018 WL 784783 at *6 (upholding magistrate court's decision on habeas). Similarly, in *In re Extradition of Ben-Dak*, No. 06 Mag. 1540 (GWG), 2008 WL 1307816, *7 (S.D.N.Y. Apr. 11, 2008), the extradition court admitted into evidence complete versions of "evidence partially quoted" in the extradition request. Indeed, in the present case, the magistrate court admitted into evidence the complete transcript of an interview of witness Jorge Barata, only a portion of which had been excerpted in the extradition request. *See* Certification Order, Exh. M, *supra*, at 8-9.[13]

**C. There Is No Probable Cause to Believe that Dr. Toledo Engaged in Collusion**

When Dr. Toledo was elected President in 2001, Josef Maiman saw an opportunity to make millions by falsely representing himself to Odebrecht as an intermediary acting on Dr. Toledo's behalf. Dr. Toledo's support for the Interoceanic Highway Project was well known. *See* 11/21/16 Statement of Jorge Henrique Simoes Barata ("Barata 11/21/16"), attached hereto as Exhibit V, at ER 352. Not only was it the centerpiece of his July 2003 Presidential Address, but he had executed a Declaration of Commitment with Brazil confirming his support for the project in August of 2003. It

[13] Some extradition courts have gone further, allowing the extraditee to present multiple affidavits, *see, e.g., United States v. Kin-Hong*, 110 F.3d 103, 121 (1st Cir. 1997); or even live testimony, *see, e.g., In re Extradition of Nava Gonzalez*, 305 F. Supp. 2d 682, 688-89 (S.D. Tex. 2004).

was also common knowledge that Dr. Toledo wanted the bidding process to be completed as quickly as possible so that construction on the highway could begin. *See id.* at ER 353.

Maiman had been doing business with Odebrecht since the 1980s, and he knew Odebrecht was "a company with corrupt practices." *See* Maiman 2/27/17, Exh. S, *supra*, at ER 490-91; *see also* Jorge Barata's April 24, 2019 Testimony ("Barata 4/24/19"), attached hereto as Exhibit W, at ¶ 135. For Odebrecht, paying bribes was an ordinary and expected cost of doing business: Odebrecht has admitted that its Division of Structured Operations "effectively functioned as a bribe department within Odebrecht and its related entities." *See* Plea Agreement, *United States v. Odebrecht S.A.*, No. 16-643 (RJD) (E.D.N.Y. Dec. 21, 2016), at B-7.[14] Maiman also knew that Odebrecht would almost certainly be awarded the contracts, with or without Dr. Toledo's assistance, because Odebrecht was the dominant construction firm in Peru, and had "the greatest capacity to execute" the contracts without excessive delays. *See* Barata 11/26/16, Exh. V, *supra*, at ER 353.

Maiman's history with Odebrecht, combined with his knowledge of Dr. Toledo's political priorities, enabled him to craft a scheme whereby it would appear to Odebrecht that Dr. Toledo was performing per the bribery agreement, when in fact Dr. Toledo had no idea that the agreement existed. Knowing that Dr. Toledo supported the expedited bidding process and was determined to avoid delays, Maiman told Odebrecht that Dr. Toledo would support the expedited bidding process and avoid delays, *if Odebrecht paid the bribe*. Maiman also knew that Odebrecht was the only viable contender for the construction contracts, so there was little risk in promising Odebrecht that it would be awarded the contracts, *if Odebrecht paid the bribe*.

Finally, it is no coincidence that Avraham Dan On was the member of Dr. Toledo's staff who allegedly first approached Barata with the bribery scheme. Maiman's relationship with Dan On dated back to the 1970s, when they both served in the Israeli military, and they had worked together in the past. *See* Barata 11/21/16, Exh. V, *supra*, at 353; Barata 4/24/19, Exh. W, *supra*, at ¶ 20. Maiman "trusted him implicitly." ER Vol. I-CD at 11. In fact, Maiman was the one who recommended that Dr. Toledo hire Dan On to handle his security. SER 1083-84, attached hereto as Exhibit AA.

---

[14] available at https:www.justice.gov/opa/press-release/file/919916/download.

Because Maiman had an independent relationship with Dan On, they could communicate directly, without Dr. Toledo's knowledge.

