*Alejandro Toledo Manrique*

*v.*

*Donald O'Keefe*

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN THE MATTER OF THE EXTRADITION )
OF ALEJANDRO TOLEDO MANRIQUE ) CASE NO. 3-19-mj-71055 MAG (THS)
)
_____)

### DECLARATION OF RICHARD J. DOUGLAS

I, Richard J. Douglas, hereby declare as follows:

1. I am an active member of the bar in Texas, the District of Columbia, Maryland, the Fourth Circuit Court of Appeals, the U.S. District Court for the Southern District of Texas and the U.S. District Court of Maryland. When the U.S.-Peru Extradition Treaty was taken up by the Senate Foreign Relations Committee in 2002, I was serving as the Committee's Chief Republican Counsel. I personally participated in organizing the Committee hearing, Executive Report and Senate resolution of approval for this treaty, and working out Committee concerns about the treaty with other Committee staff and with the Departments of State and Justice.

2. From 1998 to 2000 I was a Trial Attorney in the Office of International Affairs in the U.S. Department of Justice Criminal Division. I was responsible for daily U.S. extradition and judicial activities and extradition treaty interpretation and compliance with Spain, Mexico, Central America and Switzerland. My casework included matters related to the Augusto Pinochet prosecution in Spain, extradition to Spain of ETA terrorist Ramon Aldasoro Magunacelaya, investigations related to the murder of Mexican presidential candidate Luis Donaldo Colosio, and Swiss money laundering accusations against Raul Salinas de Gortari.

3. From 1986 to 1993 I was a commissioned officer in the U.S. Foreign Service, with assignments in Ciudad Juarez, Bilbao, Madrid, and with the U.S. Permanent Mission to the

1

Organization of American States.  I speak Spanish fluently.  I personally went into courtrooms and penitentiaries in Mexico and Spain to provide consular protection to U.S. citizens who were incarcerated or involved in criminal proceedings.  I am well-informed about the civil law system and its differences from the common law system.  On behalf of the U.S. government I participated in negotiating criminal assistance treaties at the OAS where such differences were reconciled.  Peru is a civil law country, and I am well-informed about requirements in Peru for formal charging in a criminal matter.

4. From February of 2017 to July 2019, I represented Dr. Toledo in connection with Peru's efforts to persuade the United States to extradite him.  In mid-2018, I was able to review a portion of the extradition package submitted to the United States by Peru, although the Peruvian Government withheld the full extradition package from the Toledo defense in Peru.  In addition, I have followed the progress of the investigation in Peru since the extradition package was submitted.  I am aware of and have reviewed documents filed in Peru in connection with this investigation, including documents filed after Peru's extradition package was submitted.  I have also reviewed the pleadings filed in this case, including the government's Response to Motion to Deny Extradition Request, as well as the accompanying Declaration of Tom Heinemann and supplemental submission prepared by Celia Esther Goicochea Ruiz.  These documents are available in PACER.

5. Article I of the U.S.-Peru Extradition Treaty provides that the obligation to extradite extends to "persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for, the commission of an extraditable offense."  Article VI.3.(b) of the Treaty requires submission of the charging document with the extradition demand.  Dr. Toledo has not been charged with any offense in Peru, the United States, or any other country,

and no charging document exists to be submitted.  Therefore, at the threshold, two straightforward treaty requirements were not met, and to date have not been met in the Toledo matter.

6.	The United States government has known about the lack of Peruvian charges against Dr. Toledo at least since it was brought to its attention in August 2017 letters which I sent to the Department of State and the Department of Justice on Dr. Toledo's behalf.  I reiterated our concern over this fundamental flaw in the Peruvian effort in subsequent correspondence as well.  In short, the absence of Peruvian charges, and the fact that this absence precludes Dr. Toledo's extradition, has been repeatedly raised with the U.S. government since August 2017, including in motions filed by the Toledo defense in California.

