1   STEPHANIE M. HINDS (CABN 154284)
    Acting United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   KYLE F. WALDINGER (CABN 298752)
    Assistant United States Attorney
5
        450 Golden Gate Ave., 11th Fl.
6       San Francisco, California 94102-3495
        Telephone: (415) 436-6830
7       Fax: (415) 436-7234
        Email:  Kyle.Waldinger@usdoj.gov
8
    CHRISTOPHER J. SMITH (VABN 75445)
9   Associate Director

10  REBECCA A. HACISKI (DCBN 996656)
    Trial Attorney
11
        Office of International Affairs
12      Criminal Division
        U.S. Department of Justice
13      1301 New York Avenue NW
        Washington, D.C. 20530
14      Telephone: (202) 616-2534
        Fax: (202) 514-0080
15      Email:  Rebecca.Haciski@usdoj.gov

16  Attorneys for the United States of America

17                  UNITED STATES DISTRICT COURT

18                 NORTHERN DISTRICT OF CALIFORNIA

19                     SAN FRANCISCO DIVISION

20  ALEJANDRO TOLEDO MANRIQUE,          )  CASE NO.  21-CV-08395-LB
21                                      )
              Petitioner,               )  GOVERNMENT'S RESPONSE IN OPPOSITION
22                                      )  TO PETITION FOR WRIT OF HABEAS CORPUS
         v.                             )
23                                      )
    DONALD O'KEEFE, United States Marshal )
24  for the Northern District of California, )
                                        )
25            Respondent.               )
                                        )
26

27

28

GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. 21-CV-08395-LB

# TABLE OF CONTENTS

BACKGROUND ...........................................................................................................2

    I.      STATUTORY BACKGROUND.................................................................2

    II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY ...................3

ARGUMENT ..............................................................................................................7

    I.      STANDARD OF REVIEW ......................................................................7

    II.     AS THE EXTRADITION COURT CORRECTLY FOUND, TOLEDO HAS BEEN "CHARGED WITH" THE OFFENSES FOR WHICH HIS EXTRADITION HAS BEEN REQUESTED WITHIN THE MEANING OF THE TREATY ............................................................................................8

           A.      Under Its Plain Meaning, the Treaty Applies to Fugitives Like Toledo Who Are Sought for Prosecution...................................................8

           B.      Peru Unequivocally Seeks Toledo's Extradition So that He May Be Prosecuted for the Offenses with Which He Has Been Charged...........................15

           C.      The Court Should Defer to the View of the U.S. Department of State—with Which Peru Concurs—that the Treaty Applies to Toledo.............................17

    III.    AS THE EXTRADITION COURT CORRECTLY FOUND, PERU HAS COMPLIED WITH THE CHARGING DOCUMENT REQUIREMENT OF THE TREATY ...........................................................................................20

    IV.    THE EVIDENCE PROVIDED BY PERU AMPLY SATISFIES THE "ANY EVIDENCE" STANDARD OF REVIEW APPLICABLE TO THE EXTRADITION COURT'S PROBABLE-CAUSE FINDING.........................25

           A.      Toledo's Argument Regarding the Extradition Court's Evidentiary Rulings Does Not Present a Basis for *Habeas* Relief............................27

           B.      Peru's Extradition Request Amply Establishes Probable Cause That Toledo Committed Collusion................................................28

                 1.      Toledo Received Bribe Money...................................................29

                 2.      Peru's Evidence Establishes that the Bribe Was Intended for Toledo ............................................................30

                 3.      Peru's Evidence Establishes that Toledo Complied with the Bribe Agreement by Facilitating Odebrecht's Success in the Highway Tender...........................................................32

                 4.      Peru's Evidence Establishes that Toledo Was Involved in Ensuring that Odebrecht Paid the Bribe...............................34

C.      Peru's Extradition Request Amply Establishes Probable Cause that
        Toledo Committed Money Laundering ............................................35

        1.      Peru's Evidence Establishes that Toledo Gave Directions for
                Laundering the Money.................................................35

        2.      Peru's Evidence Establishes that Toledo Received Bribe
                Proceeds ...........................................................38

        3.      Even Though Peru Has Located and Traced Additional
                Odebrecht Funds Since 2018, the Core Allegations Regarding
                the Money that Toledo Laundered Remain the Same...............41

CONCLUSION.............................................................................42

1

# TABLE OF AUTHORITIES

2

Page(s)

Cases

3

*Abbott v. Abbott,*
    560 U.S. 1 (2010).................................................................................................... 17
*Aguasvivas v. Pompeo,*
    984 F.3d 1047 (1st Cir. 2021) ................................................................................. 24
*Aguasvivas v. Pompeo,*
    405 F. Supp. 3d 347 (D.R.I. 2019) .......................................................................... 24
*Ahmad v. Wigen,*
    910 F.2d 1063 (2d Cir. 1990) .................................................................................. 19
*Air France v. Saks,*
    470 U.S. 392 (1985).................................................................................................. 17
*Basic v. Steck,*
    819 F.3d 897 (6th Cir. 2016) ............................................................................... 18, 22
*Borodin v. Ashcroft,*
    136 F. Supp. 2d 125 (E.D.N.Y. 2001) ....................................................................... 9
*Bovio v. United States,*
    989 F.2d 255 (7th Cir. 1993) ...................................................................................... 26
*Causbie Gullers v. Bejarano,*
    293 F. App'x 488 (9th Cir. 2008) ............................................................................... 9
*Charlton v. Kelly,*
    229 U.S. 447 (1913)................................................................................................... 27
*Collins v. Loisel,*
    259 U.S. 309 (1922)............................................................................................. 3, 27
*Collins v. Loisel,*
    262 U.S. 426 (1923)..................................................................................................... 2
*Cucuzzella v. Keliikoa,*
    638 F.2d 105 (9th Cir. 1981) ....................................................................................... 9
*Curreri v. Vice,*
    77 F.2d 130 (9th Cir. 1935) ....................................................................................... 26
*Eain v. Wilkes,*
    641 F.2d 504 (7th Cir. 1981) ..................................................................................... 26
*Emami v. U.S. Dist. Ct.,*
    834 F.2d 1444 (9th Cir. 1987) ........................................................................... passim
*Factor v. Laubenheimer,*
    290 U.S. 276 (1933)........................................................................................... passim
*Fejfar v. United States,*
    724 F. App'x 621 (9th Cir. 2018) .............................................................................. 15
*Fernandez v. Phillips,*
    268 U.S. 311 (1925).............................................................................................. 7, 8
*Garcia-Guillern v. United States,*
    450 F.2d 1189 (5th Cir. 1971) ................................................................................... 11
*Glucksman v. Henkel,*
    221 U.S. 508 (1911)................................................................................................... 23
*Grin v. Shine,*
    187 U.S. 181 (1902)........................................................................................... passim

*Hill v. United States*,
    737 F.2d 950 (11th Cir. 1984) ................................................................................ 14

*In re Assarsson*,
    635 F.2d 1237 (7th Cir. 1980) ........................................................................ passim

*In re Extradition of Handanovic*,
    829 F. Supp. 2d 979 (D. Or. 2011) ............................................................................ 9

*In re Extradition of Lehming*,
    951 F. Supp. 505 (D. Del. 1996) ................................................................................ 9

*In re Extradition of Manriqu*e,
    442 F. Supp. 3d 1172 (N.D. Cal. 2020) .................................................................... 3

*In re Extradition of Nava Gonzalez*,
    305 F. Supp. 2d 682 (S.D. Tex. 2004) .................................................................... 27

*In re Extradition of Rodriguez Ortiz*,
    444 F. Supp. 2d 876 (N.D. Ill. 2006) ...................................................................... 32

*In re Extradition of Rovelli*,
    977 F. Supp. 566 (D. Conn. 1997) ............................................................................ 9

*In re Extradition of Sacirbegovic*,
    280 F. Supp. 2d 81 (S.D.N.Y. 2003) ........................................................................ 9

*In re Extradition of Sainez*,
    No. 07-MJ-0177-JMA, 2008 WL 366135 (S.D. Cal. Feb. 8, 2008) .................... 19, 27

*In re Extradition of Sarellano*,
    142 F. Supp. 3d 1182 (W.D. Okla. 2015) ................................................................ 9

*In re Extradition of Trinidad*,
    754 F. Supp. 2d 1075 (N.D. Cal. 2010) .................................................................. 26

*In re Gambino*,
    421 F. Supp. 2d 283 (D. Mass. 2006) .............................................................. 11, 12

*In re Kaine*,
    55 U.S. 103 (1852) .................................................................................................... 3

*In re Lam*,
    No. 1:08-MJ-247GSA, 2009 WL 1313242 (E.D. Cal. May 12, 2009) ...................... 9

*In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*,
    634 F.3d 557 (9th Cir. 2011) .................................................................................. 11

*In re Requested Extradition of Kirby*,
    106 F.3d 855 (9th Cir. 1996) .................................................................................... 3

*Kaiser v. Rutherford*,
    827 F. Supp. 832 (D.D.C. 1993) .............................................................................. 9

*Kolovrat v. Oregon*,
    366 U.S. 187 (1961) ................................................................................................ 19

*Koskotas v. Roche*,
    931 F.2d 169 (1st Cir. 1991) .................................................................................. 19

*Luna v. O'Keefe*,
    No. 17-CV-02129-LHK, 2018 WL 784783 (N.D. Cal. Feb. 8, 2018) .................... 32

*Man-Seok Choe v. Torres*,
    525 F.3d 733 (9th Cir. 2008) .................................................................................. 26

*Manta v. Chertoff*,
    518 F.3d 1134 (9th Cir. 2008) ............................................................................ 3, 25

*Martinez v. United States*,
    828 F.3d 451 (6th Cir. 2016) ........................................................................ 8, 11, 18

*Medellin v. Texas*,
  552 U.S. 491 (2008) .................................................................................................. 8

*Narayanan v. British Airways*,
  747 F.3d 1125 (9th Cir. 2014) ............................................................................... 13

*Noeller v. Wojdylo*,
  922 F.3d 797 (7th Cir. 2019) ................................................................................. 15

*Ornelas v. Ruiz*,
  161 U.S. 502 (1896) .............................................................................................. 26

*Patterson v. Wagner*,
  785 F.3d 1277 (9th Cir. 2015) ............................................................................... 10

*Peroff v. Hylton*,
  542 F.2d 1247 (4th Cir. 1976) ............................................................................... 27

*Prasoprat v. Benov*,
  421 F.3d 1009 (9th Cir. 2005) ................................................................................. 3

*Quinn v. Robinson*,
  783 F.2d 776 (9th Cir. 1986) ........................................................................... 25, 26

*Sabatier v. Dabrowski*,
  586 F.2d 866 (1st Cir. 1978) ................................................................................. 19

*Sacirbey v. Guccione*,
  589 F.3d 52 (2d Cir. 2009) ................................................................................. 9, 12

*Sainez v. Venables*,
  588 F.3d 713 (9th Cir. 2009) ........................................................................... passim

*Sakaguchi v. Kaulukukui*,
  520 F.2d 726 (9th Cir. 1975) ................................................................................. 32

*Santos v. Thomas*,
  830 F.3d 987 (9th Cir. 2016) ........................................................................... passim

*Shapiro v. Ferrandina*,
  478 F.2d 894 (2d Cir. 1973) ................................................................................. 26

*Skaftouros v. United States*,
  667 F.3d 144 (2d Cir. 2011) ....................................................................... 7, 8, 18

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct.*,
  482 U.S. 522 (1987) .............................................................................................. 18

*Spatola v. United States*,
  925 F.2d 615 (2d Cir. 1991) ................................................................................. 19

*Sumitomo Shoji Am., Inc. v. Avagliano*,
  457 U.S. 176 (1982) .............................................................................................. 17

*Theron v. U.S. Marshal*,
  832 F.2d 492 (9th Cir. 1987) ............................................................................... 10

*U.S. ex rel. Saroop v. Garcia*,
  109 F.3d 165 (3d Cir. 1997) ................................................................................. 19

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
  508 U.S. 439 (1993) .............................................................................................. 10

*United States v. Davis*,
  767 F.2d 1025 (2d Cir. 1985) ............................................................................... 11

*United States v. Gourde*,
  440 F.3d 1065 (9th Cir. 2006) ............................................................................... 25

*United States v. Kin-Hong*,
  110 F.3d 103 (1st Cir. 1997) ................................................................................. 25

*United States v. Kollmar*,
  No. 19MJ70677MAG1KAW, 2021 WL 179606 (N.D. Cal. Jan. 19, 2021) ...................................... 32
*United States v. Knotek*,
  925 F.3d 1118 (9th Cir. 2019) ................................................................................. 2
*United States v. Nolan*,
  651 F. Supp. 2d 784 (N.D. Ill. 2009) ....................................................................... 22
*United States v. Trabelsi*,
  845 F.3d 1181 (D.C. Cir. 2017) ............................................................................... 19
*United States v. Van Cauwenberghe*,
  827 F.2d 424 (9th Cir. 1987) ................................................................................... 19
*United States v. Wells*,
  519 U.S. 482 (1997) ............................................................................................... 10
*Valentine v. United States ex rel. Neidecker*,
  299 U.S. 5 (1936) ..................................................................................................... 8
*Vo v. Benov*,
  447 F.3d 1235 (9th Cir. 2006) ........................................................................... 7, 27
*Walker v. Johnston*,
  312 U.S. 275 (1941) ................................................................................................. 8
*Zanazanian v. United States*,
  729 F.2d 624 (9th Cir. 1984) ................................................................................... 26

Statutes

18 U.S.C. § 3184 .......................................................................................................... 2
18 U.S.C. § 3186 .......................................................................................................... 3
18 U.S.C. § 3190 .................................................................................................. 25, 26
28 U.S.C. § 2241 .......................................................................................................... 7

Other Authority

Convention for the Mutual Extradition of Fugitives from Justice,
  Dom. Rep.-U.S., June 19, 1909, 36 Stat. 2468 ...................................................... 14
Extradition Treaty Between the Government of the United States and the Argentine Republic,
  U.S.-Arg., June 10, 1997, S. Treaty Doc. No. 105-18 (1997) ............................... 12
Extradition Treaty Between the Government of the United States of America and
  the Government of the Dominican Republic, Jan. 12, 2015, T.I.A.S. 16-1215 .........................14
Extradition Treaty Between the United States of America and the Republic of Peru,
  U.S.-Peru, July 26, 2001, S. Treaty Doc. No. 107-6 (2002) ............................. passim
Extradition Treaty Between the Government of the United States of America and
  the Government of the Republic of Korea, U.S.-S. Korea, June 9, 1998,
  S. Treaty Doc. No. 106-2 (1999) ............................................................................ 12
Extradition Treaty Between the Government of the United States of America and the Government
  of the Republic of Chile, U.S.-Chile, June 5, 2013, T.I.A.S. No. 16-1214 ..................................... 12, 13
Extradition Treaty Between the United States of America and Romania and
  Protocol to the Treaty Between the United States of America and Romania on Mutual Legal
  Assistance in Criminal Matters, U.S.-Rom., Sept. 10, 2007, S. Treaty Doc. No. 110-11 (2008) ........ 13
Treaty Between the United States and Chile Providing for the Extradition of Criminals,
  U.S.-Chile, April 17, 1900, 32 Stat. 1850 ................................................................... 13

GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. 21-CV-08395-LB

Treaty on Extradition Between the United States of America and Japan,
    U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892 ........................................................... 13

Treaty Between the United States and Peru Providing for the Extradition of Criminals,
    U.S.-Peru, Nov. 28, 1899, 31 Stat. 1921 (1901) ................................................. 11

Treaty Between the United States and Rumania for the Extradition of Fugitives from Justice,
    U.S.-Rom., July 23, 1924, 44 Stat. 2020 ............................................................. 13

Treaty on Extradition Between the United States of America and the Kingdom of Denmark,
    U.S.-Den., June 22, 1972, 25 U.S.T. 1293 ......................................................... 13

Vienna Convention on the Law of Treaties,
    May 23, 1969, 1155 U.N.T.S 331 ....................................................................... 20

The United States of America, by and through its undersigned counsel, hereby responds in opposition to the Petition for Writ of Habeas Corpus (HC DE 1, hereinafter, "Pet.") filed by Alejandro Toledo Manrique ("Toledo") challenging U.S. Magistrate Judge Thomas S. Hixson's certification that Toledo may be extradited to Peru to stand trial on two charges, collusion and money laundering.[1]  The charges relate to a bribery scheme orchestrated while Toledo was the President of Peru.  Peru seeks Toledo's return to face those charges pursuant to its extradition treaty with the United States (the "Treaty").[2]

On September 28, 2021, following multiple hearings and rounds of briefing, Judge Hixson (the "extradition court") issued a 30-page order certifying that Toledo is extraditable to Peru on the two charges.  EX DE 188 (Pet. Ex. M), *available at In re Extradition of Toledo Manrique*, No. 19MJ71055MAG1TSH, 2021 WL 5037680 (N.D. Cal. Oct. 29, 2021).  Toledo now seeks to re-litigate three arguments that the extradition court carefully considered and rejected.  As discussed herein, these arguments have even less merit now than they did before the extradition court.