**1. There Is No Credible Evidence that Dr. Toledo Solicited the Bribes or Participated in the November 4, 2004 Negotiations**

The government alleges that the bribery scheme was agreed upon at a November 4, 2004 meeting in Rio de Janeiro. *See* Complaint, Exh. N, *supra*, at 4. According to the Complaint, the participants in the meeting were Barata, Dr. Toledo, Dan On, Maiman, and two of Maiman's employees: Sabih Saylan and Gideon Weinstein. *See id.* The government alleges that during this meeting, Dr. Toledo told Barata that "he wanted Odebrecht to win the Highway contracts, and would ensure that the schedule for the tenders was not delayed and that the terms of the tenders would be modified to make it difficult or impossible for other companies to participate in them." *Id.* Barata then worked out the details of the bribery scheme with Saylan and Weinstein, who told Barata that "if Toledo ensured that the tender schedule would not be delayed and that the terms would be modified such that Odebrecht was awarded the Project contracts, Odebrecht should give Toledo US$35 million, via payments made to various companies owned or controlled by Maiman using fictitious contracts with Odebrecht." *Id.*

No credible evidence supports these allegations. The truth is, none of the purported participants can agree on anything about this supposed meeting. According to Barata, the meeting took place in Maiman's hotel suite and lasted two hours. *See* Barata 11/21/16, Exh. V, *supra*, at 354; Barata 4/24/19, Exh. W, *supra*, at ¶¶ 990-993. Barata claims that the individuals present in the suite were himself, Maiman, Saylan, Weinstein, Dr. Toledo, and Marcelo Odebrecht. *Id.* He also claims that during this meeting he negotiated the amount of the bribe with Weinstein and Saylan. *Id.* Peruvian prosecutors have since rejected Barata's account. *See* SER 39-42, Exh. AA, *supra*, (finding that Maiman's testimony "categorically disproves" Barata's claim that Saylan and Weinstein were involved in the bribery agreement).

Initially, Maiman agreed that a meeting had taken place in his hotel suite, but disagreed with Barata about who participated. *See* Maiman 2/27/17, Exh. S, *supra*, at 485. In 2020, however, Maiman testified that the meeting never occurred. *See* Maiman 1/22/20, Exh. P, *supra*, at ¶¶ 75-88.

According to his 2020 testimony, the only meetings in which Maiman participated in Rio de Janeiro were: (1) a meeting with Marcelo Odebrecht, Barata, and Weinstein to discuss mutual business interests unrelated to the Interoceanic Highway Project; (2) a social lunch with Dr. Toledo, Dan On, Weinstein, and Saylan, which could not have involved any discussion of bribes since Maiman has testified – and Peru has concluded – that Weinstein and Saylan knew nothing about the bribery scheme; and (3) an unrelated meeting with a water company. *See id.* at ¶¶ 75-76, 83-84. There is simply no way to reconcile Maiman's 2020 testimony with either Barata's testimony or Maiman's own earlier testimony.

No witness has ever suggested that Dr. Toledo made any statements about ensuring that the schedule for the tenders was not delayed, or modifying the terms of the tenders to make it difficult or impossible for other companies to participate in them. Barata did at one point claim that Dr. Toledo "told me he wanted company ODEBRECHT to win the bidding." Barata 11/21/16, Exh. V, *supra*, at ¶ 2. Later in the same statement, though, Barata clarified that Dr. Toledo had not actually said anything to him at the meeting. Rather, Barata had only surmised that Dr. Toledo knew about and approved of the bribery scheme, based on the "pretty compelling" fact that Dr. Toledo was in the suite. *See id.* at ¶ 16. When Barata was questioned again in 2019, he reiterated that he and Dr. Toledo had not interacted at all during the meeting. *See* Barata 4/24/19, Exh. W, *supra*, at ¶¶ 988-993.

Even Peru no longer believes that Dr. Toledo made any statements to Barata at the November 4th meeting. While discussing the November 4th meeting with Barata, Public Prosecutor Jose Domingo Perez Gomez stated: "[A]ccording to what I understand, there are persons close to the President, that he trusts, the ones who approach you [Barata] or ask you for money. But the presidential figure doesn't ask for it at that time." *See* Barata 4/24/19, Exh. W, *supra*, at ¶ 59.