7.	Upon information and belief, as recently as August 10, 2020, the Peruvian proceedings against Dr. Toledo remained firmly in the investigative phase.  On August 6, 2020, prosecutors in Peru *themselves* requested an extension of the investigative phase for an additional 78 days to continue their investigation, indicating that as of that date the prosecutors not only considered the investigative phase to be ongoing, but expected it to continue for at least two more months.  This was confirmed on August 10, 2020, when the prosecutors abruptly disgorged 1,500 new documents not previously shared with the Toledo defense in Lima and indicated that the investigation was ongoing.  Just as abruptly, on August 11, 2020, the prosecutors announced that the investigation was complete.  Given the timing, it is self-evident that the sudden declaration that the investigation was over was prompted by and in direct response to Dr. Toledo's argument in his motion to deny extradition that he cannot be considered "charged" or extraditable within the meaning of the U.S.-Peru Treaty given the posture of proceedings in Peru.  This conclusion is confirmed by the public statement of prosecutor Rafael Vela, who said that

the decision to complete the investigation will "help the extradition process," and "disrupt the defense of the former president, who [has] argued so far he has not been charged by the Public Ministry."  *See* "Fiscal Rafael Vela afirmó que accusación contra Alejandro Toledo fortalece proceso de extradición" ("Prosecutor Rafael Vela affirmed that the accusation against Alejandro Toledo strengthens the extradition process") (Aug. 13, 2020), *available at* https://canaln.pe/actualidad/fiscal-rafael-vela-afirmo-que-acusacion-contra-alejandro-toledo-fortalece-proceso-extradicion-n423121.

8.      Although under Peruvian law an extradition demand for an uncharged person may originate with a Peruvian investigating judge, that aspect of Peruvian law does not and cannot overturn explicit requirements – charging and a charging document – plainly stated in the U.S.-Peru extradition treaty.  Peruvian law cannot override or invalidate the treaty.

9.      Despite the Peruvian prosecutors' sudden decision to conclude their investigation, Dr. Toledo still is not a "charged" person until the "charging" phase of the proceedings in Peru has been completed.  As we indicated to the Departments of State and Justice in mid-2018 correspondence and on other occasions – and as three Peruvian experts who submitted statements for the Toledo defense in California also confirm – Peruvian authorities must satisfy clear-cut, specific requirements of the Peruvian Code of Criminal Procedure, including Articles 353 and 354 governing issuance of the *orden de enjuicamiento*.  Article 353 appears in [Code] TITLE III, THE CHARGING DOCUMENT.  It provides that "[o]nce the issues raised [in the preliminary hearing] are resolved, *the Judge* shall issue the charging document." (my emphasis).  Article 353 also identifies the required contents of the charging document, including "[t]he order assigning the parties of record to the oral trial Judge."   These Articles are the procedural bridge

4

between being under investigation and being "charged."  Peruvian authorities have not crossed that bridge and so their extradition effort is plainly unripe.

10. Under Peru's Article 353, how are issues raised in preliminary hearings "resolved"?  Upon information and belief, such issues are resolved after an adversary hearing where the defense has an opportunity to challenge the prosecutor's findings before "charging" is perfected.  As the Peruvian declarants here are well aware, no such opportunity has been afforded to the Toledo defense in Lima.  In fact, the Peruvian authorities have labored hard to *deny* the Toledo defense an opportunity to be heard for this purpose and many others.

11. In my opinion, several reasons explain why, as recently as August 10, 2020, the Peruvian government has kept the proceedings against Dr. Toledo in the investigative stage, and even now the charging document has not been issued.

12. First, the prosecutor's evidentiary burden is lighter in the investigative phase.  The Peruvian Supreme Court itself explained the distinction in the *Sentencia Plenaria Casatoria No. 1-2017/CIJ-433 (the "Sentencia")*.  There, the Peruvian Supreme Court wrote that the investigative stage requires only telltale signs of criminal responsibility.  In contrast, the Peruvian Supreme Court wrote, the judge cannot issue a charging document unless a higher burden of proof has been met; there must be *sufficient evidence of the elements of conviction to support a well-founded request for charges against the accused.*  In the end, based on my review of the extradition package and ongoing proceedings, Peruvian prosecutors lack the evidence to satisfy *their own* "charging" standard, much less the U.S. probable cause standard.

13. Second, in my opinion, the Toledo matter has not proceeded to formal charging in Peru in order to obstruct defense efforts in Peru to exonerate Dr. Toledo.  I am informed and believe from my discussions over nearly three years with Dr. Toledo's Peruvian counsel that

5

Peruvian authorities have asserted on multiple occasions to the Toledo defense team that during the investigative stage, *they may bar Toledo access to state witnesses and state evidence*, and they have actually done so on multiple occasions.