*First*, Toledo argues—contrary to the Treaty's plain language and negotiation history, relevant case law, and the official statements provided by the United States and Peru in this case—that he has not been charged with the crimes for which his extradition is sought, as required under the Treaty.  In fact, he is unequivocally sought for prosecution on collusion and money laundering offenses.  Toledo's contention that he has not been "formally" charged ignores the record in this case, invites the Court improperly to analyze the technicalities of Peruvian criminal procedure, and does not present a basis on which to deny extradition.

*Second*, Toledo repeats these mistakes in arguing that Peru failed to provide a copy of the relevant charging document, as required under the Treaty.  In fact, Peru provided, as a supplement to its extradition request, its *Acusacion Fiscal*, which is the operative document containing the charges against Toledo.  This document superseded the preliminary charging documents that Peru had originally

---

[1] All record citations to the events concerning Toledo's *habeas corpus* petition are denoted as "HC DE #" and reference the docket in the above-captioned case.  All record citations to the events in Toledo's extradition case are denoted as "EX DE #" and reference the docket in Northern District of California Case Number 19-MJ-71055-MAG-1 (TSH).  The government will provide the Court with courtesy copies of the extradition docket entries cited herein that are not attached to Toledo's petition.

[2] Extradition Treaty Between the United States of America and the Republic of Peru, U.S.-Peru, July 26, 2001, S. Treaty Doc. No. 107-6 (2002).

provided in support of its extradition request.  As the extradition court found, even these informal charging documents satisfied the Treaty requirement; the *Acusacion Fiscal* does so even more clearly.

*Third*, the evidence provided by Peru more than satisfies the deferential *habeas* standard of review applicable to the extradition court's determination that there is probable cause that Toledo committed collusion and money laundering.  This evidence includes two cooperating witness statements relied upon by the extradition court, as well as other witness statements; contracts; bank statements; other financial, corporate, and public records; and expert financial and accounting analysis—all of which establish probable cause that Toledo committed the charged crimes.  In response, Toledo presents a speculative theory of defense, trying to shift blame onto someone else, which is properly tested in the courts of Peru and has no place in an extradition proceeding, let alone in *habeas* review thereof. Moreover, as the Supreme Court has made clear, Toledo's claims regarding purported errors by the extradition court in declining to consider certain documents offered by Toledo at his extradition hearing are not a cognizable basis for granting *habeas* relief.

Accordingly, Toledo's claims are unavailing, and his *habeas* petition should be denied.

## BACKGROUND

### I. STATUTORY BACKGROUND

Extradition is a means by which a fugitive such as Toledo is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment.[3]  In the United States, it is primarily an executive function, with a "limited" role carved out for a judge pursuant to the federal extradition statute.  *United States v. Knotek*, 925 F.3d 1118, 1124 (9th Cir. 2019) (citation omitted); *see* 18 U.S.C. § 3184.  That statute requires a judge to hold a hearing to consider the evidence of criminality presented by the foreign country and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.  If the judge finds that the evidence is sufficient as required under Section 3184, he or she "shall certify [his or her] findings] . . . to the Secretary of State."  *Id*.

---

[3] It is common to refer to a person for whom an international extradition request has been made as a "fugitive."  *See, e.g.*, *Factor v. Laubenheimer*, 290 U.S. 276 (1933); *Collins v. Loisel*, 262 U.S. 426 (1923).

An extradition hearing is neither a criminal nor a civil proceeding, but rather entails "only a preliminary assessment of the merits of the foreign prosecution." *In re Extradition of Manriqu*e, 442 F. Supp. 3d 1172, 1174 (N.D. Cal. 2020); *see In re Requested Extradition of Kirby*, 106 F.3d 855, 857 n.1 (9th Cir. 1996). The extradition judge is neither required nor authorized to determine whether the evidence is sufficient to justify conviction, as that determination will be made by the foreign court that handles the case. *See Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Santos v. Thomas*, 830 F.3d 987, 991-92 (9th Cir. 2016). Rather, an extradition judge must certify an extradition when the following five requirements are met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which extradition is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008).

If the judge certifies an extradition, the Secretary of State ultimately decides whether or not to surrender the fugitive to the foreign country. 18 U.S.C. § 3186; *see also Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005). While the judge's role is highly circumscribed, the Secretary, when making a decision on surrender, has the sole authority to take into account humanitarian considerations and applicable statutes, treaties, or policies regarding appropriate treatment in the foreign country. *See, e.g.*, *Prasoprat*, 421 F.3d at 1016. This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs. *See In re Kaine*, 55 U.S. 103, 110 (1852).

An extradition judge's certification order pursuant to Section 3184 is not subject to direct appeal; however, as discussed further herein, "limited" collateral review is available by way of a petition for a writ of *habeas corpus*. *See Santos*, 830 F.3d at 1001 (citations omitted); *see also infra* at 7-8.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Toledo served as President of Peru from 2001 to 2006. During his presidency, the Peruvian government undertook the Peru-Brazil Southern Interoceanic Highway project, to construct a highway spanning between Peru and Brazil ("Highway"). The government held a public tender to award contracts for constructing various portions of the Highway. In 2005, Constructora Norberto Odebrecht

S.A. ("Odebrecht") was ultimately awarded contracts to construct two sections of the Highway.[4]
According to information provided by Peruvian authorities, in connection with the award of these
contracts, Toledo solicited and received a $35 million bribe from Odebrecht through the company's
superintendent in Peru, Jorge Henrique Simoes Barata ("Barata"); and Toledo directed that the bribe be
laundered through various companies and off-shore accounts, including some held by his close friend,
Josef Maiman ("Maiman").[5]   The bribe was paid in installments beginning a month before Toledo left
office, in June 2006, and continuing for the next four years.   Peru's evidence demonstrates that
Odebrecht paid some of the bribe funds directly to Toledo in cash, and that some of the laundered funds
were used nominally by Toledo's mother-in-law to purchase a number of properties associated with
Toledo.   These facts are detailed further below.   *See infra* at 28-42.

On February 3, 2017, and March 7, 2017, a Peruvian prosecutor issued decisions (collectively,
the "Prosecutor's Decisions") charging Toledo with collusion, in violation of Section 384 of the
Peruvian Criminal Code, and money laundering, in violation of Article 1 of Peruvian Act No. 27765.
*See* Extradition Request (hereinafter, "ER") at 6-18; *id.* at 3191-3247 (Pet. Ex. D, Prosecutor's Decision
No. 6 to Extend Formalization and Continuation of Preliminary Investigation); *id.* at 3248-91 (Pet. Ex.
L, Prosecutor's Decision No. 8 of Specification and Extension of Preliminary Investigation); *see also id.*
at 3293 (Prosecutor's Decision No. 13, recognizing that "[a]s stated in Decisions No. 6 and 8, . . .
collusion and money laundering charges have been brought against defendant [Toledo]").   The
prosecutor also charged Toledo with influence peddling, in violation of Section 400 of the Peruvian
Criminal Code, as an alternative to collusion, but later decided not to proceed on that charge.   *See* EX
DE 142-1 (Pet. Ex. G) at 2.

On February 9, 2017, the First National Preliminary Investigation Court in Peru issued an arrest
warrant for Toledo, who had left Peru for California the previous month.   *See* ER at 3412-3553, 5990.
On May 25, 2018, Peru sent the United States a request for Toledo's extradition pursuant to the Treaty,
and on June 4, 2019, submitted a supplement thereto.

---

[4] Odebrecht is a subsidiary of Odebrecht S.A., a Brazil-based company that has been implicated
in a massive transnational bribery scheme, involving hundreds of millions of dollars in bribes paid to
foreign officials and others in multiple different countries in exchange for construction contracts.

[5] All monetary amounts included herein are in U.S. dollars unless otherwise indicated.

1   Thereafter, the United States, in accordance with its obligations under the Treaty, filed a

2   complaint in this District seeking a warrant for Toledo's arrest.  The extradition court issued the warrant,

3   and Toledo was arrested on July 16, 2019.  Following a detention hearing, the extradition court ordered

4   Toledo detained for the pendency of the extradition proceedings.  EX DE 16.  The parties continued

5   litigating the issue of detention until the extradition court granted a motion for reconsideration filed by

6   Toledo based on his risk of contracting COVID-19 on March 19, 2020, EX DE 115; and Judge Vince

7   Chhabria denied the government's appeal thereof, EX DE 118.  Toledo is currently released on a $1

8   million bond and home confinement, along with other conditions.  *See* EX DE 120; EX DE 169.

9   The parties agreed to bifurcate briefing on the merits of the extradition.  Accordingly, first, on

10  July 10, 2020, Toledo filed a motion to dismiss presenting all of his challenges to extradition except

11  those relating to probable cause, which were that: (1) Toledo was not charged with the crimes for which

12  his extradition is sought, as required under the Treaty, and (2) Peru failed to provide a copy of the

13  relevant charging document, as required under the Treaty.[6]  EX DE 137.  Second, on July 8, 2021,

14  Toledo filed a motion to dismiss presenting his argument that extradition should be denied for lack of

15  probable cause.  EX DE 170.  The extradition court denied both motions in separate orders issued on

16  September 4, 2020, and September 28, 2021.  EX DE 147 (Pet. Ex. H, hereinafter, "EX Order 1"); EX

17  DE 188 (Pet. Ex. M, hereinafter, "EX Order 2").

18  In its order on the first motion, the extradition court found that the Treaty applies to fugitives,

19  such as Toledo, who are generally sought for prosecution, regardless of whether formal charges have

20  been filed against them.  EX Order 1 at 1-5.  The extradition court concluded that the Prosecutor's

21  Decisions, even if not styled like a U.S. indictment, constituted charging documents in the sense that

22  they identified the criminal conduct alleged to have been committed by the named defendants as well as

23  the provisions of law alleged to have been violated.  *Id.*  The court rejected Toledo's arguments that the

24  Treaty required the existence of formal charges, and the inclusion of a formal charging document in the

25  extradition request, as not being supported by the text of the Treaty, being overly formalistic for

26

27

28

_____

[6] Toledo also challenged whether the influence peddling charge was covered by the Treaty, but that challenge became moot when Peru withdrew its request with respect to that charge.

1  purposes of extradition, and improperly requiring an in-depth analysis of the formalities of another

2  country's criminal procedure laws.  *Id.* at 5-8.

3          While the first motion to dismiss was pending, the Peruvian criminal case progressed in

4  accordance with Peruvian law, and on August 11, 2020, the prosecutor issued the *Acusacion Fiscal*, a

5  charging document entitled "Combined Request (Order of Dismissal and Criminal Information) to the

6  Judge of the First National Court for Preliminary Investigation Proceedings with Jurisdiction over

7  Organized Crime,"[7] enumerating the charges against Toledo and other defendants, and dismissing

8  certain other charges.  This document, which is 1,269 pages long (in Spanish), also describes the

9  evidence underlying the charges.

10         Peru subsequently transmitted that document to the United States as a supplement to its request

11 for Toledo's extradition (hereinafter, "SER").  *See* EX DE 171.  Although the extradition court

12 acknowledged the issuance of the *Acusacion Fiscal* in its order denying Toledo's first motion to dismiss,

13 it did not rely on that document in reaching its decision, as the document had not yet been officially

14 received by the United States at that time.  *See* EX Order 1 at 9.

15         In its order on Toledo's second motion to dismiss, the extradition court rejected Toledo's

16 challenges to probable cause.  In particular, the court found that "Barata and Maiman's testimony,

17 combined with Toledo's admissions in this extradition proceeding that he ultimately received

18 approximately $500,000 in Odebrecht bribe money and concerning the path that money and other

19 money took to get to him and to a company and real estate in his mother-in-law's name, establish

20 probable cause to believe that Toledo committed collusion and money laundering."  EX Order 2 at 25.

21 The extradition court recognized that the two witnesses' testimony contained certain inconsistencies,

22 and that some aspects of their stories of what happened would need to be clarified at trial, but regardless

23 concluded that "these issues do not defeat probable cause."  *Id.* at 25-30.

24         In making its probable-cause finding, the extradition court admitted and relied upon the

25 documents presented by Peru in support of its extradition request, including the *Acusacion Fiscal*.  *Id.* at

26 6.  The court also admitted some additional documents offered by Toledo, namely: (1) two excerpts

27

28         [7] This title is written in all capitals in the original text.  Such capitalization in the *Acusacion Fiscal* and the extradition request is not reflected in the quotations from those documents contained herein.

from the *Acusacion Fiscal*; (2) a complete transcript of testimony provided by Barata, only excerpts of which were included in the *Acusacion Fiscal*; and (3) the first 157 pages of a 193-page transcript of a deposition taken of Maiman. *Id.* at 7-12.  The court declined to admit the remainder of the 193-page transcript and other documents offered by Toledo, including a different transcript of the same deposition of Maiman, which included objections and argument by counsel, and the judge's rulings thereon; a copy of Maiman's cooperation agreement with the Peruvian government; a nominee agreement between a company owned by Maiman and the company from which Odebrecht funds were disbursed to purchase properties associated with Toledo; and 2,195 pages of bank records. *Id.*  However, the extradition court found that, even if it were to admit and consider such evidence, doing so "would not dispel probable cause." *Id.* at 29-30.

Also in its order on Toledo's second motion to dismiss, the extradition court determined that all of the other requirements for finding Toledo extraditable had been met and, therefore, certified to the Secretary of State that Toledo may be extradited to Peru on the two charges for which his extradition is sought. *Id.* at 3-5, 30.  On October 28, 2021, Toledo filed the instant *habeas* petition pursuant to 28 U.S.C. § 2241 challenging that certification.

## ARGUMENT

Toledo has failed to meet his burden of establishing that he is held contrary to the Constitution, law, or treaties of the United States.  *See* 28 U.S.C. § 2241.  Accordingly, he is not entitled to *habeas* relief pursuant to the three-part standard established by the Supreme Court in *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925), and his petition should be denied.