Peru has also concluded that neither Saylan nor Weinstein played any role in the bribery negotiations. In August of 2020, Prosecutor Perez Gomez filed an Order of Dismissal as to both Saylan and Weinstein. *See* SER 2-3, Exh. AA, *supra*. The prosecutor acknowledged that Barata had "declared about the involvement" of Saylan and Weinstein "in the agreement to make illicit payments." *See id.* at 40-42. The prosecutor rejected Barata's testimony, however, in favor of

Maiman's testimony that Saylan and Weinstein had not even been present at the meeting, much less negotiated the terms of the agreement with Barata. *See id.* The prosecutor concluded that Maiman's statement "justifies an acquittal" for both Saylan and Weinstein, "since it *categorically disproves the Prosecutor's thesis* regarding the participation of [Saylan and Weinstein] in the agreement to make illicit payments." *See id.* at 39-42 (emphasis added).

The prosecutor's decision regarding Saylan and Weinstein is significant for two reasons. Not only does it undermine the government's assertion regarding the November 4, 2004 meeting, but it indicates that the prosecutors in Peru have concluded that the testimony of one of its key witnesses – Jorge Barata – is not credible.

**2. Maiman's Claim that Dr. Toledo Said to Expect $20 Million Is Not Credible**

According to the Complaint, sometime toward the end of 2004, "Toledo told Maiman he was planning to establish a foundation for which he would receive 'donations' that might total substantial amounts." *See* Complaint, Exh. N, *supra*, at 4. This allegation is taken from Maiman's February 27, 2017 deposition, during which he added: "At a later date, TOLEDO specified that the donations might total approximately US$ 20 million, although he did not have the exact dates yet." Maiman 2/27/17, Exh. S, *supra*, at ER 484. Maiman's statement makes no sense.

It is undisputed that Odebrecht promised to pay $35 million, not $20 million. If Dr. Toledo had been involved in the bribery scheme, he would have known that the agreement was for Odebrecht to pay $35 million, not $20 million. And if Dr. Toledo had been receiving the payments, he would have known that Odebrecht paid at least $34 million, not $20 million.

It is true that both Barata and Maiman initially testified that Odebrecht paid only $20 million. *See* Barata 11/21/16, Exh. V, *supra*, at ER 355; Maiman 2/27/17, Exh. S, *supra*, at ER 487-88. After Peru confronted them with financial records disproving this claim, however, both Barata and Maiman were forced to admit that there was never an agreement for Odebrecht to pay $20 million, nor did Odebrecht ever decide to limit its payments to $20 million. In his 2019 testimony, Barata acknowledged that Odebrecht had paid $34 million. *See* Barata 4/24/19, Exh. W, *supra*, at ¶¶ 788-92. Likewise, Maiman admitted in his 2020 testimony that Odebrecht had paid at least $34 million. *See* Maiman 1/22/20, Exh. P, *supra*, at ¶ 174.

**3. Dr. Toledo Did Not Perform the Unlawful Acts Maiman Had Promised Odebrecht**

If Dr. Toledo had been a knowing participant in the bribery scheme, he would have fulfilled, or at least attempted to fulfill, his side of the bargain. He was not, and did not. Odebrecht was promised three things in return for its $35 million bribe: (1) Dr. Toledo would support the expedited bidding schedule and prevent delays; (2) Dr. Toledo would amend the bidding requirements to favor Odebrecht and impede other companies; and (3) Odebrecht would be awarded the contracts.

Two of these events were bound to occur regardless of whether Odebrecht paid bribes: Dr. Toledo had already committed his support to expediting the Highway Project, long before Odebrecht ever considered paying a bribe. Dr. Toledo did not support the expedited bidding process because he was expecting a bribe; he supported it because he agreed with the Congress that the Interoceanic Highway was a "public need and national priority." *See* Act Declaring the Execution of the Peru-Brazil Interoceanic Highway Project – IIRSA Sur a Public Need and National Priority, attached hereto as Exhibit X. And Odebrecht was almost certain to win the contracts, with or without a bribe, because it was the only construction firm capable of fulfilling the contracts on the desired schedule. Accordingly, the only real benefit promised in return for the bribes was that Dr. Toledo would amend the bidding requirements to favor Odebrecht and impede other companies. This never happened.