14.     Third, in my opinion the prosecutors have not sought a formal charging document, and investigating judge Richard Concepcion Carhuancho has not issued one, because as soon as the charging document is issued, Judge Concepcion will lose jurisdiction to the trial court.  By confining the case to the investigative stage, Concepcion retains control.  Based upon my three years of experience with this case, this is preferred not only by the judge but also by the prosecutors.  As described in a November 3, 2019 article in the *Intercept* blog, ("In Peru's Operation Car Wash, Prosecutors and Witness Doctored Testimony to Avoid Contradictions," *available at* https://theintercept.com/2019/11/03/peru-operation-car-wash-prosecutors/) prosecutors in the Car Wash investigations prefer to have Judge Concepcion (who has been forthright about his anti-Toledo bent) as the judge in these cases because he and is more likely than another judge to overlook discrepancies in evidence.

15.     Having been a direct Senate staff participant at the Foreign Relations Committee in 2002 in the preparation of the U.S.-Peru extradition treaty for Senate review, I was well-informed about the views of members and staff on that agreement.  At that time, it was my understanding that selection of the "persons who have been charged" formulation in treaty Article I (as opposed to alternatives found in other U.S. extradition agreements approved in the 106th and 107th Congresses like "investigated persons," "wanted persons," or "persons found in the requested state") was no accident.   Rather, my recollection is that the Article I text actually chosen reflected concerns by the treaty drafters about the Fujimori practice of summarily and indefinitely imprisoning uncharged persons, a practice which, unfortunately, continues in Peru to

6

the present day. When the treaty was reviewed by the Senate in 2002, the brutal Fujimori dictatorship in Peru was coming to an end. Its practice of incarcerating thousands without even a pretense of charges or due process was well known. The Inter-American Commission on Human Rights has publicly deplored the practice and the U.S. government itself has expressed concern about it. It is no answer to attempt to interpose the State Department's Technical Analysis of the Treaty to defeat the Treaty's unambiguous Article I text and the related Toledo defense argument. The Technical Analysis is a non-binding unilateral Executive Branch document that was not formally endorsed in 2000 by the Peruvian negotiators or by the U.S. Senate. Reversion to the Technical Analysis is not necessary to an understanding of the unambiguous language of Treaty Article I except to *introduce* ambiguity where none exists.

      16.    In 2002, on the "charging document" question, while I was researching the case law for preparation of the Foreign Relations Committee Executive Report on the U.S.-Peru extradition treaty, I became aware of the 9th Circuit opinion in *Emami v. U.S. D.C. for N.D. Calif.*, 834 F.2d 1444 (9th Cir. 1987). In that case, the U.S.-Germany extradition treaty required that an extraditee be a charged person. But, unlike the U.S.-Peru treaty, the U.S.-Germany treaty *does not* include a requirement for submission of a charging document with the extradition demand. As such, the absence of a formal charging document in the German demand for Emami did not defeat the demand. In contrast, and viewing this important issue in the U.S.-Peru context, prior to the Foreign Relations Committee action on the U.S.-Peru treaty in 2002, I personally queried a former colleague with whom I had become acquainted while in the Foreign Service, then-Assistant [State Department] Legal Advisor for Treaty Affairs Robert Dalton, about the *Emami* decision relative to the U.S.-Peru extradition treaty. I came away from that query convinced that, in contrast to the U.S.-German treaty, the U.S.-Peru treaty indicates clearly

7

that charges (Art. I) and a valid charging document (Art. VI.3(b)) are required as indispensable parts of a Peruvian extradition demand. As such, the *Emami* opinion would not rescue a Peruvian request which failed to include the charging document. This outcome is consistent with Committee concerns over the Fujimori regime's detention of thousands of people for years at a time with no charging document and, typically, no charges at all.

17. In Dr. Toledo's case, the "charging document" contemplated under the Peruvian Criminal Code and logically required under the U.S.-Peru extradition treaty cannot be produced for him because he has not been charged. In the end, in the Toledo case the U.S.-Peru extradition treaty was not satisfied in two critically important respects: no charge, and no charging document.

I declare under penalty of perjury that the foregoing is true and correct, except for those matters stated on information and belief, and as to those matters, I am informed and believe them to be true.

Executed this 17th day of August, 2020, at The Woodlands, Texas.

Respectfully submitted,

*/s/ Richard J. Douglas*

Richard J. Douglas
202-257-7110
richardjdouglas@gmail.com
83 Woodhaven Wood Drive
The Woodlands, Texas 77380

8