## I.      STANDARD OF REVIEW

In reviewing an extradition certification through a petition for a writ of *habeas corpus*, a district court may consider only three issues: (1) whether the extradition judge had jurisdiction, (2) whether the offense charged is "within" the applicable treaty, and (3) whether there was "any evidence" warranting the judge's finding that there was reasonable ground to believe the fugitive guilty.  *Fernandez*, 268 U.S. at 312.  In so doing, the court should review questions of law *de novo* and questions of fact for clear error.  *Vo v. Benov*, 447 F.3d 1235, 1240 (9th Cir. 2006); *Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir. 2011).

"*Habeas corpus*, it is well known, is not a neutral proceeding in which the petitioner and the State stand on an equal footing.  Rather, it is an asymmetrical enterprise in which [the petitioner] seeks to overturn a presumptively valid judgment." *Skaftouros*, 667 F.3d at 158 (internal quotation marks and citations omitted); *see also Fernandez*, 268 U.S. at 312.  Accordingly, the burden is on the petitioner to show by a preponderance of evidence that he is held contrary to the Constitution, law, or the treaties of the United States.  *See Walker v. Johnston*, 312 U.S. 275, 286 (1941); *Skaftouros*, 667 F.3d at 158.

## II.   AS THE EXTRADITION COURT CORRECTLY FOUND, TOLEDO HAS BEEN "CHARGED WITH" THE OFFENSES FOR WHICH HIS EXTRADITION HAS BEEN REQUESTED WITHIN THE MEANING OF THE TREATY

Article I of the Treaty, similar to most extradition treaties, obligates the parties to extradite "persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for, the commission of an extraditable offense," in accordance with the provisions of the Treaty.  As the extradition court properly found, Toledo qualifies as such a person.  *See* EX Order 1 at 8.  This Court should likewise reject Toledo's overly narrow reading of the Treaty to the contrary.

### A.   Under Its Plain Meaning, the Treaty Applies to Fugitives Like Toledo Who Are Sought for Prosecution

"The interpretation of a treaty, like the interpretation of a statute, begins with its text. . . .  [A]ids to its interpretation [also include] the negotiation and drafting history of the treaty as well as the postratification understanding of signatory nations." *Medellin v. Texas*, 552 U.S. 491, 506-07 (2008).  When considering an extradition treaty in particular, it "should be . . . interpreted with a view to fulfil our just obligations to other powers, without sacrificing the legal or constitutional rights of the accused." *Grin v. Shine*, 187 U.S. 181, 184 (1902).  This means, as the Supreme Court articulated in *Factor v. Laubenheimer*, that "if a[n] [extradition] treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."  290 U.S. 276, 293-94 (1933); *see also, e.g.*, *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936).  Courts have applied this principle to conclude that ambiguities in extradition treaties must be construed in favor of effecting their purpose, namely, surrendering the fugitive to the requesting country.  *See, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) (citing cases);

1  *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 n.3 (9th Cir. 1981) (noting the principle that "treaties should

2  be construed to enlarge the rights of the parties").

3          In accordance with this principle, courts, including the Ninth Circuit, have construed the term

4  "charged" in an extradition treaty "in the generic sense only to indicate 'accused'" (in contrast to

5  "'convicted'") of certain crimes, and have concluded that the term does not implicitly impose any

6  requirement that the fugitive be indicted, as in the U.S. legal system, or that formal "'charges' . . .

7  [otherwise] be filed." *In re Assarsson*, 635 F.2d 1237, 1242-44 (7th Cir. 1980); *Emami v. U.S. Dist. Ct.*,

8  834 F.2d 1444, 1448 (9th Cir. 1987) (discussing and adopting the reasoning of *Assarsson*); *cf. Grin*, 187

9  U.S. at 192 (concluding that extradition was proper where "criminal proceedings ha[d] been instituted in

10  Russia," despite the fugitive's complaint that "no indictment has ever been found").[8]  This interpretation

11  of "charged" accounts for the fact that foreign countries have different procedures than the United States

12  for instituting criminal prosecutions.  *See Causbie Gullers v. Bejarano*, 293 F. App'x 488, 489 (9th Cir.

13  2008) ("[T]here is no requirement in the Treaty or otherwise that Mexican proceedings must be

14

---

15          [8] *See also, e.g., In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1186 n.2 (W.D. Okla.
16  2015) (foreign arrest warrant provided sufficient evidence that fugitive was "charged," even without
    evidence of the existence of a formal charging document, because the warrant "identifie[d] the offense
    in the [foreign] criminal code, set[] out the essential facts of the alleged crime, and detail[ed] the
17  evidentiary basis for the charge"); *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 986 (D. Or.
    2011) (rejecting fugitive's argument that he was not "charged" where "[n]o indictment has been issued
18  by [the requesting country] formally charging [the fugitive] with any crime," despite fugitive's claim
    that he was "merely a suspect wanted for investigation"); *In re Extradition of Sacirbegovic*, 280 F. Supp.
19  2d 81, 83-84 (S.D.N.Y. 2003) (rejecting fugitive's argument that he was not "charged" where foreign
    court orders issuing an arrest warrant, together with the extradition request describing "good reason" the
20  fugitive was suspected of having done the criminal act, sufficiently demonstrated an intent to prosecute
    him), *rev'd in part on other grounds by Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009); *Borodin v.
21  Ashcroft*, 136 F. Supp. 2d 125, 129-30 (E.D.N.Y. 2001) (rejecting fugitive's argument in defense of
    extradition that the requesting country "did not formally charge him with any crime, but rather rest[ed]
22  only on a 'soupçonné,' or suspicion"); *Kaiser v. Rutherford*, 827 F. Supp. 832, 834 (D.D.C. 1993)
    (stating that "[t]he Treaty's requirement that a party be charged with an offense simply requires that a
23  party must be accused of a crime and does not require any particular technical stage of foreign criminal
    procedure"; and finding that an arrest warrant and prosecutor's statement given before a judge detailing
24  the prosecution's case against the fugitive "are sufficient to charge [him] for purpose of extradition
    under the terms of the Treaty"); *In re Extradition of Rovelli*, 977 F. Supp. 566, 568 (D. Conn. 1997)
25  (Italian arrest warrant provided sufficient evidence that fugitive was "charged" because it "constitutes a
    charging document under Italian Law"); *In re Extradition of Lehming*, 951 F. Supp. 505, 510 (D. Del.
26  1996) (rejecting fugitive's argument that he was not "charged," where the warrant for his arrest sought
    his detention only "pending further investigation," given information in the warrant as well as a letter
27  from the prosecutor indicating the requesting country's intent to prosecute him); *In re Lam*, No. 1:08-
    MJ-247GSA, 2009 WL 1313242, at *3 (E.D. Cal. May 12, 2009) (rejecting fugitive's argument that he
28  was not "charged" where "although the extradition documents indicate that [he] [wa]s charged with all
    of these crimes, the government subsequently clarified that [he] [wa]s only wanted for questioning
    regarding these offenses").

commenced by an indictment of the type commonly used in criminal proceedings in the United States."). And in any event, "it would be inappropriate to engage in . . . an inquiry into the formal procedure a country uses in instituting prosecution." *Theron v. U.S. Marshal*, 832 F.2d 492, 499-500 (9th Cir. 1987) (rejecting fugitive's argument that South Africa had improperly incorporated an indictment into a superseding indictment), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997). Construing "charged" broadly thus comports with the general reluctance of U.S. courts to delve into analyzing the requirements of foreign criminal procedure, given their lack of expertise in foreign law, and out of respect for foreign countries' sovereignty. *See, e.g.*, *Emami*, 834 F.2d at 1449; *Assarsson*, 635 F.2d at 1244; *cf. Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009).

A broad definition of "charged" is reflected in the Treaty at issue in this case. The three categories of covered persons established in Article I of the Treaty—those "charged with, found guilty of, or sentenced for" an extraditable offense—are further discussed in Article VI of the Treaty, which establishes what documents are required to accompany an extradition request. In particular, Article VI(3) discusses certain documents required where the fugitive "is sought for prosecution," in contrast to Article VI(4), which discusses other documents required where the fugitive "has been found guilty of, or sentenced for" an offense. Thus, "charged" in the Treaty broadly means "sought for prosecution," in contrast to "found guilty" or "sentenced." *Cf. U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("Over and over we have stressed that in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law . . . .") (cleaned up).

This understanding of "charged" is further reflected in the Treaty's history. The Technical Analysis for the Treaty explains that "the negotiating delegations intended that 'charged' persons include those who are *sought for prosecution* for an extraditable offense based on an outstanding warrant of arrest, *regardless of whether such warrant was issued pursuant to an indictment, complaint, information, affidavit, or other lawful means for initiating an arrest for prosecution under the laws in Peru or the United States*." S. Exec. Rep. No. 107-12, at 4 (2002) (emphasis added). That is, as the Technical Analysis confirms, the term "charged" does not depend on whether a formal charging document akin to a U.S. indictment has been filed in the requesting country. *Cf., e.g.*, *Patterson v.*

*Wagner*, 785 F.3d 1277, 1282-83 (9th Cir. 2015) (relying in part on technical analysis to interpret the U.S.-Korea extradition treaty); *In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 569-70 (9th Cir. 2011) (relying in part on technical analysis to interpret the U.S.-Russia mutual legal assistance treaty); *United States v. Davis*, 767 F.2d 1025, 1029-30 (2d Cir. 1985) (relying in part on technical analysis to interpret the U.S.-Switzerland mutual legal assistance treaty); *In re Gambino*, 421 F. Supp. 2d 283, 305 (D. Mass. 2006) ("Senate reports are . . . a proper interpretive guide.") (internal quotation marks and citation omitted).[9]

This is the same understanding of "charged" adopted by the Fifth Circuit in *Garcia-Guillern v. United States* when interpreting the predecessor to the Treaty (the "1899 treaty").[10]  450 F.2d 1189, 1191 & n.1 (5th Cir. 1971).  In that case, the court rejected the argument of a fugitive from Peru that "the evidence did not warrant the conclusion that [he] was ever properly or legally charged with the alleged crime in accordance with the extradition treaty." *Id.* at 1191.  The court concluded that, even though the fugitive's argument was not reviewable by means of a *habeas* petition, "there is no merit to [it]" because "[a] provisional arrest warrant had been issued requiring the appearance of the [fugitive] before a Peruvian Court and in addition, the Supreme Court of Peru has declared that the extradition of the [fugitive] is lawful." *Id.* at 1192 n.1.  The Court did not inquire into the procedures by which Peru had charged the fugitive.

Contrary to Toledo's suggestion (Pet. at 19), the definition of "charged" does not vary depending on the documentary requirements of the applicable treaty.  As a general matter, the term "charged" appears in most extradition treaties, *see* EX DE 140-1 at 2 ¶ 3, and it would be illogical to think that it means one thing in a treaty that does not require that an extradition request be supported by a charging document, and another thing in a treaty that does, *cf., e.g.*, *Martinez*, 828 F.3d at 460-62 (looking to other extradition treaties' provisions on "lapse of time" when interpreting that provision in the U.S.-

---

[9] Toledo cites no support for his argument (Pet. at 22-24) that the Court should rely on the opinion of a Senate staff participant in preparing the Treaty for Senate review—who also previously served as counsel for Toledo—instead of the Treaty's Technical Analysis—which was prepared by the Department of Justice and Department of State "based on their participation in [the Treaty's] negotiation"—when construing the "charged with" requirement.  *See* EX DE 143-3 (Pet. Ex. A) at 6-7 ¶¶ 14-15; S. Exec. Rep. No. 107-12, at 4.

[10] Treaty Between the United States and Peru, Providing for the Extradition of Criminals, U.S.-Peru, Nov. 28, 1899, 31 Stat. 1921 (1901).

Mexico treaty); *Gambino*, 421 F. Supp. 2d at 306 (discussing "'[s]tandard' . . . practice with respect to *non bis in idem* clauses" when interpreting the U.S.-Italy treaty).  As the Second Circuit explained in *Sacirbey v. Guccione*, the documentary requirements of an extradition treaty simply define "the *proof* required under the [relevant] [t]reaty to establish that an individual has been 'charged' with a crime." 589 F.3d 52, 67 (2d Cir. 2009) (emphasis added).  In that case, recognizing the "breadth of the term 'charged,'" the court concluded that the relevant treaty's requirement of providing a warrant in support of an extradition request established what "is required by the Treaty to show that a person has been charged with an extraditable crime"; it did not alter the definition of the term "charged" itself.  *Id.* at 66.[11]

Indeed, the notion that "charged" should be understood broadly to mean "sought for prosecution," irrespective of what documents must be provided in support of an extradition request, is apparent in the fact that treaties with different documentary requirements use the terms interchangeably. For example, like the Treaty, the U.S.-Chile extradition treaty contains a charging document requirement, but it provides for the extradition of "persons sought by the authorities in the Requesting State for prosecution."[12]  However, some treaties lacking any charging document requirement also provide for the extradition of individuals "sought for prosecution," while other such treaties provide for

---

[11] *Sacirbey* involved an extradition request submitted to the United States under its treaty with Bosnia and Herzegovina, which requires the requesting country to provide an arrest warrant, but not a charging document.  589 F.3d at 67.  In that case, the Bosnian court that had issued the warrant provided in support of the extradition request lost jurisdiction over the case and, therefore, could no longer enforce the warrant.  Accordingly, the Second Circuit concluded that Bosnia failed to "satisfy the Treaty's requirement that Bosnia demonstrate a 'charge' by producing a valid arrest warrant."  *Id.*  That case is distinguishable from the instant case because it involved only "an investigation of [the fugitive] in the prosecutor's office—rather than a prosecution in court."  *See id.* at 68-69.  Here, by contrast, criminal proceedings are pending against Toledo in Peru's courts, as evidenced by the *Acusacion Fiscal*, the Prosecutor's Decisions, and the warrant filed therein, as well as by the view of the Peruvian government, discussed below.

[12] *See* Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Chile, arts. 1 & 8(3)(b), U.S.-Chile, June 5, 2013, T.I.A.S. No. 16-1214. Similarly, the U.S.-Korea extradition treaty provides for the extradition of individuals "wanted in the Requesting State for prosecution [or] trial," while the U.S.-Argentina extradition treaty provides for the extradition of individuals "charged with" an extraditable offense; and both treaties require that, in the case of requests for the extradition of "a person who is sought for prosecution," the requesting state must provide "a copy of the charging document, if any," along with a copy of the arrest warrant and information establishing probable cause.  *Compare, e.g.*, Extradition Treaty Between the Government of the United States and the Argentine Republic, arts. 1 & 8(3), U.S.-Arg., June 10, 1997, S. Treaty Doc. No. 105-18 (1997), *with* Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea, arts. 1 & 8(3), U.S.-S. Korea, June 9, 1998, S. Treaty Doc. No. 106-2 (1999).

the extradition of individuals "charged with" an extraditable offense.[13]   Accordingly, the interpretation

of "charged" (or "sought for prosecution") in an extradition treaty does not turn on its documentary

requirements.