According to Barata, Maiman's executives had assured him that Dr. Toledo would "amend the provisions of the bidding conditions to favor [Odebrecht] and hinder or prevent the participation of other companies, thereby granting [Odebrecht] a competitive advantage in the bidding," but this "*was not executed*." Barata 11/21/16, Exh. V, *supra*, at ER 355 (emphasis added). Dr. Toledo not only "failed to amend the bidding conditions," but also "failed to implement other favorable measures for the company." *Id.* at ER 355-56. As Barata later recalled, "I wasn't getting anywhere with President Toledo, and I felt frustrated by his procedure, because he hadn't made the modifications that we wanted." Barata 4/24/19, Exh. W, *supra*, at ¶¶ 181-82.

**D. There Is No Probable Cause to Believe that Dr. Toledo Engaged in Money Laundering**

The government alleges that Dr. Toledo engaged in money laundering by (1) having Maiman receive $20 million in bribes from Odebrecht on his behalf; (2) directing Maiman to transfer the

money to Ecostate and Milan Ecotech; (3) transferring the money from Ecostate and Milan Ecotech to Ecoteva, a company whose nominal owner was Dr. Toledo's mother-in-law; and finally (4) having his mother-in-law spend the funds for his benefit.  None of these allegations are supported by probable cause.

### 1.     The Complaint's Allegations Are Based on Outdated and Incorrect Information from Peru

When Peru submitted its extradition request to the United States in 2018, its theory was that Odebrecht had decided to pay only $20 million.  This theory was based on the early testimony from Barata and Maiman.  By the time the government filed its Complaint in July of 2019, both Barata and Maiman had changed their testimony and admitted that Odebrecht had actually paid at least $34 million.  This information apparently was not conveyed to the United States by Peru, however.  As a result, the Complaint's money laundering allegations are based on outdated and incorrect information.

Peru's current theory appears to be that Odebrecht paid $34.2 million to Maiman: $31.5 million to Warbury and $2.7 million to Trailbridge and Merhav.  Of the $31.5 million paid into Warbury, Peru now alleges that $8 million went to an account in Israel belonging to Maiman's mother; $3.7 million went to a consulting company called Sirloin Dash; $17.5 million went to Ecostate and Milan Ecotech; and $2.3 million is unaccounted for.  Ecoteva received a combined $16.3 million from Ecostate and Milan Ecotech.  From there, Peru now alleges that $6 million was personally used by Maiman; $6.6 million was seized, or will be seized, by Peru; $4.5 million was used to purchase real estate in Fernenbug's name (Las Casuarinas and Torre Omega); and $500,000 went to pay Dr. Toledo's mortgage payments.  *See* Declaration of Caitlin Costello ("Costello Decl."), attached hereto as Exhibit Y, at ¶ 22 & Attachment 1 (a visual representation of Peru's theory).[15]

---

[15] The defense's understanding of the money trail differs in a few respects.  Based on its review of the financial records, the defense has determined that Odebrecht paid $4 million to Trailbridge and Merhav, not $2.7 million.  *See* Costello Decl., Exh. Y, *supra*, at ¶ 9.  In addition, the defense has determined that Milan Ecotech and Ecostate transferred $17.5 million to Ecoteva, not $16.3 million. *See id.* at ¶¶ 16-17, 22 & Attachment 2 (a visual representation of the defense's understanding of the money trail).

**2. Maiman Was the True Owner of Ecostate and Ecoteva**

The government alleges that Maiman was acting on instructions from Avraham Dan On when he transferred the funds from Confiado to Ecostate and Milan Ecotech. *See* Complaint, Exh. N, *supra*, at 9. The implication is that Dan On was acting on behalf of Dr. Toledo, and that Maiman had no connection to either Ecostate or Milan Ecotech. In 2013, however, Maiman testified that Dan On had originally incorporated both companies on *Maiman's* behalf, and that all of the money in both Ecostate and Milan Ecotech belonged to him. *See* Maiman 7/5/13, Exh. R, *supra*, at ¶¶ 31, 53. Maiman's ownership of both Ecostate and Milan Ecotech was subsequently confirmed by Maiman's attorney, who attested to the fact that all of the funds in both Ecostate and Milan Ecotech were "solely and exclusively owned" by Maiman. *See* Declaration of Julio Fernando Mazuelos Coello ("Mazuelos Decl."), attached hereto as Exhibit Z, at ER 2200, 2205, 2207, 2212.

The government alleges that the money went from Ecostate and Milan Ecotech to Ecoteva, "the chairman of which was nominally Eva Fernenbug ('Fernenbug'), Toledo's mother in law." *See* Complaint, Exh. N, *supra*, at 9. In 2013, however, Maiman testified that he was the true owner of Ecoteva's funds, and that all investments were made at his direction, for his financial benefit. This testimony is corroborated by the February 2, 2012 Nominee Agreement between Ecoteva and Maiman's Merhav Group, as well as the January 27, 2014 declaration by Maiman's attorney.