      With respect to the Treaty at issue here, the Technical Analysis confirms that Article I contains

"a standard provision" creating an obligation to extradite, without differentiating that provision from

ones in any other treaty.  S. Exec. Rep. No. 107-12, at 4 (2002).  Moreover, as Toledo points out (Pet. at

20), unlike the current Treaty, the 1899 treaty did not require the production of a charging document;

however, the same "charged with" language appears in Article I of both treaties.  During the ratification

process for the current Treaty, neither Article I nor Article VI was identified as a "[k]ey [p]rovision" for

discussion, but rather officials focused on other issues, including the fact that the current Treaty updated

the 1899 treaty by permitting the extradition of nationals and by introducing the dual-criminality

requirement.  S. Exec. Rep. No. 107-12, at 1-3 (2002); *see also* Law Enforcement Treaties: Hearing

Before the Comm. on Foreign Relations, 107 Cong. 721 (2002) (statement of Samuel M. Witten;

prepared statement of Bruce C. Swartz).  There is thus no indication that the drafters of the Treaty

intended to change the meaning of "charged" in Article I by introducing a charging document

requirement in Article VI.  *Cf., e.g.*, *Narayanan v. British Airways*, 747 F.3d 1125, 1127 n.2 (9th Cir.

2014) (noting that, to interpret a successor treaty, courts have relied on precedent interpreting the

original treaty "where the equivalent provision in the [successor treaty] is substantively the same").[14]

---

[13] *Compare, e.g.*, Treaty on Extradition Between the United States of America and Japan, arts. I & VIII(3), U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892, *with* Treaty on Extradition Between the United States of America and the Kingdom of Denmark, arts. 1 & 11, U.S.-Den., June 22, 1972, 25 U.S.T. 1293, *as amended by* the Instrument as Contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union Signed 25 June 2003, as to the Application of the Treaty on Extradition Between the United States of America and the Kingdom of Denmark Signed 22 June 1972, U.S.-Den., June 23, 2005, S. Treaty Doc. No. 109-14 (2006).

[14] The speculation by Toledo's expert (*see* Pet. at 22-23) that the charging document requirement was added to the Treaty due to human rights concerns at the time of drafting is unfounded.  To the contrary, such a requirement has similarly been added to other modern extradition treaties irrespective of such concerns.  *Compare, e.g.*, Extradition Treaty Between the United States of America and Romania and the Protocol to the Treaty Between the United States of America and Romania on Mutual Legal Assistance in Criminal Matters, art. 8(3)(b), U.S.-Rom., Sept. 10, 2007, S. Treaty Doc. No. 110-11 (2008) (requiring "a copy of the charging document"), *with* Treaty Between the United States and Rumania for the Extradition of Fugitives from Justice, art. XI, U.S.-Rom., July 23, 1924, 44 Stat. 2020 (containing no charging document requirement); Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Chile, art. 8(3)(b), U.S.-Chile, June 5, 2013, T.I.A.S. No. 16-1214 (requiring "a document setting forth the charges against the person sought"), *with* Treaty Between the United States and Chile Providing for the Extradition of Criminals, art. III,

1       Contrary to Toledo's suggestion (Pet. at 19), dicta in *Emami* and *Assarsson*, even if it were

2   controlling, would not require a different result.  *See* EX Order 1 at 7-8 (explaining how *Emami* and

3   *Assarsson* support finding that Toledo is "charged").  Toledo attempts to distinguish these cases by

4   noting that the courts suggested that they might have ruled differently if the relevant treaties had

5   included a requirement that the country requesting extradition provide a "formal" charging document.

6   *See Emami*, 834 F.2d at 1448; *Assarsson*, 635 F.2d at 1243.  But, as discussed further below, the Treaty

7   at issue here does not specify what particular form the requisite "charging document" must take.[15]

8       While Toledo argues (Pet. at 20) that interpreting "charged" liberally would render the charging

9   document requirement mere surplusage, that argument is misplaced.  Article VI(3) of the Treaty requires

10  a number of supporting documents, including, in the case of someone "sought for prosecution," a copy

11  of an arrest warrant, a copy of the charging document, and evidence establishing probable cause.  By

12  requiring a copy of the charging document, the Treaty simply recognizes that it is important for the

13  requesting country to identify all charges for which the fugitive's prosecution is sought.  *See* EX DE

14  140-1 at 2-3 ¶ 4.  In some cases—including the instant one—the arrest warrant required under Article

15  VI(3)(a) of the Treaty may not set forth all of the charges for which the fugitive's extradition is sought.[16]

16  *See, e.g.*, *Hill v. United States*, 737 F.2d 950, 952 (11th Cir. 1984) (Canadian arrest warrant stated one of

17  the five offenses for which extradition was sought).  In such cases, submission of a warrant is required to

18  prove that the requesting country has the power to bring the fugitive into custody upon return, but a

19  separate charging document may also be required to satisfy Article VI(3)(b).  *Cf. Grin*, 187 U.S. at 191

20  (arrest warrant demonstrates the requesting country's power to "secure the apprehension of the

21

---

22  U.S.-Chile, April 17, 1900, 32 Stat. 1850 (containing no charging document requirement); Extradition
    Treaty Between the Government of the United States of America and the Government of the Dominican

23  Republic, art. 7.3(b), Jan. 12, 2015, T.I.A.S. 16-1215 (requiring "the document setting forth the charges
    against the person sought"), *with* Convention for the Mutual Extradition of Fugitives from Justice, art.

24  XI, Dom. Rep.-U.S., June 19, 1909, 36 Stat. 2468 (containing no charging document requirement).

25     [15] Toledo's claim (Pet. at 20) that "The Drafters Added the Charging Document Requirement to
    the U.S.-Peru Treaty in Response to *Emami* and *Assarsson*" is not supported by the record in this case

26  (or otherwise).  Rather, it is based simply upon the speculation of his expert—who was not present
    during the Treaty negotiations—that the drafters "would have known" about the cases.  EX DE 143-4

27  (Pet. Ex. B) at 6 ¶ 21.

       [16] Toledo is incorrect (Pet. at 26) that the warrant in this case "lists the offenses for which he is
28  under investigation."  The warrant was issued prior to the addition of the collusion charge and the
    dismissal of the influence peddling charge, and so it enumerates the latter (and not the former) along
    with the money laundering charge.  *See* ER at 3772-75 (Pet. Ex. K); *see also id.* at 3412-3553.

GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. 21-CV-08395-LB                                       14

1    accused").  As discussed further below, the charging document requirement is satisfied as long as the

2    requesting country clearly identifies all of the charges for which prosecution is sought.

3         Given the foregoing, Toledo's argument (Pet. at 24-25) that a fugitive from Peru is "charged"

4    under the Treaty only once a court has issued an Order of Prosecution (*Orden de Enjuiciamiento*) is

5    untenable.[17]  As the extradition court explained, "Toledo's argument is the equivalent of contending that

6    under U.S. law, only an indictment [and not a criminal complaint or information] counts as a charging

7    document for purposes of the treaty."  EX Order 1 at 5.  In any event, "[j]udicial inquiry into foreign

8    criminal procedural issues is limited in the extradition context."  *Fejfar v. United States*, 724 F. App'x

9    621, 622 (9th Cir. 2018); *see also, e.g.*, *Noeller v. Wojdylo*, 922 F.3d 797, 805 (7th Cir. 2019)

10   ("[E]xtradition proceedings are not vehicles for United States federal courts to interpret and opine on

11   foreign law.").  Therefore, the Court's determination of whether Toledo is "charged" under the Treaty

12   should not require delving into the nuances of the Peruvian criminal charging process.

13        Moreover, Toledo's narrow interpretation of "charged" conflicts with the well-established canon

14   of interpretation articulated in *Factor*, discussed above, *see supra* at 8-9, which requires that, to the

15   extent the Court finds that Article I is ambiguous, it should construe the Treaty liberally so as to allow

16   Toledo's extradition.  *See* 290 U.S. at 298.  In other words, to defeat extradition based on Article I of the

17   Treaty, Toledo must show that the Treaty unambiguously means that Peru must have filed an Order of

18   Prosecution against him.  He has failed to do so.

19
20   **B.     Peru Unequivocally Seeks Toledo's Extradition So that He May Be Prosecuted for the Offenses with Which He Has Been Charged**

21        Peru's extradition request makes clear that Toledo is "charged" within the meaning of the Treaty.

22   As an initial matter, Toledo was formally charged with collusion and money laundering via the

23

24        [17] While Toledo relies on the declarations of three Peruvian attorneys in making this argument, he fails to establish that any of these individuals is an expert in Peruvian criminal procedure or

25   extradition.  Zully Robles Apumayta claims to have expertise only in "Parliamentary and Electoral Law and Identity Registration," EX DE 137-3 (Pet. Ex. I) at 2; Jose Palomino Manchego is a constitutional

26   law professor, EX DE 137-4 (Pet. Ex. J) at 2; and, although Moises Aguirre Lucero claims to have "extensive experience reviewing extradition treaties," EX DE 137-2 (Pet. Ex. C) at 2, he provides no

27   support for that claim other than his experience (for an unspecified time) in various government positions, including his current position as a Consultant for the Peruvian Embassy of the People's

28   Republic of China, and regardless, he fails to establish any expertise in Peruvian criminal procedure law. Moreover, the opinions offered by Toledo's declarants are contrary to the view of the Peruvian government on its law, as discussed below.

GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. 21-CV-08395-LB                                                                                      15

*Acusacion Fiscal*—the "Combined Request (Order of Dismissal and Criminal Information)," setting forth the two "charges filed . . . against [Toledo]"—which Peru provided in support of its extradition request. *See* SER at 1, 1562-73; *see also, e.g., id.* at 102 ("After conducting the corresponding preliminary investigation, this Government Attorney General's Office hereby files a criminal information against . . . Alejandro Toledo Manrique, as perpetrator of . . . collusion, as provided for and punished under Section 384 of the Criminal Code . . . and, as perpetrator of the crime of money laundering . . . contained in Section 1 of Law 27765."); *id.* at 1563 (establishing that Toledo "is accused . . . as the perpetrator of the crime against the Public Administration in the form of collusion, . . . punishable by Article 384 of the Criminal Code . . ."); *id.* at 1572-73 (establishing that Toledo "is attributed as author of the commission of the crime of assets laundering . . . contained in Articles 1 of the Law 27765 . . .").[18]

Furthermore, Peru requested Toledo's extradition expressly "for his prosecution on Influence Peddling, Collusion and Money Laundering charges." ER (diplomatic note 5-3-M/43 dated May 25, 2018). As Peru explained in its request, Toledo has been "charged" with those offenses, and its extradition request repeatedly refers to the "charges" against Toledo. *See, e.g., id.* at 2 (requesting Toledo's extradition "so that he may be extradited . . . to respond to the pertinent court for the charges brought against him"); *id.* ("The extradition requested is aimed at bringing the person sought to trial . . . to elucidate (whether he is criminally liable for the facts and charges brought against him) the defendant's liability."); *id.* at 7-11 (stating that the "specific charges against [Toledo]" are influence peddling, collusion, and money laundering); *id.* at 22 (stating that Toledo "has been charged with influence peddling, collusion and money laundering"); *id.* at 167 (referring to Toledo as one of the "parties charged" in the action). Peru also provided a copy of the warrant by which a Peruvian court authorized Toledo's arrest in connection with the criminal case against him. *Id.* at 3412-3553.

---

[18] Peru describes that the case against Toledo arises out of an investigation that Peru conducted into influence peddling and money laundering, as announced in Prosecutor's Decision No. 3 on January 21, 2017. ER at 3152-90. On February 3, 2017, the investigation was "extend[ed]" to Toledo, on the "charges" of influence peddling and money laundering in Prosecutor's Decision No. 6, which "formaliz[ed] and continu[ed]" the investigation into Toledo on those charges. *Id.* at 3191-3247. On March 7, 2017, the investigation was further "extend[ed]" to include "collusion charges" against Toledo in Prosecutor's Decision No. 8. *Id.* at 3248-91. On August 11, 2021, Peru filed its *Acusacion Fiscal*, formalizing its charges.

In addition, on March 13, 2018, the Supreme Court of Justice of Peru ("Peruvian Supreme Court") reviewed and approved the request for Toledo's extradition, noting that Toledo "is currently being tried for the crimes of influence peddling, collusion, and money laundering," *id.* at 5946, and that he is sought "so that he can be prosecuted and tried, i.e., in order to proceed with the purposes of the declaration criminal proceeding," *id.* at 5948-49.  Toledo's Peruvian attorneys had the opportunity to challenge the legality of the extradition request, and did not question the lack of an Order of Prosecution or otherwise raise any argument that Toledo was not "charged" within the meaning of the Treaty at that time.  *See id.* at 6099-6106; SER at 29-30.  To the contrary, his attorneys have been litigating the criminal case against Toledo in Peru, making numerous filings, such as a motion to dismiss (which was denied), in which they acknowledged "[t]he charges filed against" Toledo.  *See* ER at 4358-59; *see also, e.g.*, *id.* at 4483-84 (seeking admission of a "motion to dismiss criminal prosecution").  Accordingly, Toledo's claim now that he has not been "charged" because he is not yet subject to an Order of Prosecution should be rejected.

## C. The Court Should Defer to the View of the U.S. Department of State—with Which Peru Concurs—that the Treaty Applies to Toledo

An independent reason the Court should construe the Treaty to apply to Toledo is that both the U.S. Department of State and the Government of Peru agree that the Treaty applies to him.  "It is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight."  *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (internal quotation marks and citation omitted).  Such deference is even more warranted when its view is consistent with that of its treaty partner.  *See, e.g.*, *Air France v. Saks*, 470 U.S. 392, 399 (1985) ("[I]t is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties."); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982) ("When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation.").

In this case, the view of the U.S. Department of State, as set forth in a declaration by an Attorney Adviser in the Office of Law Enforcement and Intelligence, is that Toledo is "charged" as required under the Treaty.  EX DE 140-1 at 3 ¶ 5.  In accordance with the plain language of the Treaty, the State

1   Department understands persons "charged with" crimes to include those wanted for prosecution, even if

2   "a formal charging process akin to the one used in the United States may not have taken place." *Id.* at 2

3   ¶ 2.  It routinely grants requests for the extradition of such persons under other extradition treaties, and

4   applies the same interpretation of "charged" in the context of the Treaty with Peru.  *Id.* at 2 ¶ 3.  The

5   Court should likewise adopt the same understanding in this case.

6   Deference to the State Department's view is particularly appropriate here for the additional

7   reason that Peru concurs with it.  In particular, as set forth in a supplement to the request for Toledo's

8   extradition, Peru provided its view that Toledo "has been duly charged" under the Treaty, in compliance

9   with the requirement of Article I.  EX DE 140-1 at 32.  Peru explained that Toledo "is currently a

10  'defendant' under Peruvian law" because criminal proceedings—which "start in Peru with a Pretrial

11  Investigation"—are currently pending against him.  *See id.* at 19-24, 29.[19]  Thus, Peru understands

12  Article I to apply to persons like Toledo who are being "prosecuted" for specified extraditable offenses.

13  *Id.* at 28-29, 32.[20]

14  Given the above, the Court should refuse to question the manner by which Toledo is being

15  prosecuted in Peru.  Indeed, extradition courts generally defer to a foreign government's interpretation

16  of its own law.  *See, e.g.*, *Grin*, 187 U.S. at 190; *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016);

17  *Skaftouros*, 667 F.3d at 160 n.20; *Sainez*, 588 F.3d at 717; *Assarsson*, 635 F.2d at 1244.  Such deference

18  is commensurate with the "comity considerations that lurk beneath the surface of all extradition cases,"

19  and with due respect for foreign nations' sovereignty.  *See Martinez*, 828 F.3d at 463; *see also Société*

20  *Nationale Industrielle Aérospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 546 (1987) ("[W]e have long

21

22  [19] Accordingly, Toledo is incorrect (Pet. at 28) that "[i]t is undisputed that the preliminary
23  investigation stage precedes the filing of charges."  Regardless, this claim is also irrelevant, given that
    Peru has now completed the initial, Pretrial Investigation stage of its criminal proceedings against
24  Toledo.  *See* EX DE 142-1 (Pet. Ex. G) at 1.  By filing the *Acusacion Fiscal*, the Peruvian prosecutor
    has "request[ed] that the case advance to the Intermediate Phase of the criminal process [the stage prior
25  to trial] on the basis of certain charges."  *Id.*; *see* EX DE 140-1 at 23-24 (describing Peruvian criminal
    process).