According to Maiman's attorney, Maiman "decided to incorporate" Ecoteva in 2012, as part of a plan to "diversify[] his investments into the real estate industry in Peru." Mazuelos Decl., Exh. Z, *supra*, at ER 2213. Ecoteva was incorporated on January 26, 2012, in the name of Eva Fernenbug, using Maiman's money from the Ecostate and Milan Ecotech accounts.[16] *Id.* at ER 2214; *see also* Maiman 7/5/13, Exh. R, *supra*, at ¶¶ 14-15. Although Fernenbug was the nominal director of Ecoteva, Maiman had exclusive "control of the funds and assets" by virtue of a February 2, 2012 Nominee Agreement. *Id.* at ¶ 15. Under the terms of the Nominee Agreement, Maiman "retained

[16] Maiman's relationship with Fernenbug goes back to 1972, a decade before he met Dr. Toledo. Mazuelos Decl., Exh. Z, *supra*, at ER 5020. According to his attorney, Maiman asked Fernenbug to be the nominal head of Ecoteva because he "could not purchase the properties directly, given that transactions made by legal entities not domiciled in Peru (non-residents) are subject to a higher tax burden." *Id.* at ER 2213, 5042.

absolute power over the functions of ECOTEVA CONSULTING GROUP S.A., as well as the decision-making power regarding investment in various projects or in business of any nature whatsoever." Mazuelos Decl., Exh. Z, *supra*, at ER 2215; *see also* Maiman 7/5/13, Exh. R, *supra*, at ¶¶ 22-23. While Ecoteva could "propose investments and projects," it had "no autonomy to act on purchases, sales or any transaction" without Maiman's express authorization. *See id.* at ¶ 15.

**3. Eva Fernenbug Acted at Maiman's Direction, for Maiman's Benefit**

The government alleges that "at Fernenbug's direction, at least some of the funds were transferred [from Ecoteva] to two Peruvian bank accounts" and "used to purchase properties (and to pay mortgages for properties) in Peru." Complaint, Exh. N, *supra*, at 9.

It is true that Fernenbug made the real estate purchases in Peru, but she did so on Maiman's instructions, for Maiman's financial benefit. As Maiman explained in his 2013 testimony, Ecoteva "would propose investments and projects to manage the funds, administer the purchases and investments, subject to the instructions of the MERHAV GROUP. ECOTEVA ha[d] no autonomy to act in purchases, sales or any transaction" without Maiman's authorization. Maiman 7/5/13, Exh. R, *supra*, at ¶ 15. Both the house in Las Casuarinas and the office at Torre Omega were investments made on Maiman's behalf. *Id.* at ¶¶ 16-18, 35.

Dr. Toledo did receive $500,000 to pay his mortgages, but as Maiman testified in 2013, the $500,000 was a loan that Maiman expected Dr. Toledo to repay. *Id.* at ¶ 36.

**4. There Is No Credible Evidence that Dr. Toledo Ever Asked Barata or Maiman for the Money**

The Complaint alleges that "on one occasion in 2010 after Toledo had left office, Toledo summoned Barata to his home in Camacho to pressure Barata to continue the payments." Complaint, Exh. N, *supra*, at 8. There is no evidence to corroborate Barata's claim – no phone records, voice mail messages, emails, or calendar notations. Moreover, the idea that Dr. Toledo would approach Barata directly is not credible. According to the government, Toledo went to great lengths to distance himself from the bribery scheme. The government's theory is that Dr. Toledo used intermediaries at every stage: Avraham Dan On to make the initial approach to Barata; Weinstein and Saylan to negotiate the details with Barata and, later, tell Barata which of Maiman's accounts would

be receiving the money; and Dan On to tell Maiman to transfer the funds to the Costa Rican accounts. It is simply not plausible that Dr. Toledo would expose his involvement by personally approaching Barata.