26  [20] This understanding is reflected in the Spanish version of the Treaty (*available at*
    https://www.state.gov/wp-content/uploads/2019/04/03-825-Peru-Extradition-Treaty.pdf), which uses the
27  term "procesadas" for "charged with" in Article I.  *See* Treaty (providing that the English and Spanish
    texts are "equally authentic").  Peru has explained that such language "corresponds to the term
28  'procesado' . . . in the [Peruvian] Code of Criminal Procedure (Legislative Decree 957) and refers to a
    person who is formally investigated by a prosecutor and under the control of a guarantee judge, called a
    pretrial investigation judge."  EX DE 140-1 at 29.

recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation."); *Sainez*, 588 F.3d at 717; *Koskotas v. Roche*, 931 F.2d 169, 174 (1st Cir. 1991); *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990).  It is further supported by the prudential policy of avoiding the high risk that a U.S. court might erroneously interpret the law of a foreign country.  *See Emami*, 834 F.2d at 1449; *Assarsson*, 635 F.2d at 1244.  Deference is particularly appropriate where, as here, the requesting country's interpretation comports with a decision of its own courts.  *See, e.g.*, *United States v. Trabelsi*, 845 F.3d 1181, 1192 (D.C. Cir. 2017) ("U.S. courts will defer to the judgment of foreign courts construing their own laws."); *U.S. ex rel. Saroop v. Garcia*, 109 F.3d 165, 169 (3d Cir. 1997) ("Under the international principle of comity [a foreign court's] judgment is entitled to recognition [by a U.S. court]."); *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) ("[W]hen possible, the decisions of foreign tribunals should be given effect in domestic courts . . . .") (citation omitted).

Toledo's suggestion (Pet. at 17) that the Court should ignore the view of Peru when interpreting the Treaty is misguided.  As the Supreme Court has stated, "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is [still] given great weight."  *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961).  Moreover, Toledo's citation to *United States v. Van Cauwenberghe*, 827 F.2d 424, 429 (9th Cir. 1987), is inapposite.  The issue in that case, which involved a request submitted by the United States to Switzerland, was whether Switzerland properly determined that the offenses at issue were extraditable under the relevant treaty.  *Van Cauwenberghe*, 827 F.2d at 429.  The Court ultimately "defer[red]" to Switzerland's decision that the fugitive was extraditable.  *Id.*  Toledo's citation to *In re Extradition of Sainez*, No. 07-MJ-0177-JMA, 2008 WL 366135, *5 (S.D. Cal. Feb. 8, 2008), is equally inapposite.  There, the court decided that it was "required to conduct an independent analysis of the appropriate statute of limitations when considering a request for extradition," where Mexico had failed to provide any explanation of the statute of limitations at issue but instead had simply asserted that the underlying arrest warrant was valid.  Accordingly, in fulfilling its role of interpreting the Treaty, the Court should give deference to the view of both parties thereto.

1       The practice of the two parties further confirms that the Treaty does not require that a formal

2 charging process akin to that in the United States have occurred in the requesting country. *See Sabatier*

3 *v. Dabrowski*, 586 F.2d 866, 868 (1st Cir. 1978) (relying on the "history of the relations between the two

4 countries," *inter alia*, to determine that an offense was extraditable under the U.S.-Canada extradition

5 treaty); Vienna Convention on the Law of Treaties, art. 31(3)(b), May 23, 1969, 1155 U.N.T.S 331

6 (requiring that treaties must be interpreted by taking into account, *inter alia*, "[a]ny subsequent practice

7 in the application of the treaty which establishes the agreement of the parties regarding its

8 interpretation"). *See* EX DE 140-1 at 31.  As Peru noted, the United States has previously extradited

9 another fugitive to it even where no formal, U.S.-style charging document had been issued.  In

10 particular, the United States extradited William Tricket ("Tricket") to Peru for prosecution on a

11 homicide charge in 2008, while the Peruvian criminal proceedings were at a preliminary stage, where

12 Tricket was not subject to an Order of Prosecution but rather to an order to open investigation analogous

13 to the Prosecutor's Decisions in Toledo's case.[21]  *Id.*  Regardless, Peru sought, and the United States

14 granted, extradition based on the Treaty.  Likewise, here, Peru has properly sought Toledo's extradition

15 under the Treaty even though he is not subject to an Order of Prosecution.

16
17 **III.**    **AS THE EXTRADITION COURT CORRECTLY FOUND, PERU HAS COMPLIED WITH THE CHARGING DOCUMENT REQUIREMENT OF THE TREATY**

18       Relatedly, Peru's extradition request is "supported by . . . a copy of the charging document," as

19 required by Article VI(3)(b) of the Treaty.  The extradition court properly found that Peru complied with

20 that Treaty requirement in its original extradition request by providing copies of the Prosecutor's

21 Decisions.  *See* EX Order 1 at 3.  As the Government of Peru stated in the request, "[t]he general and

22 specific charges brought against [Toledo] are listed in" these documents.  ER at 6.[22]  When Peru

23 subsequently concluded the Pretrial Investigation stage of its proceedings, it issued the *Acusacion Fiscal*

24 and provided that document as a supplement to its extradition request.  *See* EX DE 142-1 (Pet. Ex. G) at

25
26    [21] According to Peru, the *Tricket* case was filed in that country under a now-repealed version of its criminal procedure code.  EX DE 140-1 at 31.  Therefore, the request for Thicket's extradition was supported with an order to open investigation, which "is equivalent to the formalization of a pretrial investigation in the current criminal procedure."  *Id.*

27
28    [22] Similarly, the warrant for Toledo's arrest (which predates Prosecutor's Decision No. 8) specifies that "[t]he specific charges against [Toledo] are contained in District Attorney's Decision No. 06 dated February 03, 2017," that is, "i) Influence Peddling; and, ii) Money Laundering").  ER at 209.

1; EX DE 171.  The Government of Peru explained that "[t]he *acusacion fiscal* replace[d] the prosecutor's decisions as the operative charging document for the case at the current stage in the criminal process."  EX DE 142-1 (Pet. Ex. G) at 1.  As noted above, both the Prosecutor's Decisions and the *Acusacion Fiscal* identify Toledo and recite the "charges" of collusion and money laundering against him, in addition to providing a detailed description of the facts underlying each alleged offense.  As with the "charged" requirement in Article I of the Treaty, both a plain reading of Article VI(3)(b) as well as the views of both parties to the Treaty indicate that the *Acusacion Fiscal*, like the Prosecutor's Decisions previously, satisfies the "charging document" requirement in this case.

The plain text of Article VI(3)(b) does not specify that any particular type of charging document, such as an indictment, charge sheet, or any other formal document, is required.  *See* EX Order 1 at 3 ("[T]he plain language of the treaty doesn't seem to impose narrow and technical limits on the manner in which the requesting state *charges* a person.").  Accordingly, as the U.S. Department of State recognizes, the drafters of the Treaty allowed for different types of documents to fulfill the requirement. *See* EX DE 140-1 at 2-3 ¶ 4; *cf., e.g.*, *Assarsson*, 635 F.2d at 1243 ("If the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided."); *Emami*, 834 F.2d at 1448 ("grafting such a [formal charge] requirement as Emami proposes on to the treaty in the instant case is inadvisable").

Toledo's contention (Pet. at 29) that only an Order of Prosecution, and not the Prosecutor's Decisions (or *Acusacion Fiscal*), satisfies Article VI(3)(b) is thus incorrect.  Indeed, the Spanish version of the Treaty's charging document requirement does not identify that specific type of document (the "*Orden de Enjuiciamiento*") but rather just the "*documento de imputación*."

As Toledo notes (Pet. at 28), the Treaty reflects a different approach to the documentary requirements in Article VI(4)(a), which, in the case of a person already found guilty or sentenced, requires the requesting country to provide "a copy of the judgment of conviction or, if such copy is not available, a statement by a competent judicial authority that the person has been found guilty."  While Toledo suggests that Article VI(4)(a) is more permissive than Article VI(3)(b), that is not so.  The fact that Article VI(4)(a) expressly permits an alternative to a copy of the judgment of conviction to suffice when the latter is not available may simply indicate that the "judgment of conviction" refers to a specific

document.  By contrast, the absence of similar language allowing for an alternative to the "charging document" may suggest that the documentary requirement in Article VI(3)(a) is not so rigid, such that no express provision for an alternative is necessary.  Thus, as the extradition court found, "[t]he term 'charging document' seems deliberately expansive [and] [c]ertainly . . . is broader and less precise than 'judgment of conviction.'"  EX Order 1 at 2.

In any event, in accordance with *Factor*, courts have interpreted extradition treaties' documentary requirements broadly.  290 U.S. at 298.  For example, the Supreme Court in *Grin v. Shine* established that the warrant requirement in extradition treaties must be broadly interpreted, explaining that "it can hardly be expected of us that we should become conversant with the criminal laws of [a requesting state], or with the forms of warrants of arrest used for the apprehension of criminals."  187 U.S. at 190.  Accordingly, the Court held that the U.S.-Russia treaty's warrant requirement was satisfied by a document that was "evidently designed to secure the apprehension of the accused, and his production before an examining magistrate," even though it did not resemble a U.S. arrest warrant.[23]  *Id.* at 190-91; *see also, e.g.*, *Basic*, 819 F.3d at 901 ("We will not second guess th[e] determination" by Bosnia that a "[d]irective to find and arrest" the fugitive "for detention and issuance of an international arrest warrant" constituted the "warrant of arrest" required under the applicable extradition treaty); *United States v. Nolan*, 651 F. Supp. 2d 784, 796 (N.D. Ill. 2009) (Costa Rican arrest warrant satisfied the relevant treaty's requirement that the requesting country provide "[a] copy of the charging document, or an equivalent document issued by a judge or judicial authority"); *cf., e.g.*, *Sainez*, 588 F.3d at 717 (concluding that, for the purpose of an extradition proceeding, a Mexican arrest warrant could constitute a charging document even if it was not analogous to a U.S. indictment, such that it tolls the U.S. statute of limitations, based on "established approach of giving credence to foreign proceedings").

---

[23] The warrant requirement in the U.S.-Russia treaty (which is no longer in force) provided that when a fugitive is "merely charged with the commission of an extraditable crime or offense, the application for extradition shall be accompanied by an authenticated copy of the warrant of arrest or of some other equivalent judicial document, issued by a judge or a magistrate duly authorized to do so." *Grin*, 187 U.S. at 190.  The Court described the warrant at issue in that case as "a certified copy of an order by one purporting to act as an examining magistrate, and reciting that 'having investigated the preliminary examination concerning the accusation of the [fugitive],' . . . 'he is ordered to be brought to the city of Rostov on the Don, in order to be placed at the disposition of the examining magistrate . . . .'" *Id.* at 190-91.  The document did not, apparently, specify the underlying charges for which Russia sought extradition.

1    This Court should likewise refuse to impose *sub silentio* technical requirements on the form and

2    substance of Peru's "charging document" for purposes of the Treaty.  The fact that Peru's charging

3    documents might not adhere to all the rituals of a U.S.-style charging document is immaterial.  *See, e.g.*,

4    *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("It is common in extradition cases to attempt to bring

5    to bear all the factitious niceties of a criminal trial at common law.  But it is a waste of time."); EX

6    Order 1 at 4 ("[W]e have to remember that other countries use different terminology in their legal

7    systems, so we need to look to substance and not get too caught up in words and labels.").  As the

8    extradition court noted, "[t]he Prosecutor's Decisions read like criminal complaints, spelling out the

9    accused conduct and charging the named defendants with specific crimes."  EX Order 1 at 4.  The

10   *Acusacion Fiscal* even more closely resembles a U.S.-style charging document in that it is entitled in

11   part a "Criminal Information," in addition to being issued by a prosecutor at the close of the initial

12   investigation stage, clearly setting forth the "charges" against Toledo (and his co-defendants), and

13   detailing the factual allegations underlying those charges.  *See* SER at 1 *et seq.*[24]

14       The views of the U.S Department of State and Peru further support a finding that the *Acusacion*

15   *Fiscal* satisfies the Treaty's "charging document" requirement.  In particular, both Treaty parties agree

16   that Peru satisfied the documentary requirement set forth in Article VI(3)(b) by providing the

17   Prosecutor's Decisions, which were subsequently superseded by the *Acusacion Fiscal*.  *See* EX DE 140-

18   1 at 3 ¶ 5; SER at 27.  As the State Department concluded, the Prosecutor's Decisions constituted "the

19   charging document" because they identify the charges for which Toledo's prosecution is sought, which

20   is all that Article VI(3)(b) requires.  *See* EX DE 140-1 at 2-3 ¶¶ 4-5.  Peru similarly concluded that the

21   Prosecutor's Decisions, *i.e.*, the "charging documents resulting from the Decision to Formalize the

22   Pretrial Investigation are 06 and 08, which were submitted in the extradition request," satisfied Article

23   VI(3)(b) of the Treaty because they "contain the charges and evidence against" Toledo.  *See* SER at 27-

24   28.  According to Peru, a document formalizing a pretrial investigation such as the Prosecutor's

25   Decisions is "issued by a prosecutor when there is probable cause," and serves the function of informing

26   the defendant of the factual allegations against him and the alleged violations of law.  *See* EX DE 140-1

27

28   _____

[24] The fact that the prosecutor dismissed certain charges that were pending against some of Toledo's co-defendants in the *Acusacion Fiscal* provides further proof that the Prosecutor's Decisions served as charging documents.  *See* SER 56-101.

GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. 21-CV-08395-LB                                                                                         23

at 24-25.  Similarly, "the Prosecutor responsible for the case presents the *acusacion fiscal*" at the end of the Pretrial Investigation, "when there are sufficient elements for conviction that sustain the advancement of the criminal proceeding," and it serves the same function as the Prosecutor's Decisions.  *See* EX DE 142-1 (Pet. Ex. G) at 1.  The parties thus do not interpret Article VI(3)(b) of the Treaty to require the Order of Prosecution.  As explained above, the Court should defer to these views.

These views also accord with the conclusion of the Peruvian Supreme Court, which approved the request for Toledo's extradition.  In its decision, that court refers to the Prosecutor's Decisions in a section entitled "Formal Charges or Criminal Indictment," ER at 5980-83, and holds that "[t]he documents required by the Treaty," including "copies of the prosecution's charging documents," are "attached to th[e] extradition request," *id.* at 5980, 6096-97.  Just as Toledo's Peruvian counsel declined to challenge that the "charged" requirement of Article I was met before that court, they similarly declined to challenge that the documentary requirements of Article VI were met, as Toledo does now.