More important, there is no evidence whatsoever that Dr. Toledo ever asked Maiman for the money. According to the government's theory, Dr. Toledo entrusted Maiman to receive $35 million on his behalf, then waited patiently for years while Maiman withheld all but a $500,000 loan. There is no evidence, documentary or testimonial, that Dr. Toledo ever asked Maiman to pay him. The government would have this Court believe that Dr. Toledo was willing to betray his country, violate the law, destroy his reputation, and risk dying in prison so that Maiman could enrich himself by tens of millions of dollars, while Dr. Toledo would receive nothing more than a $500,000 loan. Aside from being patently implausible, there is no way to reconcile this picture of Dr. Toledo with the impatient man who, according to the government, summoned Barata to his home to pressure him for payments.

**5. Maiman Is the True Beneficiary of the Bribery Scheme**

Tellingly, both Barata and Maiman have conceded that they do not know whether Dr. Toledo profited from the bribery scheme. When Barata was asked in 2019 whether he had any knowledge of money going to Dr. Toledo, he testified, "I have no idea." *See* Barata 4/24/19, Exh. W, *supra*, at ¶¶ 797-98. Later in the same statement, Barata confirmed that he had "no direct evidence" that any money was ever delivered to Dr. Toledo. *See id.* at ¶¶ 1002-03. In 2017, Maiman, too, admitted that he did not know whether or not Dr. Toledo had benefitted from the bribes. *See* Maiman 2/27/17, Exh. S, *supra*, at ¶ 11.

Maiman was the real beneficiary of the bribery scheme. Odebrecht paid $35 million. Of that, $4 million was deposited into Maiman's Trailbridge and Merhav Overseas accounts. There is no allegation that this money ever left Maiman's control. The remaining $31 million went to Warbury and then to Confiado, both accounts controlled by Maiman. Of the $31 million deposited in Confiado's account, Peru alleges that between $16.3 million and $17.5 million was transferred to Ecoteva. Most of the remaining $14 million either went to Maiman's relatives and companies, with $2.3 million unaccounted for. Of the money that went to Ecoteva, Peru acknowledges that Maiman

personally used $6 million and Peru has seized or will seized another $6.6 million. Maiman's own testimony shows that the $5 million spent on real estate was done on Maiman's behalf, not Dr. Toledo's. At most, Dr. Toledo received a $500,000 loan.

Not only did Maiman receive (and maintain control over) all of the bribe money, but under the terms of his collaboration agreement with Peru, he gets to keep most of it. Maiman has promised to pay Peru $7 million and Peru has seized or will seize an additional $6.5 million. That leaves Maiman with more than $20 million.

**CONCLUSION**

Peru requested Dr. Toledo's extradition in 2018, even though the case was still in the preliminary investigation stage. Three years later, Peru still has not charged Dr. Toledo with a crime. The U.S.-Peru Treaty prohibits the extradition of people who, like Dr. Toledo, have not been formally charged with any crime. Moreover, the Treaty requires the requesting country to supply a copy of the charging document – in Peru's case, the Order of Prosecution. Peru has not provided a copy of the Order of Prosecution, nor can it; the Order of Prosecution doesn't exist.

In addition to Peru's failure to comply with the terms of the Treaty, there is a more fundamental reason to refuse Peru's extradition request: There is no probable cause to believe that Dr. Toledo committed either of the alleged offenses. What the evidence shows, conclusively, is that Josef Maiman trade on Dr. Toledo's name to collect bribes. The evidence shows that Maiman believed that Odebrecht would receive the contracts even without any intervention from Dr. Toledo. And the evidence shows that Maiman was right. Dr. Toledo did not intervene, much to the frustration of Jorge Barata, and yet Odebrecht still received the contracts and Maiman received his money. The evidence also shows that Maiman kept (or spent) the millions that Odebrecht paid, with the exception of approximately $500,000 that Maiman loaned to Dr. Toledo to pay down his mortgages. It has been more than a decade since Odebrecht paid Maiman. Yet Dr. Toledo never did anything to demand that Maiman give him the money that Odebrecht paid, money that supposedly was meant for Dr. Toledo. In their zeal to build a case against Dr. Toledo, the Peruvian prosecutors have embraced the self-serving testimony of the true culprit. No probable cause exists to believe that Dr. Toledo was aware of Maiman's machinations, let alone that he directed them, or was the true beneficiary.

For all of these reasons, Dr. Toledo respectfully requests that the Court grant his petition for a writ of habeas corpus.

Dated: October 28, 2021

Respectfully submitted,

GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California

/S
MARA K. GOLDMAN
GRAHAM ARCHER
Assistant Federal Public Defenders