Toledo's heavy reliance (Pet. at 26-27) on the First Circuit's decision in *Aguasvivas v. Pompeo* is misplaced.  984 F.3d 1047 (1st Cir. 2021).  The issue in that case, unlike here, was whether the arrest warrant provided by the Dominican Republic in support of an extradition request satisfied not only the relevant treaty's requirement that the requesting country provide a warrant, but also its requirement that the requesting country provide "the document setting forth the charges."  *Id.* at 1057-58.  The court held that the warrant could not do "double duty" to satisfy both requirements.  *Id.* at 1058-61.  That holding does not apply here, where Peru does not contend that its warrant functions as its charging document, but rather has provided both a warrant and separate charging documents.  *See* EX Order 1 at 6-7.  Furthermore, although the *Aguasvivas* court concluded that the warrant in that case could not serve as the requisite charging document, it recognized that a charging document could come in multiple forms, as "an indictment, a criminal complaint, or in some circumstances in this country, an information," *i.e.*, "something more than a warrant procured by a prosecutor who has not yet decided to bring charges."  984 F.3d at 1058-59.  It thus declined to adopt the district court's finding that "[t]he Treaty's requirement that the Dominican Republic government must include 'the document setting forth the charges against the person,' refers to a *formal* charging document."  *See Aguasvivas v. Pompeo*, 405 F. Supp. 3d 347, 355 (D.R.I. 2019) (emphasis added); *see also* EX Order 1 at 6 (noting that "the adjective

1   'formal'—used to modify the term 'charging document'—crept into the [*Aguasvivas* district] court's

2   decision without any analysis").

3        In this case, the *Acusacion Fiscal* fulfills the function of making Toledo aware of the charges for

4   which his extradition is sought.  To require something more and find that only one specific document

5   may contain the charges, as Toledo asks this Court to do, would improperly elevate form over substance.

6   Accordingly, Toledo's argument that Peru's extradition request is not supported by a "charging

7   document" under the Treaty should be rejected.

8   **IV.   THE EVIDENCE PROVIDED BY PERU AMPLY SATISFIES THE "ANY EVIDENCE"**
    **STANDARD OF REVIEW APPLICABLE TO THE EXTRADITION COURT'S**
9   **PROBABLE-CAUSE FINDING**

10        The record before the extradition court contained ample evidence supporting its finding that

11   there was reasonable ground to believe that Toledo committed the crimes with which he has been

12   charged.  To demonstrate probable cause, the government offered, and the extradition court admitted,

13   the *Acusacion Fiscal*, as well as other summaries of the case against Toledo and much of the underlying

14   evidence itself, including the testimony of two key witnesses, Barata and Maiman.  The extradition court

15   concluded that "Barata's testimony provides evidence of the collusive agreement," "Maiman's

16   testimony provides evidence to support the money laundering charge," and Toledo's admission that he

17   received some of the bribe money via "a company owned by his mother-in-law, which also spent [some]

18   bribe money to buy real estate in his mother-in-law's name . . . support[s] probable cause to believe that

19   Toledo knew he had received bribe money."  EX Order 2 at 25-28.

20        "[T]he magistrate's probable cause finding . . . must be upheld if there is any competent evidence

21   in the record to support it."  *Santos*, 830 F.3d at 1001.[25]  "Competent evidence" is generally evidence

22   that has been properly authenticated pursuant to 18 U.S.C. § 3190 or the applicable treaty.  *See Manta*,

23

24

25       [25] While the probable-cause standard is by no means "toothless," it "does not even require that

26   the government make its showing by a preponderance of the evidence."  *United States v. Kin-Hong*, 110
    F.3d 103, 120-21 (1st Cir. 1997); *see also United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006)

27   (an banc).  Probable cause thus exists even where "the evidence introduced . . . is not overwhelming."
    *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986).  While "[c]onclusory statements alone" will not

28   suffice, all that is required is "sufficient evidence from which an inference [may] be drawn" that the
    elements of the foreign crime have been met.  *In re Extradition of Trinidad*, 754 F. Supp. 2d 1075, 1082
    (N.D. Cal. 2010).

1   518 F.3d at 1146; *cf. Santos*, 830 F.3d at 1001 (carving out an exception for evidence obtained by

2   coercion).[26]

3           While Toledo recognizes the *habeas* standard for upholding the extradition court's probable-

4   cause determination, he fails to explain how it is not met in this case (nor could he).  Instead, he argues

5   (Pet. at 38-45) that there is no "credible evidence."  But "'[a]n accused in an extradition hearing has no

6   right . . . to pose questions of credibility as in an ordinary trial . . . .'"  *Santos*, 830 F.3d at 992 (quoting

7   *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981)); *see also, e.g.*, *Shapiro v. Ferrandina*, 478 F.2d 894,

8   905 (2d Cir. 1973) ("The judge's refusal to examine the credibility of the testimony and statements

9   included in the translated material was clearly proper . . . .").  To the extent that credibility may be

10  considered at all, "[t]he credibility of witnesses and the weight to be accorded their testimony is solely

11  within the province of *the extradition magistrate*."  *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir.

12  1986) (emphasis added).  Accordingly, Toledo's credibility attacks, which failed before the extradition

13  court, are unavailing on *habeas* review.  *See, e.g.*, *Man-Seok Choe v. Torres*, 525 F.3d 733, 740 (9th Cir.

14  2008) (rejecting fugitive's arguments that the requesting country's evidence was not reliable and a

15  witness was not credible); *Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993) ("Bovio has no

16  right to attack the credibility of either [witness, one who failed to indicate how he obtained the

17  information discussed, and the other who admitted to lying during the investigation] at this stage of the

18  proceedings; issues of credibility are to be determined at trial.").  The Court should thus reject Toledo's

19  probable-cause argument on this ground alone.

20          But even taking into account Toledo's credibility attacks, as discussed further below, the

21  statements of Barata and Maiman each independently satisfy the "any evidence" standard.  *See* EX

22  Order 2 at 13-24 (summarizing Barata and Maiman's statements); *see, e.g.*, *Zanazanian v. United States*,

23  729 F.2d 624, 627 (9th Cir. 1984) ("[T]he self-incriminating statements of accomplices are sufficient to

24  establish probable cause in an extradition hearing.") (citing *Curreri v. Vice*, 77 F.2d 130, 132 (9th Cir.

25  1935)); *see generally Ornelas v. Ruiz*, 161 U.S. 502, 512 (1896) (probable cause is "proof furnishing

26  good reason to believe that the crime alleged has been committed by the person charged with having

27

28  ―――――――――――――
    [26] Toledo does not contest that the evidence from Peru was competent.  Indeed, as the extradition court noted, the documents were authenticated pursuant to 18 U.S.C. § 3190.  EX Order 2 at 2, 6 n.1.

1  committed it").  In short, Barata says that Toledo solicited a bribe, which Barata agreed to, and did in

2  fact pay, via companies owned by Maiman, in exchange for Toledo favoring Odebrecht in the tender for

3  contracts to construct the Highway; Maiman says that he received and laundered the bribe from

4  Odebrecht for Toledo, on Toledo's behalf and upon his instructions, through Maiman's and other

5  accounts.  Their statements are specific, detailed, and corroborated by significant evidence.  The

6  extradition court's factual findings based upon these statements are subject to clear-error review.  *See*

7  *Vo*, 447 F.3d at 1240.

8          Notably, Toledo concedes (Pet. at 37, 44-46) that Odebrecht paid the alleged bribe, that the bribe

9  proceeds were laundered, and that he received some of those laundered funds (albeit in the form of a

10  loan).  He argues, however, that it was not him, but rather his friend Maiman who solicited, received,

11  and laundered the bribe.  *See id.* at 36-37, 45-46.  This approach of pointing the finger at someone else

12  fails to defeat a finding of probable cause, let alone *habeas* review thereof.  *See, e.g., Peroff v. Hylton*,

13  542 F.2d 1247, 1249 (4th Cir. 1976) ("It may be that on the full trial Peroff may be able to submit

14  substantial proof that another rather than he was the perpetrator of the fraud, but that is a matter for

15  exploration during the trial in Sweden and not for extensive evidentiary inquiry during the extradition

16  hearing."); *In re Extradition of Nava Gonzalez*, 305 F. Supp. 2d 682, 693 (S.D. Tex. 2004) (rejecting

17  fugitive's "theory of a conspiracy masterminded by mostly anonymous [ruffians] to wrongly accuse him

18  of the early-morning attack" as "highly implausible," and also concluding that "the final resolution of

19  such issues will be left to the Mexican judicial system"); *Sainez*, 2008 WL 366135, at *17 (rejecting

20  fugitive's claim that someone else committed the shooting of which he was accused because "none of

21  []his evidence is sufficient to negate [the victim's] definitive statements that [the fugitive] shot him and

22  [another individual]"), *certification upheld on habeas review by Sainez*, 588 F.3d 713.

23          **A.    Toledo's Argument Regarding the Extradition Court's Evidentiary Rulings Does**

24          **Not Present a Basis for *Habeas* Relief**

25          As a preliminary matter, Toledo's argument (Pet. at 32-36) that the extradition court "erred" in

26  declining to consider certain evidence offered by Toledo is unavailing because the "wrongful exclusion

27  of specific pieces of evidence, however important, does not render [a fugitive's] detention illegal."

28  *Collins*, 259 U.S. at 316; *see also Charlton v. Kelly*, 229 U.S. 447, 456-57 (1913) ("A writ of habeas

corpus cannot be used as a writ of error. . . .   Mere errors in the rejection of evidence are not subject to review by a writ of habeas corpus.").  Indeed, the extent to which a fugitive may offer evidence at an extradition hearing is within the discretion of the judge.  *See, e.g.*, *Santos*, 830 F.3d at 1007-08.  Therefore, Toledo's claim does not present a cognizable basis for granting *habeas* relief.  And in any event, the extradition court correctly concluded that consideration of the excluded evidence would not alter its probable-cause decision.  *See* EX Order 2 at 29.[27]

## B.  Peru's Extradition Request Amply Establishes Probable Cause That Toledo Committed Collusion

Ample evidence provided by Peru supports the extradition court's finding of probable cause for the collusion charge.  The elements of collusion under Peruvian law are: (1) the defendant was a government official or civil servant; (2) by reason of his or her position, the defendant participated at any stage in contracts, supplies, tenders, competitive biddings, auctions, or any other similar operations conducted by the government; and (3) in connection therewith, the defendant defrauded the State of Peru or state-supported bodies or entities by making arrangements with the concerned parties in agreements, adjustments, liquidations, or supplies.  *See* ER at 3280-85; SER at 54-56, 1915-25.

Peru's evidence demonstrates that in 2004, when Toledo was the President of Peru, he used his authority in that position, and particularly his influence over the Private Investment Promotion Agency ("Proinversion"), a Peruvian state agency, to solicit and agree to a bribe in connection with Proinversion's awarding of contracts to construct the Highway.  *See, e.g.*, ER at 5964-68 (description of criminal conduct set forth in decision of the Peruvian Supreme Court).  In particular, individuals acting on behalf of Toledo, including Avraham Dan On ("Dan On"), Gideon Weinstein ("Weinstein"), and Sabi Saylan ("Saylan"), told Barata that Odebrecht should pay Toledo a $35 million bribe.  They offered that, in exchange, Toledo would ensure that the schedule for the Highway project would not be delayed and that the conditions for bidding on the project would be modified, so as to facilitate Odebrecht

---

[27] To the extent Toledo relies in his petition on evidence that the extradition court excluded, his arguments should be rejected.  *See, e.g.*, Pet. at 35-36 (discussing money trail based on financial records obtained by Toledo); *id.* at 43-44 (quoting terms of the nominee agreement); *id.* at 45-46 (discussing bribe money purportedly used by Maiman and subject to forfeiture); *id.* at 46 (arguing about the trail of bribe money based on Maiman's cooperation agreement); *see also* Pet. Exs. O, P, Q, T, & Y.

winning the contracts.[28]  Barata agreed to pay the bribe.  Toledo was thereafter involved in Proinversion's tender process, and Odebrecht was ultimately awarded contracts for two sections of the Highway at a ceremony that Toledo attended, held at the presidential palace, after a Proinversion Committee Chairman who had been appointed by Toledo dismissed last-minute concerns about Odebrecht's qualifications.

Toledo's arguments that the evidence is insufficient to establish probable cause are meritless.  Specifically, he argues (Pet. at 36-37, 45-46) that Maiman executed an elaborate scheme in which he pretended to seek a bribe for Toledo, when in fact he intended the money for himself.  However, the evidence does not support this theory.  Rather, it establishes probable cause that Toledo was the true bribe-seeker, as multiple witnesses attested to that fact, and there is evidence that Toledo received bribe funds and also made efforts to comply with and to enforce the bribe agreement.

### 1.   Toledo Received Bribe Money

Strong proof demonstrating that Toledo made an agreement to receive a bribe comes from evidence establishing that he actually received bribe money.  Barata stated that he paid some money directly to Toledo.  Specifically, Barata described that "I personally have handed over money to Mr. Alejandro Toledo . . . [i]n his house, in the palace, on several occasions, in Avi Dan On's house . . . ." SER at 1136.  Moreover, Toledo concedes (*see* Pet. at 44) that he received $500,000 of the bribe money, purportedly as a loan.  He also concedes (*see id.*) that other bribe money was used to purchase properties in Peru, each of which was purchased in his mother-in-law's name and which has a nexus to him (as detailed below), thereby creating an inference that such money was in fact used for Toledo's benefit.  Such evidence, even if it involves only part of the bribe funds, clearly implicates Toledo in the bribe agreement, and undercuts his claim (*id.* at 37) that he "had no idea that the agreement existed."  *See* EX Order 2 at 28 ("Toledo's description of the path the bribe money took," to the $500,000 loan and the real estate in his mother-in-law's name, "is enough for probable cause.").[29]

---

[28] To bid on the Highway project, Odebrecht entered into joint ventures with Peruvian companies, *see* ER at 28, but for ease of reference, these joint-venture companies are referred to collectively as "Odebrecht" herein.

[29] Barata further stated that he gave $300,000 or $400,000 to Toledo personally in cash, purportedly for Toledo's 2010 presidential campaign.  SER at 1292-95.

2.   Peru's Evidence Establishes that the Bribe Was Intended for Toledo

Relatedly, other evidence submitted by Peru indicates that no one other than Toledo was ever discussed as the intended recipient of the bribe. The other party to the bribe agreement, Barata, has stated unequivocally and consistently that he understood that Odebrecht would pay Toledo in order to ensure its success in the Highway tender. Barata describes a number of encounters in which the arrangements for a bribe expressly for Toledo were made:

- "At the end of 2004, during a social event in the Government Palace, I was contacted by Avi Dan On, the immediate assistant and intermediary of the President of the Republic at the time, Alejandro Toledo, who offered to favor Odebrecht in the biddings for the construction of Sections 2, 3, and 4 of the Highway." ER at 353; *see also* EX DE 170-1 (Pet. Ex. W) at 53 ("[T]he first conversation was with Avi Dan On," who said "what we want is compensation for facilitating. We're going to help you, and President Toledo will support you. Just tell me what you need; we'll guarantee this process.").

- "Subsequently, in the first week of November 2004, . . . I participated in a meeting held in the presidential suite of the Hotel Marriot [in] Rio de Janeiro, counting with the presence of Alejandro Toledo, Jose Maiman and two officials of Josef Maiman, called Gideon Weinstein and Sabi Saylan. On this occasion, the officials of Josef Maiman informed me that should Odebrecht be the [sic] awarded the contract in the bidding, it would have to pay a bribe of $35 million to Toledo, via several companies of Josef Maiman Business Group, through the adoption of fictitious contracts with Odebrecht." ER at 354. "[T]he presidential suite is a very large room and I was with the officials of Maiman sitting at a table. Toledo and Maiman were somewhere else inside the Suite. However, for me, the presence of the President of the Republic in the same room was pretty compelling." *Id.* at 359.[30]

- In addition, "I was summoned by Avi Dan On to attend meetings in the Government Palace, in 2005, which we accessed through the side door, with no record of our visit, and which I attended to obtain updates on the bidding. On one of these occasions, Avi Dan On informed me that should Odebrecht win the referred biddings, it would have to make corrupt payments to Alejandro Toledo, the amounts of which would be indicated later on by the officials of the Peruvian-Israeli multimillionaire business Josef Maiman." *Id.* at 353.

Barata thus understood from the beginning that the bribe was for Toledo because his intermediaries "were very objective, very clear [with regard to] . . . the consent and the authorization of the President." EX DE 170-1 (Pet. Ex. W) at 63.

---

[30] *See also* EX DE 170-1 (Pet. Ex. W) at 53 ("We finished arriving at a final figure: the number was thirty-four thousand three hundred, something like that. Not only Mr. Maiman attended this event, but President Toledo as well. He arrives to give confirmation of his, of his presence and validate his knowledge of the subject . . . ."); *id.* at 58 ("The confirmation [of the bribe agreement] took place, we were in a presidential suite, in a room much bigger than this one. There was a table, a dinner table, a dining room, and there was a living room on the other side. So, I had stayed on this side of the dining room table, with Mr. Saby and Mr. Gideon discussing amounts and defining, making timetables and that whole history of payments. . . . And there, at that time, we sealed a deal.").

Maiman corroborates Barata's story, in which Toledo first broached the idea of a bribe toward the end of 2004, and plans were further solidified in Rio de Janeiro. He states:

- "Toward the end of 2004, Alejandro Toledo . . . mentioned he was going to establish a foundation and asked [me] to help him with the reception of donations," which Maiman "suspected . . . might be intended to cover up less-than-transparent activities." ER at 484.

- "It was the end of the year 2004, and [Toledo] told me that he wanted to develop a political program that he hoped to receive contributions, help, and support from Brazilians . . . . At some point, he asked me if I was willing to help him by receiving the funds, to which I said yes. That must have been in the second half of 2004, because in November, once in Brazil, he already knew that I was willing to be the recipient, and when Mr. Barata asked me, he was not offering it but rather trying to confirm if I had accepted to be the recipient." SER at 180-81.

- "In Rio de Janeiro, in November 2004, . . . [in a] suite at the Marriott, there was a meeting between [me], Alejandro Toledo, . . . Wide on Weinstein and Sabih Saylan, and Jorge Baratta." ER at 485.

- In addition, also in Rio de Janeiro, "at some point, Jorge Baratta told [me] that there were going to be donations for Alejandro Toledo's foundation" and Maiman "confirmed to Barata that Alejandro Toledo had indeed already mentioned the matter of the donations" and "confirmed [my] willingness to receive the funds." *Id.* at 486; 503.

Other evidence further corroborates Toledo's (and Barata's) presence at the Marriott in Rio de Janeiro on November 4, 2004—nor has Toledo contested that fact. *See id.* at 2149-89 (travel records, other official records, and hotel records). This evidence makes sense, given that, as a matter of public record, a presidential summit involving Peru, Brazil, and other countries was held in Rio de Janeiro on November 3 to 5, 2004, to discuss matters relating to the partnership between the countries, including the physical integration of their territories. SER at 153, 181.

Toledo's claim (Pet. at 39) that Peruvian prosecutors have "concluded neither Saylan nor Weinstein played any role in the bribery negotiations" is misplaced. Prosecutors continue to allege that "Gideon Weinstein and Sabih Saylan were also present" at the meeting held in Rio de Janeiro in November 2004 through which Barata, Maiman, and Toledo colluded. SER at 209. Even if, as the extradition court found, the dismissal of the collusion charges against Saylan and Weinstein "means that the exact negotiation of the bribe is somewhat opaque[,] . . . that opacity is not enough to undo probable cause because there is still evidence that Toledo and Odebrecht entered into a collusive agreement." EX Order 2 at 27.

1    The fact that there may be minor discrepancies between different witnesses' accounts, such as

2    exactly who participated in the meetings and in what capacity, does not vitiate probable cause,

3    particularly given that the witness statements were given well over a decade after the fact.  *See, e.g.*,

4    *Sakaguchi v. Kaulukukui*, 520 F.2d 726, 728 (9th Cir. 1975).  "Providing an air-tight narrative of the

5    events surrounding a crime is not a precondition for granting extradition," and issues regarding alleged

6    inconsistencies in the evidence "are all properly reserved for the eventual trial in [the requesting

7    country]."  *In re Extradition of Rodriguez Ortiz*, 444 F. Supp. 2d 876, 893 (N.D. Ill. 2006); *see also,*

8    *e.g.*, *United States v. Kollmar*, No. 19MJ70677MAG1KAW, 2021 WL 179606, at *8 (N.D. Cal. Jan. 19,

9    2021) (finding probable cause where a witness's statements, while "generally consistent," contained

10   some "errors" and inconsistencies); *Luna v. O'Keefe*, No. 17-CV-02129-LHK, 2018 WL 784783, at *12

11   (N.D. Cal. Feb. 8, 2018) (finding probable cause even despite "some minor inconsistencies between the

12   statements that two of the witnesses . . . gave in 2009 and the statements they gave in 2012").  Indeed,

13   the extradition court recognized the existence of discrepancies in Barata and Maiman's testimony, but

14   regardless found probable cause that a bribe agreement was reached.  *See* EX Order 2 at 25, 30.

15   Furthermore, as discussed below, other evidence suggests that Toledo reached an agreement to help

16   Odebrecht win the Highway tender in exchange for a bribe.

17          3.    Peru's Evidence Establishes that Toledo Complied with the Bribe Agreement by
18                Facilitating Odebrecht's Success in the Highway Tender

19          Contrary to Toledo's suggestion, Odebrecht's successful bid for two sections of the Highway

20   (sections 2 and 3) was not a foregone conclusion; rather, Toledo helped to ensure the company's

21   success.  Odebrecht was not clearly "almost certain to win the contracts, with or without a bribe, because

22   it was the only construction firm capable of fulfilling the contracts on the desired schedule," as Toledo

23   claims (Pet. at 41).  Indeed, other companies in fact successfully obtained contracts for constructing

24   sections 1, 4, and 5 of the Highway.  *See* ER at 2270, 4339.[31]  Moreover, as Barata described, his

25   "agreement with Alejandro Toledo was that [Odebrecht] would only pay if [it] was awarded the contract

26

27   _____

28   [31] In addition, Toledo's hypothesis that "Maiman's history with Odebrecht" contributed to his
     ability to craft his covert scheme to arrange a "bribe" for himself (Pet. at 37) fails to explain Peru's
     evidence demonstrating that Maiman also received money from another Highway contractor, Camargo
     Correa, on behalf of Toledo.  *See, e.g.*, ER at 517, 526, 2270-71; SER at 1124-25.

1  in the bidding," and "the assistance of Alejandro Toledo" provided in compliance with that agreement

2  "consisted [of] maintaining the terms for the execution of the bidding, despite the requests for its

3  postponement, by other bidders, which obviously reduced the level of competitiveness of the process."

4  *Id.* at 354-56.  Thus, regardless of whether an expedited schedule happened to align with Toledo's

5  political priorities, as he suggests (Pet. at 36-37), the evidence supports an inference that Toledo took

6  action in furtherance of the bribe agreement, and rebuts Toledo's claim (Pet. at 39) that "[n]o witness

7  has ever suggested that Dr. Toledo made any statements about ensuring that the schedule for the tenders

8  was not delayed."

9        As of December 2, 2004, the Highway contracts were scheduled to be finalized on September 26,

10  2005, ER at 907; but with involvement by Toledo discussed further below, the contracts were ultimately

11  finalized almost two months earlier, on August 4, 2005, *id.* at 45-46.  Overall, this timeline was much

12  shorter than usual, as bidding usually lasted approximately two years.  *See id.* at 355; SER at 330-31,

13  586-87.  According to Barata, completing the tender "in a record time" was "the main competitive

14  advantage [Odebrecht] had over other potential bidders."  SER at 212.

15        As an example of Toledo's involvement in giving Odebrecht this competitive advantage, Peru's

16  evidence demonstrates that Toledo held a meeting at the government palace in September 2004 with

17  various Proinversion officials at which he urged them to move the tender process along quickly.  As

18  described in a statement by Jorge Penaranda, the Peruvian official in charge of feasibility assessments

19  for the Highway project, Toledo "stated the importance and urgency of starting the works of the

20  Southern Interoceanic Highway, and indeed he asked me if I could deliver the assessments before the

21  contractual term," requesting that the officials "carry out the work as soon as possible."  *Id.* at 218-19.

22        As another example, Peru's evidence demonstrates that Toledo attended a Proinversion board

23  meeting held on December 22, 2004.  ER at 779, 874-77.  According to testimony by Peruvian Minister

24  of Transportation and Communications and Proinversion board member Jose Ortiz Rivera ("Ortiz"), the

25  meeting was held in the government palace, which was unusual, because Toledo "wanted to be

26  informed" about the Highway tender, and at the meeting, Toledo asked whether the planned deadlines

27

28

1   could be shortened. *Id.* Although other public works projects were discussed at the meeting, Toledo

2   participated only in the discussion relating to the Highway project.  SER at 260-61.[32]

3         Subsequently, on February 9, 2005, Toledo signed a Supreme Executive Resolution exempting

4   the Highway project from having to undergo certain feasibility assessments, which were ordinarily

5   mandated by law for public works projects in Peru.  ER at 878-80.  By eliminating this step, the tender

6   process could proceed more quickly, thereby reducing the possibility that companies other than

7   Odebrecht could submit competitive bids.  *See id.* at 3504-05; SER at 285.  In this way, as determined

8   by Peru's First National Preliminary Investigation Court, which issued the warrant for Toledo's arrest,

9   Toledo "practically set the basis for benefitting" Odebrecht.  ER at 3470.

10        Toledo's concern for ensuring that Odebrecht was awarded the contracts on schedule may also

11   be inferred from the events that occurred on the day of signing, August 4, 2005.  Proinversion's board of

12   directors convened a meeting that day to complete its review of the bidding process, at which time it

13   learned of an issue relating to Odebrecht's eligibility to participate in the tender.  *Id.* at 50, 56, 914-15.

14   The meeting was adjourned, and, although it had initially been held as usual at the Ministry of Economy

15   and Finance, Toledo invited the board to continue their meeting at the government palace, as reflected in

16   the meeting minutes and the testimony of Proinversion's chairman of the board.  *Id.* at 2050-75; 4315.

17   Odebrecht's bids were approved despite the irregularity.  Toledo attended the ceremony at which the

18   contracts were signed, even though such an appearance was unusual.  *Id.* at 46.

19         4.   Peru's Evidence Establishes that Toledo Was Involved in Ensuring that Odebrecht
20              Paid the Bribe

21        Further evidence that the bribe agreement involved Toledo is apparent in that Toledo sought to

22   enforce the agreement.  According to Barata, when "we were behind in payment of the bribes, he

23   summoned me to his house in Camacho, to pressure me into continuing with the payments."  *Id.* at 359.

24   He further explained that "sometimes President Toledo himself called me at his house two or three

25   times" and said "hey Barata, damn, pay me, come on . . . ."  SER at 1134; *see also, e.g.*, EX DE 170-1

26

27        ――――――――――――――
     [32] Toledo engaging in this kind of intervention with Proinversion regarding the Highway project
28   was not unusual.  *See, e.g.*, SER at 1110 (Barata stating that he witnessed Toledo call Proinversion and
     Ministry of Economy and Finance officials to "complain . . . that the process was not working, why they
     had extended the deadline and that kind of thing"); *see also* EX DE 170-1 (Pet. Ex. W) at 56 (Barata
     recounting similar information); *id.* at 64-65 (same).

1  (Pet. Ex. W) at 54 ("[S]everal times, . . . after the negotiation phase, [Toledo] would ask me to pay, that

2  I wasn't paying, that I was delaying payments.  Even after becoming president, he invited me to his

3  home on several occasions to ask what was going on.").

4      In his petition, Toledo claims that "[t]here is no evidence to corroborate Barata's claim – no

5  phone records, voice mail messages, emails, or calendar notations.  Moreover, the idea that Dr. Toledo

6  would approach Barata directly is not credible." Pet. at 44.  These claims are misplaced.  An address

7  book found during a search of Toledo's house in Camacho in 2017 contained the name and details for

8  Barata. ER at 2929-30; 3491.  Moreover, Barata explained that he spoke with Toledo "over the phone,

9  we exchanged no emails. . . .  [and] I only used one mobile phone which I would change every 3 years,"

10  which would reduce the likelihood that any investigation would uncover corroborating evidence of

11  specific interactions.  *Id.* at 356.  Even so, the visitor log from the government palace documents that

12  direct contact between Toledo and Barata was not unheard of, as it notes that Barata had meetings with

13  Toledo on August 26, 2004; January 10, 2005; May 5, 2005; February 22, 2006; and June 23, 2006.  *Id.*

14  at 65-66, 2147; SER at 1091-92.  Even putting aside this evidence, the extradition court noted that

15  "discussions through intermediaries early on are not inconsistent with direct discussions later," after

16  Toledo had known Barata for many years, and was no longer in office.  EX Order 2 at 26.

17      Thus, Peru's request for Toledo's extradition contains evidence, from multiple sources,

18  identifying Toledo as the person who, through intermediaries, made arrangements with Odebrecht for

19  the payment of a bribe in connection with the Highway tender.  This evidence spans the inception of the

20  illicit agreement to well after the plan was executed, and more than satisfies the "any evidence" standard

21  for upholding the extradition court's finding of probable cause.

22

23  **C.  Peru's Extradition Request Amply Establishes Probable Cause that Toledo
       Committed Money Laundering**

24      The evidence provided by Peru supports the extradition court's finding of probable cause not

25  only that Toledo agreed to receive bribe money but also that he engaged in laundering it.  The elements

26  of money laundering under Peruvian law are: (1) the defendant converted or transferred money, goods,

27  effects, or earnings; (2) the defendant was aware or presumed that the money or other items had illegal

28

1  origins; (3) the defendant sought to prevent the money or other items from being seized or confiscated,

2  or to prevent their illegal origins from being identified.  *See* ER at 3228-31; SER at 1926-45.

3  Peru's evidence demonstrates that Toledo directed Odebrecht to pay him a bribe through

4  offshore accounts, and that at least some of the bribe money was in fact passed through a number of

5  such accounts and was ultimately used to purchase, and pay mortgages for, properties in Peru.  *See* ER

6  at 5973-78 (description of criminal conduct set forth in decision of the Peruvian Supreme Court).  In

7  particular, it demonstrates that Odebrecht upheld its agreement with Toledo by paying at least

8  $28,699,639.08 and €1,225,584.06 between 2006 and 2010.[33]  SER at 1115, 1128-30.  The funds were

9  transferred first to accounts of three companies associated with Maiman.  They were then passed

10 through other offshore accounts, including ones designated by Dan On acting on behalf of Toledo, and

11 then into the account of Ecoteva Consulting Group S.A. ("Ecoteva"), a company which Toledo was

12 involved in creating, and of which he named his elderly mother-in-law the chairman.  Finally, some of

13 the funds were then converted to buy properties and pay off mortgages in Peru, each of which has a

14 nexus to Toledo.

15 It is implausible that, as Toledo claims (Pet. at 45), all of the bribe money went to Maiman.  In so

16 claiming, Toledo ignores the testimony of both Maiman and Barata indicating that at least some of the

17 bribe money in fact went to Toledo, as well as other evidence from which it may easily be inferred that

18 Toledo orchestrated the laundering of, and benefitted from, at least some of the funds.

19    1. <u>Peru's Evidence Establishes that Toledo Gave Directions for Laundering the</u>

20      <u>Money</u>

21 Peru's evidence shows that Toledo directed Odebrecht to funnel its bribe payments through

22 Maiman's accounts.  According to Peruvian prosecutors, "the illicit funds were deposited in accounts of

23 offshore companies (front companies) in the name of third parties so that the illicit origin of such assets

24 would not be discovered."  SER at 313.

25 As discussed above, Maiman stated that Toledo asked him to receive "donations," which he said

26 might total approximately $20 million.  ER at 484.  Barata similarly stated that at the November 4, 2004,

27

28    [33] When Peru initially transmitted its extradition request, it provided evidence indicating that Odebrecht had paid approximately $9,626,010 of the bribe; however, as discussed further below, its investigation later uncovered additional amounts.

1   meeting in Rio de Janeiro, it was decided that the bribe would be paid "via several companies of Josef

2   Maiman Business Group." *Id.* at 354.[34]

3       Maiman further stated that in the first half of 2006, Toledo told him "that the first donations were

4   about to come in" and that Maiman should "keep them in his accounts until he received further

5   instructions." *Id.* at 486; *see also id.* at 512 ("the task with which Toledo entrusted me was to receive

6   the money in my companies' accounts and keep it there until he gave me further instructions").  Barata

7   confirmed that disbursements for the bribe began in 2006, and bank records indicate that Odebrecht's

8   first payment to Maiman's accounts occurred on June 23, 2006—the same day that the palace visitor log

9   documents a meeting involving Barata and Toledo.  *Id.* at 355, 366-67; SER at 1092.  Bank records also

10  confirm subsequent additional transfers from Odebrecht to Maiman's accounts.  ER at 366-87; SER at

11  1128-30, 1237-39; *see also* EX DE 8 at 15 (summarizing transfer of funds between various Maiman

12  accounts).

13      According to Maiman, Toledo provided instructions for the bribe funds to be transferred to three

14  Costa Rican companies, Milan Ecotech Consulting S.A. ("Milan Ecotech"), Ecostate Consulting S.A.

15  ("Ecostate"), and Sirlon Dash Consulting S.A. ("Sirlon").  In particular, Maiman stated that Toledo told

16  him by phone that he should "transfer the funds to the companies and accounts indicated . . . by Mr. Dan

17  On." ER at 513.  Subsequently, in October or November 2006, Dan On reportedly met Maiman in Israel

18  and "brought the names of the [three Costa Rican] companies and the account information." *Id.*; SER at

19  1113 (Maiman's statement that amounts paid by Odebrecht were to be transferred to Costa Rica upon

20  "an instruction that we received from former President Toledo . . . via Dan On").  Bank records confirm

21  the transfer of funds to Milan Ecotech and Ecostate.  ER at 2276-81, 2801-35.

22      Public records indicate that Dan On served as the chairman of the board of directors of both

23  Milan Ecotech and Ecostate (which were incorporated on July 20, 2005, and November 23, 2006,

24  respectively).  *Id.* at 2751, 2762.  As Toledo has acknowledged, Dan On worked for him as his security

---

[34] The notion that Toledo might have entrusted Maiman to receive the Odebrecht bribe on his behalf is not implausible, as Toledo suggests (Pet. at 45).  Toledo has explained, "I know Mr. Maiman well.  I have been a friend of his since 1980." ER at 2633-34.  Maiman confirms that he "was a trusted friend of [Toledo's]," *id.* at 504, and that he and Toledo "have been very close friends for many years, *id.* at 483.  *See also, e.g., id.* at 5062 (statement of Saylan noting that "Mr. Maiman is a very close friend of Mr. Toledo").

1    advisor during Toledo's presidency, and thereafter went to work for Maiman. *Id.* at 5105; *see also id.* at

2    5062 (statement of Saylan indicating that Dan On "was the security advisor of Mr. Toledo" and

3    following Toledo's presidency, "began managing some funds belonging to Maiman").  According to

4    Maiman, Toledo and Dan On had "an extremely close relationship," "a very close personal

5    relationship," due to the "nature of [Dan On's] work in protecting the president" such that he and Toledo

6    "were basically together all day."  SER at 1087.

7         Bank records further show that in 2011 and 2012, the funds in the accounts of Milan Ecotech and

8    Ecostate were transferred to Ecoteva, another Costa Rican company, which is linked to Toledo.  ER at

9    2216-19, 2868-75.  According to Melvin Rudelman Wohlstein ("Rudelman"), the notary public who

10   incorporated Ecoteva, he met with Toledo on January 19 or 20, 2012, in Costa Rica, along with Dan On,

11   to discuss creating Ecoteva.[35]  *Id.* at 2716-17.  Rudelman stated that Toledo "chose the name of 'Ecoteva

12   Consulting Group S.A.'" and "pointed out that his mother-in-law would be the CEO and legal

13   representative of the Company."  *Id.* at 2717.  Travel records confirm Toledo and Dan On's presence in

14   Costa Rica from January 18 to 21, 2012.  *Id.* at 2744, 2746.  A record from Costa Rica's National

15   Register indicates that Rudelman established Ecoteva, with Toledo's mother-in-law, Eva Fernenbug

16   ("Fernenbug"), as the chairman of its board of directors, shortly thereafter, on January 23, 2012.  *Id.* at

17   2774-76.  Fernenbug was then nearly eighty-five years old.  *See id.* at 2248.  Toledo remained involved

18   with Ecoteva thereafter, as, according to Rudelman, Toledo called to tell Rudelman that Fernenbug

19   would be arriving in Costa Rica on July 17, 2012, and Fernenbug came to his office the next day, along

20   with Dan On, saying that she had come to transfer money from Ecoteva to Peru.  *Id.* at 2718-19.[36]

21        Thus, the extradition court's finding that, "once the bribe money was transferred [to Milan

22   Ecotech, Ecostate, and Sirlon], it was out of Maiman's hands and under the control of Toledo and those

23   who worked for him (Dan On) or his mother-in-law" is supported by ample evidence.  EX Order 2 at 28.

24                    2.    Peru's Evidence Establishes that Toledo Received Bribe Proceeds

25        The extradition court correctly found that Toledo received at least some of the bribe money.  *See*

26   EX Order 2 at 28.  Indeed, according to Maiman, "[t]he actual beneficiary of the money was Alejandro

27   _____

28   [35] Rudelman's uncle handled the incorporation of Milan Ecotech and Ecostate, and introduced
     Toledo to Rudelman.  ER at 2730-31, 2750-51, 2761-63.

     [36] Toledo denied having participated in the creation of Ecoteva.  *See* ER at 2682-83.

Toledo."  ER at 489; *see* SER at 1124 (confirming that the money from Odebrecht came from "the agreement to pay Toledo").  Other evidence also supports this claim.

As an initial matter, Barata understood Toledo to be the intended beneficiary of the bribe.  *See* EX DE 170-1 (Pet. Ex. W) at 90.  Barata also told Peruvian authorities that, although he does not know how much of the bribe payments Maiman turned over to Toledo, Barata gave Toledo some money directly, as discussed above.  SER at 1136.  While such money would not necessarily have been part of the laundering scheme, it bolsters the notion that other Odebrecht money was also destined for Toledo.

Moreover, Toledo concedes that he received $500,000 of the Odebrecht money, which he claims came in the form of a loan from Maiman to pay off the mortgages on two houses Toledo owned in Camacho and Punta Sal, Peru.  Pet. at 44; *see also* ER at 2658-59.  Maiman has also said that the money was a loan, but conceded that the loan is not documented because it "was an oral agreement."  ER at 5049.  While Toledo says in his petition that Maiman expected him to repay the loan, Toledo does not say that he actually did so.  *See* Pet. at 44.  Bank records indicate that the money for this purported loan was first transferred from Ecoteva to a personal account of Fernenbug's (not Maiman's), and then used to pay off the mortgages.  ER at 72-73, 2882-84, 2891-2905, 2909; 3050-51.

Toledo also does not dispute that $4.5 million of the Odebrecht money that was transferred to Ecoteva was used to purchase certain real estate in Peru.  *See*  Pet. at 44; EX DE 170-1 (Pet. Ex. Y) at 20.  Even though the money was nominally used by Fernenbug (who did not reside in Peru), Toledo was involved in the purchases, thus supporting an inference that the money was used to buy real estate for his benefit.

*First*, bank records document the transfer of $3.45 million on July 24, 2012, from Ecoteva to an account held by a person named Luis Fernando Arbulu Alva ("Arbulu").  ER at 72-73, 2885-90.  Public records document the sale of a house owned by Arbulu in Las Casuarinas, Peru to Fernenbug six days later.  *Id.* at 3004-05; *see also id.* at 2719 (statement of Rudelman describing a financial agreement executed by Fernenbug shortly ahead of the sale, on July 18, 2012, at his office during her trip to Costa Rica).  Moreover, Toledo admitted to browsing real estate in Las Casuarinas, including the house that Fernenbug ultimately purchased there.  *Id.* at 2650.  According to Paul Allemant Florindez, the real estate broker who handled the purchase of the Las Casuarinas house, he met Toledo in 2009 at Toledo's

1   residence in Camacho "so that [Toledo] [could] tell me the characteristics of the property he was looking

2   for," and he then visited various houses, including Arbulu's, with Toledo and his wife from then until

3   2012. *Id.* at 3117-18.

4        *Second*, bank records document the transfer of money from Ecoteva, to Fernenbug's personal

5   account, and then to the seller of an office, three parking spaces, and a storage unit located in the Torre

6   Omega building in Peru. *Id.* at 72-73, 2882-84, 2891-2905, 2906, 2908; *see also id.* at 2938-95

7   (purchase agreement). Although Fernenbug was nominally the purchaser of that property on September

8   5, 2012, for approximately $882,400, Toledo admitted that he was involved in discussions about the

9   purchase. *Id.* at 2637. According to the seller's representative, Fernenbug's real estate agent, Moises

10   Velarde Zabalbeascoa ("Velarde"), "told me that the person with whom he was talking to was Alejandro

11   Toledo," and he met with Velarde and Toledo to discuss the sale price. *Id.* at 3098-99. He said that he

12   was unaware that Fernenbug was the purchaser until after the contact was signed. *Id.* at 3103. Velarde

13   corroborated Toledo's participation in the meeting about the sale price, and also stated that Toledo had

14   first contacted him in July or August 2012 asking about offices for sale. *Id.* at 3108-09. During a search

15   of Toledo's house in Camacho, authorities found an email from the lawyer who handled the Torre

16   Omega purchase, which Dan On had forwarded to Toledo and his wife, with instructions that "if it is

17   very urgent, you better meet with [the lawyer] and clarify this matter and the central point: 'if it possible

18   [sic] to pay directly to the seller without opening an account in Lima?'" *Id.* at 2935-36. This email

19   further indicates Toledo's involvement in the purchase (as well as Dan On's collaboration with Toledo).

20        Toledo's suggestion (Pet. at 44) that Fernenbug purchased the real estate in Peru "on Maiman's

21   instructions, for Maiman's financial benefit" is contrary to the evidence. Regardless of whether

22   Fernenbug has known Maiman for somewhat longer than either of them has known Toledo, she has been

23   Toledo's mother-in-law for over forty years. *See* EX DE 19 at 7.[37] Moreover, Toledo's claim that

24   Maiman controlled all of Fernenbug's purchases by virtue of a nominee agreement between one of his

25   companies and Ecoteva (Pet. at 43-44) is unavailing. Even if the nominee agreement were enforced as

26   written (despite the fact that other contracts in the money-laundering scheme were admittedly shams),

27

28   

---

[37] Fernenbug has also transferred significant sums of money to Toledo's wife. For example, in the span of less than a year, between October 2018 and June 2019, she transferred over $1 million to Toledo's wife. *See* EX DE 49 at 2.

1  the funds for the Torre Omega properties do not appear to have been governed by that agreement

2  because they did not come directly from Ecoteva.  Rather, they passed first through Fernenbug's

3  personal bank account, which does not appear to have been subject to the nominee agreement.  *See* ER

4  at 2882-84, 2891-2905.

5          3.    Even Though Peru Has Located and Traced Additional Odebrecht Bribe Funds
              Since 2018, the Core Allegations Regarding the Money that Toledo Laundered
6              Remain the Same

7          Contrary to Toledo's suggestion (Pet. at 40-42), the fact that Peru's investigation has been

8  ongoing since the submission of its extradition request in 2018, and has uncovered more bribe money

9  than initially believed, does not undermine probable cause or discredit Peru's understanding of the

10  money trail from Odebrecht to Toledo.

11          Since 2018, Peruvian authorities have uncovered additional evidence, which is described in the

12  *Acusacion Fiscal* and incorporated into the discussion above, that supports their allegations that there

13  was an agreement to pay a $35 million bribe to Toledo.  SER at 202.  While their understanding of

14  exactly how much of the promised money was paid and where all the money went may have evolved,

15  their original allegations generally persist.  In particular, Peru's current case shows, as it did before—

16  and as Toledo concurs, *see* EX DE 170-1 (Pet. Ex. Y) at 18—that money passed from Odebrecht to

17  three companies associated with Maiman (Trailbridge Ltd., Merhav Overseas Ltd. ["Merhav"], and

18  Warbury & Co.); then to another Maiman company, Confiado International Corp.; then to Ecostate and

19  Milan Ecotech; then to Ecoteva.  SER at 1241-85.  Peru's current evidence—which Toledo does not

20  dispute—shows that, as set forth originally in the extradition request, at least $16,370,255.98 was

21  transferred to Ecoteva, approximately $5 million of which was used for the purchase of the Las

22  Casuarinas and Omega Torre properties and to pay off Toledo's home mortgages.  *Id.*; *see* Pet. at 42

23  n.15 & 44.

24          Peru's more recent claims about additional money paid by Odebrecht and transferred to Maiman

25  and others do not undermine its original allegations.  Barata stated in 2019 that in 2016 he understood

26  from records maintained by Odebrecht's structured operations department (which was responsible for

27  paying bribes) that the company had paid $20 million of the bribe for Toledo.  SER at 205; *see* ER at

28  356.  He explained, however, that the company had since accessed additional data such that he "fe[lt]

much more certain in affirming that the value that has been transferred to Mr. Maiman is 31 million and something," based on records that he made available to prosecutors.  SER at 205.  In addition, since submitting the extradition request, prosecutors obtained a copy of a sham agreement in which Odebrecht agreed to pay $34.3 million to a company owned by Maiman, purportedly for "technical services in relation to the preparation of the tender documents and the execution of the Projects."  *Id.* at 1150-57; *see also id.* at 1093-98 (statement of Barata discussing the document as being intended to "ratify that we had reached an agreement and that we were going to pay thirty-four million").  Barata and Maiman both recognized the document as being a fictious contract pertaining to the bribe agreement.  *Id.* at 1095-96, 1102-04.  Thus, even if some Odebrecht funds landed in Maiman's or others' pockets, the extradition court's finding of probable cause that Toledo committed money laundering far exceeds the "any evidence" standard of review.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny Toledo's petition for a writ of *habeas corpus*.


DATED:  November 18, 2021                    Respectfully submitted,

                                            STEPHANIE M. HINDS
                                            Acting United States Attorney


                                                /s/
                                            _____

                                            KYLE F. WALDINGER
                                            Assistant United States Attorney

                                            CHRISTOPHER J. SMITH
                                            Associate Director

                                            REBECCA A. HACISKI
                                            Trial Attorney
                                            Office of International Affairs