1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| ALEJANDRO TOLEDO MANRIQUE,<br><br>Petitioner,<br><br>v.<br><br>DONALD O'KEEFE,<br><br>Respondent. | Case No. 21-cv-08395-LB<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Re: ECF No. 1 |

## INTRODUCTION

The Republic of Peru seeks the extradition of the country's former president, the petitioner Dr. Alejandro Toledo Manrique, so that he can be prosecuted for his alleged role in a bribery scheme.[1] After receiving Peru's request under the Peru-U.S. extradition treaty in May 2018, the United States filed a complaint in this district for the petitioner's arrest in July 2019.[2] The petitioner was

---

[1] Pet. – ECF No. 1 at 8; Opp'n – ECF No. 9 at 9; Compl., Ex. N to Pet. – ECF No. 1-14 at 6; Compl. – XR ECF No. 1. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents. *Matter of Extradition of Manrique*, 19-MJ-71055-MAG-1(TSH) (N.D. Cal.), is the petitioner's underlying extradition proceeding. Citations to docket entries and documents from the petitioner's underlying extradition proceeding are denoted with an "XR." For example, "XR ECF No. 1" refers to the first docket entry in the petitioner's underlying extradition proceeding.

[2] Compl., Ex. N to Pet. – ECF No. 1-14; Compl. – XR ECF No. 1; Ltr. from G. Bonifaz, Embassy of Peru in the U.S., Ex. G to Pet. – ECF No. 1-7.

1   allowed to remain free on bail while he contested his extradition and remains released on bail

2   today.[3] Nonetheless, the extradition court certified the petitioner's extradition.[4]

3       The petitioner now challenges his extradition through a petition for a writ of habeas corpus. The

4   petitioner contends that the Peru-U.S. extradition treaty does not apply to him because Peru has (1)

5   not "charged" him for purposes of the treaty, and (2) has not produced "charging documents" as

6   required by the treaty.[5] The petitioner also contests the extradition court's evidentiary rulings and

7   claims that there is no probable cause to believe that he committed the alleged crimes.[6]

8       The court denies the petition. The term "charged" encompasses those who, like the petitioner,

9   are sought for prosecution. The term "charging documents" refers to a category of documents and

10  does not refer to any specific document that Peru has not submitted. Furthermore, the petitioner's

11  admitted acceptance of bribe money along with testimony from two witnesses implicating him in

12  the bribery scheme provides a reasonable basis to conclude that he committed the alleged crimes

13  and supports the extradition court's probable-cause determination.

14

15                                    **STATEMENT**

16      The petitioner is accused of accepting approximately $35 million in bribes related to the

17  construction of a highway between Brazil and Peru.[7] Peruvian prosecutors charged the petitioner

18  with collusion and money laundering and obtained a warrant for his arrest.[8] In May 2018, Peru

19  requested the petitioner's extradition pursuant to the Peru–U.S. Extradition Treaty and submitted a

20  supplemental extradition request in June 2019.[9] Extradition Treaty Between the United States of

21

22  _____

23  [3] Order Directing Release on Bail – XR ECF No. 43; Order Denying Mot. to Revoke Bail – XR ECF
    No. 198.

24  [4] Order – XR ECF No. 188.

25  [5] Pet. – ECF No. 1 at 18–29.

    [6] *Id.* at 29–46.

26  [7] *Id.* at 11–13; Opp'n – ECF No. 9 at 11–12.

27  [8] Pet. – ECF No. 1 at 26–27; Arrest Warrant, Ex. K to Pet. – ECF No. 1-11.

28  [9] Opp'n – ECF No. 9 at 12; Ltr. from G. Bonifaz, Embassy of Peru in the U.S., Ex. G to Pet. – ECF
    No. 1-7.

United States District Court
Northern District of California

America and the Republic of Peru, Peru-U.S., July 26, 2001, T.I.A.S. No. 03-825, S. Treaty Doc. No. 107-6, 2001 WL 1875758 (the Treaty).

### 1. Procedural History

In July 2019, the United States filed a complaint seeking the petitioner's arrest.[10] In September 2020, the extradition court denied the petitioner's motion to deny extradition, which was based on his contentions that (1) he had not been "charged" for purposes of the Treaty, (2) Peru had not complied with the Treaty's "charging document" requirement, and (3) the now-dropped influence-peddling charge failed to comply with the Treaty's dual-criminality requirement.[11] In September 2021, the extradition court found that there was probable cause to believe the petitioner committed collusion and money laundering and certified that he was extraditable to Peru on those charges.[12] The petitioner challenged the extradition certification through the petition here and remains released on bail.[13] The parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636.[14]

### 2. Factual Background

Peruvian authorities allege that the petitioner solicited a bribe from Constructora Norberto Odebrecht S.A., a subsidiary of Odebrecht S.A. (Odebrecht), and in exchange helped direct construction contracts to Odebrecht.[15] Odebrecht is a large conglomerate that pleaded guilty in 2016 to bribery and bid-rigging under the Foreign Corrupt Practices Act (FCPA) by engaging in bribery and bid-rigging. Press Release, U.S. Dep't of Just., *Odebrecht and Braskem Plead Guilty and Agree to Pay at Least $3.5 Billion in Global Penalties to Resolve Largest Foreign Bribery*

---

[10] Compl. – XR ECF No. 1; Compl., Ex. N to Pet. – ECF No. 1-14.

[11] Order – XR ECF No. 147.

[12] Order – XR ECF No. 188.

[13] Pet. – ECF No. 1; Order – XR ECF No. 198.

[14] Consents – ECF Nos. 5, 10.

[15] Opp'n – ECF No. 9 at 11–12 & n.4; *see, e.g.*, Prosecutor's Decision No. 6, Ex. D to Pet. – ECF No. 1-4 at 7; Prosecutor's Decision No. 8, Ex. L to Pet. – ECF No. 1-12 at 31.

United States District Court
Northern District of California

*Case in History* (Dec. 21, 2016), https://www.justice.gov/opa/pr/odebrecht-and-braskem-plead-guilty-and-agree-pay-least-35-billion-global-penalties-resolve.

The bribery scheme at issue here involved contracts for the construction of the Peru–Brazil Southern Interoceanic Highway project.[16] The petitioner admits that Odebrecht paid at least $34 million in bribes related to the highway project and that he received some of the illicit funds.[17] Nonetheless, the petitioner contends that Josef Maiman (Maiman) — a now-deceased Israeli businessman who eventually entered into a cooperation agreement with Peruvian authorities — concocted the bribery scheme without the petitioner's knowledge and then escaped prosecution by providing false evidence against him.[18]

The prosecutors in Peru contend that the petitioner's chief of security, Avraham "Avi" Dan On (Avi), approached Jorge Henrique Simoes Barata (Barata) — Odebrecht's superintendent of operations — to arrange the bribery scheme in 2004.[19] The prosecutors claim that, during a November 2004 meeting in Rio de Janeiro, the petitioner told Barata that "he wanted Odebrecht to win the Highway contracts, and would ensure that the schedule for the tenders was not delayed and that the terms of the tenders would be modified to make it difficult or impossible for other companies to participate in them."[20] According to the prosecutors, the bribe amount was eventually reduced to $20 million when the petitioner failed to modify the bidding or discourage the participation of other companies.[21] Testimony from Barata and Maiman supports the Peruvian government's theory.

[16] Pet. – ECF No. 1 at 8; Opp'n – ECF No. 9 at 41.

[17] Pet. – ECF No. 1 at 8, 37, 40 ("It is undisputed that Odebrecht promised to pay $35 million[.]"), 44 ("Dr. Toledo did receive $500,000 to pay his mortgages, but as Maiman testified in 2013, the $500,000 was a loan that Maiman expected Dr. Toledo to repay.").

[18] *Id.* at 8, 37, 44.

[19] *Id.* at 30–31; Opp'n – ECF No. 9 at 11–12.

[20] Pet. – ECF No. 1 at 38; Compl., Ex. N to Pet. – ECF No. 1-14 at 6; Compl. – XR ECF No. 1 at 5.

[21] Pet. – ECF No. 1 at 38; Compl., Ex. N to Pet. – ECF No. 1-14 at 9–10; Compl. – XR ECF No. 1 at 8–9. There remains some uncertainty about the precise amount of the bribe and whether some of the funds were paid to others besides the petitioner. *See* Pet. – ECF No. 1 at 40; Opp'n – ECF No. 9 at 50.

United States District Court
Northern District of California

Maiman and the petitioner became friends while both were attending college in the United States and, as of 2017, had known each other for fifty years.[22] Both studied economics and stayed in touch while the petitioner worked in the Peruvian government.[23] In 2017, Maiman testified that, "[t]oward the end of 2004, Alejandro Toledo . . . mentioned he was going to establish a foundation and asked [me] to help him with the reception of donations."[24] Maiman "suspected that the donations might be intended to cover up less-than-transparent activities."[25]

Maiman further testified that, "[i]n Rio de Janeiro, in November 2004, there was a presidential summit that was held at the Marriott Hotel" involving the petitioner, Maiman, Barata, and Maiman's associates, Gideon Weinstein and Sabih Saylan.[26] According to Maiman, during a "series of meetings" in Rio de Janeiro, Barata, Maiman, and Marcelo Odebrecht discussed "opportunities for cooperation on the implementation of different works."[27] Maiman testified that when Barata told him that there would be donations to the petitioner's foundation, Maiman confirmed that the petitioner had already mentioned possible donations.[28]

Maiman also testified that in 2006, the petitioner told Maiman that donations would be coming in and instructed Maiman to tell "the Brazilians" where the money should be deposited.[29] The funds were deposited, and the petitioner reportedly told Maiman to wait for instructions from Avi regarding where the money should then be moved.[30] Maiman said that he participated in the scheme to develop a closer relationship with Odebrecht and advance his own business interests,

---

[22] Maiman Dep., Ex. S to Pet. – ECF No. 1-19 at 3–5.

[23] *Id.* at 4.

[24] *Id.* at 7.

[25] *Id.*

[26] *Id.* at 8.

[27] *Id.* at 8–9.

[28] *Id.* at 9.

[29] *Id.*

[30] *Id.* at 9–11.

1   and denied (at least in his 2017 testimony) that he profited "in any way" from receiving money on

2   the petitioner's behalf.[31]

3       As the petitioner points out, Maiman's testimony has not always been consistent regarding the

4   development of the bribery scheme. In 2020 testimony, Maiman stated that he did not participate

5   in negotiations regarding the $34.3 million bribe amount.[32] When asked who was involved with a

6   memorandum of understanding for the payment of $34.3 million, Maiman stated that "[o]n

7   Barata's side, the only one I know is Barata. And on my side, the only one who saw them is me."[33]

8   Moreover, Maiman's claim that he did not profit from the scheme eventually proved false.[34] But

9   despite the inconsistencies in Maiman's testimony, the other key witness, Barata, corroborated

10  Maiman's incriminating claims and the prosecutors' theory.

11      In a deposition on April 24, 2019, Barata testified that "the first conversation was with Avi

12  Dan On," who said, "what we want is compensation for facilitating. We're going to help you, and

13  President Toledo will support you. Just tell me what you need; we'll guarantee this process."[35]

14  Barata stated that those negotiating the bribe had the authorization of the petitioner and that they

15  "sealed a deal" in a hotel room in Rio de Janeiro.[36] The petitioner allegedly used his influence over

16  the Private Investment Promotion Agency (Proinversion), a Peruvian state agency, to carry out his

17  end of the bargain by expediting the bidding process.[37] Barata claims that he witnessed the

18  petitioner call officials at the Ministry of Economy and Finance to move the process along.[38]

19      Barata later clarified that he only assumed the petitioner knew about the bribery scheme

20  (because he was at the 2004 meeting in Rio de Janeiro) and stated that the petitioner "did not

21

22  _____

    [31] *Id.* at 12.

23  [32] Pet. – ECF No. 1 at 38–39; Maiman Dep., Ex. P to Pet. – ECF No. 1-16 at 88.

24  [33] Maiman Dep., Ex. P to Pet. – ECF No. 1-16 at 77–78.

25  [34] Collaboration Agreement, Ex. O to Pet. – ECF No. 1-15 at 10 (stating that Maiman was to receive
    approximately $6 million in the bribery scheme).

26  [35] Barata Dep., Ex. W to Pet. – ECF No. 1-23 at 7.

27  [36] *Id.* at 12, 17.

    [37] Pet. – ECF No. 1 at 31; Opp'n – ECF No. 9 at 36.

28  [38] Barata Dep., Ex. W to Pet. – ECF No. 1-23 at 10–11, 18–19.

interact in a direct way" during the meeting.[39] While the petitioner relied on this testimony to contest probable cause in the extradition court, that court did not find that these comments exonerated the petitioner or undermined the incriminating aspects of Barata's testimony.[40] For instance, Barata testified that the petitioner requested money from him after the negotiation phase on several occasions.[41] Furthermore, Barata's testimony supports Peru's theory that the bribe amount was reduced when the petitioner failed to amend the bidding conditions to favor Odebrecht. Barata has stated that the petitioner helped Odebrecht with the contract by limiting the bidding period to six months instead of the usual two years, but because the petitioner did not amend the bidding terms, the bribe amount was reduced.[42] Barata also claimed that the petitioner expressly told him that "he wanted [Odebrecht] to win the bidding."[43]

Regarding the payment of the bribe, the complaint alleged that Odebrecht paid $20 million into the following business accounts allegedly controlled by Maiman: "Warbury and Co., Trailbridge Ltd., and Merhav Overseas." Maiman then allegedly transferred funds from Warbury to Confiado International Corp. (Confiado), another Maiman-owned company, and "then transferred $17,527,000 from Confiado to Ecostate Consulting S.A. ($9,052,650) and Milan Ecotech Consulting S.A. ($8,474,350)." Avi allegedly designated these accounts for receiving the illicit funds.[44] From Ecostate and Milan Ecotech, $16,370,255.98 was then transferred to Ecoteva Consulting Group S.A., "the chairman of which was nominally Eva Fernenbug ('Fernenbug'), Toledo's mother-in-law." Fernenbug then allegedly used the funds to (1) pay off the mortgages at the petitioner's home ($217,007) and vacation home ($277,309), and (2) purchase a home for the

---

[39] *Id.* at 7; Barata Dep., Ex. V to Pet. – ECF No. 1-22 at 10.

[40] Order – XR ECF No. 188 at 25–26.

[41] Barata Dep., Ex. W to Pet. – ECF No. 1-23 at 8, 48.

[42] Barata Dep., Ex. V to Pet. – ECF No. 1-22 at 5–7.

[43] *Id.* at 7.

[44] Pet. – ECF No. 1 at 32 (citing Compl., Ex. N to Pet. – ECF No. 1-14 at 9); Compl. – XR ECF No. 1 at 9.

petitioner in Las Casuarinas ($3.45 million) and an office at Torre Omega (an office tower in Peru) ($882,400).[45]

The petitioner admits that (1) he received approximately $500,000 for his mortgages and (2) Fernenbug purchased the subject real estate in Peru.[46] But according to the petitioner, the $500,000 was a loan and the real estate purchases were investments for Maiman done on Maiman's instructions.[47] Notwithstanding these excuses, the petitioner's admissions generally align with the accusations against him.

Furthermore, Maiman confirmed the basics of the money trail in his 2017 testimony. Maiman testified that Odebrecht paid the funds to Warbury and Co., Trailbridge Ltd., and Merhav Overseas.[48] Maiman also testified that the petitioner then instructed Maiman to transfer the funds to companies and accounts according to instructions from Avi.[49] In sum, Maiman testified that "the purpose of the transactions was to make the money available to" the petitioner, but acknowledged that he could not say whether the petitioner "benefited" from the transactions.[50]

The petitioner challenges the reliability of Maiman's testimony by arguing that Maiman's 2017 testimony contradicts Maiman's earlier 2013 testimony.[51] In 2013, Maiman testified that Fernenbug (the petitioner's elderly mother-in-law) incorporated Ecoteva with Avi's help and that he (Maiman) had "total control over the disposition of funds and investments and purchases" in view of a trust Nominee Agreement between Merhav and Ecoteva.[52] In 2017, however, Maiman denied knowledge of Ecoteva's transactions and stated that "the task with which [the petitioner] entrusted me was to receive the money in my companies' accounts and keep it there until he gave me further

---

[45] Pet. – ECF No. 1 at 32 (citing Compl., Ex. N to Pet. – ECF No. 1-14 at 9–10); Compl. – XR ECF No. 1 at 9–10.

[46] Pet. – ECF No. 1 at 44.

[47] *Id.*

[48] Maiman Dep., Ex. S to Pet. – ECF No. 1-19 at 34–35.

[49] *Id.* at 36.

[50] *Id.* at 18.

[51] Pet. – ECF No. 1 at 34–35.

[52] Maiman Statement, Ex. R to Pet. – ECF No. 1-18 at 18–19, 22; Nominee Agreement, Ex. Q to Pet. – ECF No. 1-17.

1    instructions."[53] The extradition court summarized this conflicting testimony as follows: according to

2    Maiman's "2013 statement, the $20 million was Maiman's money, [and] he controlled all the

3    companies it flowed through," but in 2017 after Maiman began cooperating and the bribery scandal

4    broke, "this was all Odebrecht bribe money, which Maiman lost possession and control of as soon

5    as it was transferred to the Costa Rican companies."[54]

6        The inconsistency between the 2013 and 2017 Maiman testimony is important because the

7    2017 testimony supports the Peruvian prosecutors' theory by refuting the petitioner's claim that

8    the bribe money he admittedly received was actually a loan from Maiman.[55] Arguing that the 2013

9    testimony is more accurate, the petitioner claims that the Nominee Agreement between Merhav

10    and Ecoteva corroborates the substance of Maiman's 2013 testimony and that the extradition court

11    erred by declining to consider the agreement.[56]

12        Moreover, Maiman eventually began cooperating with Peruvian authorities and his

13    cooperation was outlined in the Collaboration Agreement. The petitioner claims that the

14    extradition court erred by not admitting this agreement as evidence because it contradicts some of

15    the testimony Peru relies upon.[57] For example, the petitioner asserts that the Collaboration

16    Agreement establishes that Maiman and Odebrecht agreed that Maiman would receive a

17    percentage of the bribe money and that Maiman kept most of the bribe money.[58]

18        Despite the opacity of the bribe negotiations and the fact that witnesses have sometimes provided

19    inconsistent testimony, the extradition court found that there was probable cause to believe the

20    petitioner committed the crimes he is accused of committing. Based on witness testimony and the

21    petitioner's own admissions, the extradition court certified the petitioner for extradition.[59]

22

23    _____

24    [53] Pet. – ECF No. 1 at 35; Maiman Dep., Ex. S to Pet. – ECF No. 1-19 at 18–19, 35.

      [54] Order – XR ECF No. 188 at 21.

25    [55] Pet. – ECF No. 1 at 44.

26    [56] Id. at 34–35.

      [57] Id. at 33–34.

27    [58] Id. at 33–34, 46; Collaboration Agreement, Ex. O – ECF No. 1-15 at 10.

28    [59] Order – XR ECF No. 188.

United States District Court
Northern District of California

**ANALYSIS**

**1.  The Extradition Process**

Extradition is a diplomatic process that originates from the executive branch. *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1207 (9th Cir. 2003). To extradite a person from the United States, the foreign country seeking extradition submits a request to the U.S. Department of State. *Id.* If the State Department determines that the request is within the relevant treaty, a U.S. Attorney files a complaint seeking an arrest warrant for the person to be extradited. *Id.*

When reviewing an extradition request, "the district court, which may include a magistrate judge," is limited to determining "first, whether the crime of which the person is accused is extraditable, that is, whether it falls within the terms of the extradition treaty between the United States and the requesting state, and second, whether there is probable cause to believe the person committed the crime charged." *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016). Because "[f]oreign states requesting extradition are not required to litigate their criminal cases in American courts," the usual rules of evidence and criminal procedure do not apply to extradition proceedings. *Id.* at 991–92. Instead, the accused may ask the court to admit evidence if the evidence "would 'be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped.'" *Id.* at 992 (quoting 18 U.S.C. § 3190). In this regard, however, the accused is limited to introducing evidence that explains, but does not contradict, the foreign government's evidence. *Id.*

In short, the court's role when considering an extradition request is "very limited." *Patterson v. Wagner*, 785 F.3d 1277, 1279–80 (9th Cir. 2015). Once the court certifies that the accused may be extradited, the Secretary of State "ultimately decides whether to surrender the individual to the requesting state." *Santos*, 830 F.3d at 993.

**2.  Standard of Review**

A person facing extradition may not directly appeal the district court's extradition order but may challenge the order by filing a petition for a writ of habeas corpus. *Vo v. Benov*, 447 F.3d

1235, 1240 (9th Cir. 2006); *Barapind v. Enomoto*, 400 F.3d 744, 748 n.5 (9th Cir. 2005); *see also* 28 U.S.C. § 2241. When reviewing an extradition order on a habeas petition, the district court is limited to considering "(1) whether the extradition court had jurisdiction to conduct the proceeding and jurisdiction over the individual sought; (2) whether the extradition treaty was in force and the crime fell within the treaty's terms; (3) whether there was probable cause that the individual committed the crime; and (4) whether the crime fell within the political offense exception." *Prasoprat v. Benov*, 421 F.3d 1009, 1013 (9th Cir. 2005) (citing, *inter alia*, *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *see also Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008); *Vo*, 447 F.3d at 1240.

On a habeas petition, questions of law resolved in the extradition order are reviewed de novo and pure questions of fact are reviewed for clear error. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986). Mixed questions of fact and law are reviewed for clear error if they are "essentially factual" questions and de novo if they require consideration of legal principles in the mix of fact and law. *Id.* For example, determining "whether the offense comes within the treaty" is a legal question, but determining whether the accused is a fugitive is a fact question. *Id.* Furthermore, because the court's "probable cause determination serves only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based," it is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues [and] it must be upheld if there is any competent evidence in the record to support it." *Id.* (cleaned up).

The petitioner does not challenge the jurisdiction of the extradition magistrate or claim a defense under the political-offense exception. Rather, the petitioner challenges extradition on two fronts, arguing that (1) he does not fall within the treaty's terms and (2) there is no probable cause that he committed the alleged crimes.[60]

---

[60] Pet. – ECF No. 1 at 8.

### 3.  Applicability of the Treaty to the Petitioner

Article I of the Peru–U.S. Extradition Treaty provides for the extradition of "persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for, the commission of an extraditable offense." Treaty, art. I. Article VI of the Treaty provides that when a state seeks to extradite "a person who is sought for prosecution," it must produce "(a) a copy of the warrant or order of arrest issued by a judge or other competent authority; (b) a copy of the charging document; and (c) such evidence as would be sufficient to justify the committal for trial of the person if the offense had been committed in the Requested State." Treaty, art. VI.

The petitioner claims that the Treaty does not apply to him because (1) Peruvian prosecutors have not formally charged him and (2) the Peruvian government has not included an "Order of Prosecution" with its extradition request and has, therefore, not satisfied the requirement to include "a copy of the charging document."[61] The extradition court rejected these arguments. This court does too.

The petitioner's challenges to the applicability of the Treaty (based on the meaning of "charged" and "the charging document") are legal questions. The extradition court's decisions on these issues are subject to de novo review. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986) ("The interpretation of a treaty is a question of law and not a matter of fact."); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("[T]he challenge to the Secretary's decision . . . presents a purely legal question of statutory interpretation."); *United States v. Kelly*, 676 F.3d 912, 915 (9th Cir. 2012) ("Whether a treaty supersedes a domestic criminal statute is a legal question[.]").

Treaties are contracts between nations and should be interpreted as a whole. *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) ("As a general matter, a treaty is a contract, though between nations."); *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921) ("[T]reaties are to be interpreted upon the principles which govern the interpretation of contracts . . . [and] all parts of a treaty are to receive a reasonable construction with a view to giving a fair operation to the whole."). Courts

---

[61] *Id.* at 25.

United States District Court
Northern District of California

1    should interpret treaties to give effect to the treaty parties' intent. *Air France v. Saks*, 470 U.S.

2    392, 399 (1985) ("[I]t is [the Court's] responsibility to give the specific words of the treaty a

3    meaning consistent with the shared expectations of the contracting parties.").

### 3.1   Charging Requirement

5        The petitioner claims he has not been "charged" for purposes of the Treaty because the Peruvian

6    court has not issued an *Orden de Enjuiciamiento* (Order of Prosecution).[62] The Ninth Circuit has held

7    that when a treaty uses the word "charged" to define a category of persons who may be extradited, it

8    does not necessarily mean that extraditable persons must have been formally charged. *Emami v. U.S.*

9    *Dist. Ct. for N. Dist. of Cal.*, 834 F.2d 1444, 1448 (9th Cir. 1987). The *Emami* court's holding was

10   based on the reasoning that the word "charged" was used as a verb and not a noun in an extradition

11   treaty between the United States and Germany. *Id.* at 1448–49. Context showed that the term

12   "charged" functioned as a verb because it contrasted with the adjective "convicted" in the relevant

13   treaty passage: "charged with or convicted of any of the offenses." *Id.*

14       The *Emami* court also noted that all documents that the treaty required the foreign country to

15   submit (which did not include a formal charging document) were before the district court during

16   the extradition hearing. *Id.* at 1448 & n.3. The fact that the treaty did not require submission of a

17   specific formal charging document supported the court's holding that the word "charged" was

18   synonymous with "accused" and did not mean formally charged. *Id.* at 1448. Accordingly, the

19   *Emami* court's core rationale was that the treaty's document-requirement provision did not prevent

20   the term "charged" from meaning "accused" because even if the person to be extradited was

21   accused and not formally charged, the extraditing country could still comply with the treaty's

22   document requirements. *Id.*

23       When it decided *Emami*, the Ninth Circuit relied in large part on the Seventh Circuit's

24   reasoning in *In re Assarsson*, 635 F.2d 1237 (7th Cir. 1980). In *Assarsson*, the court held that the

25   term "charge" — when used in the phrase "charged with or convicted of" — was used in the

26   "generic sense only to indicate 'accused.'" 635 F.2d at 1242 (interpreting the United States-

27

---

28   [62] *Id.* at 24.

United States District Court
Northern District of California

1   Sweden extradition treaty). The court also noted the "parties [to the subject treaty] chose not to

2   require production of the charge document" and that the court could infer that the treaty parties did

3   not require "the 'substance' of a charge" to accompany an extradition request. *Id.* at 1243.

4       Arguing that the addition of a requirement for the requesting state to produce "a copy of the

5   charging document" changed the meaning of the term "charged" to mean "formally charged," the

6   petitioner points to a more recent decision outside of the Ninth Circuit: *Aguasvivas v. Pompeo*,

7   405 F. Supp. 3d 347 (D.R.I. 2019), *aff'd in relevant part*, 984 F.3d 1047 (1st Cir. 2021). In

8   *Aguasvivas*, the court held that the extradition treaty between the United States and the Dominican

9   Republic was materially different than the treaties at issue in *Assarsson* and *Emami* because it

10  required the requesting country to produce "the document setting forth the charges against the

11  person" sought for extradition and a warrant. 405 F. Supp. 3d at 355. The court then held that the

12  warrant could not satisfy both the warrant and the charging-document requirements because if the

13  same document could satisfy both requirements, then the separate charging-document requirement

14  "would be stripped of any meaning." *Id.* The First Circuit affirmed this part of the *Aguasvivas*

15  decision and held that there was a "strong inference" that the "treaty require[d] more than an arrest

16  warrant" because the charging-document requirement was added after the *Assarsson* and *Emami*

17  decisions and because, unlike in some other extradition treaties, the charging-document

18  requirement was not optional. *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1060 (1st Cir. 2021).

19      The relevant holdings from *Emami*, *Assarsson*, and *Aguasvivas* are consistent: the

20  interpretation of the term "charged" in a treaty must not contradict any applicable document

21  requirements. Given the conclusion in Section 3.2 below that the government has satisfied the

22  charging-document requirement and that documents other than an *Orden de Enjuiciamiento* can

23  satisfy the charging-document requirement, there is no reason to deviate from the Ninth Circuit's

24  reasoning in *Emami* that "charged" was used in a generic sense to mean "accused." The text of the

25  Treaty supports the government's position that the term "charged" is used generically to mean

26  "accused" and not "formally charged," because Article I of the Treaty uses the term "charged" in

27  the same way the term was used in the treaty at issue in *Emami* and *Assarsson*. The term contrasts

28

United States District Court
Northern District of California

with the phrase "found guilty of" in this Treaty just as it was used in contrast to "convicted of" in the treaty at issue in *Emami*.

Additionally, the structure of the Treaty provides some insight into the meaning of the term "charged." Article I describes who may be extradited under the Treaty: those "charged with, found guilty of, or sentenced for . . . an extraditable offense." Article VI identifies specific requirements depending on whether the extradition is for a person "charged with, found guilty of, or sentenced for" a crime. But Article VI does not use the term "charged with" and instead refers to persons "sought for prosecution." This suggests that "charged" has a broader meaning than "formally charged" and in fact means "sought for prosecution." The inclusion of a "charging document" requirement in Article VI does lend some support to the petitioner's theory that the terms "sought for prosecution" and "charged" mean "formally charged." But the better reading is that the use of the expansive term "sought for prosecution" in Article VI implies that the Article I reference to persons "charged" includes individuals who have been accused or are sought for prosecution even if not formally charged.

In sum, there is a conflict between the term "charged" in Article I and the phrase "sought for prosecution" in Article VI. The interpretation that best resolves the conflict is the interpretation that preserves the intent of the treaty parties and thus is the correct reading of the treaty. *See In re Ariz. Appetito's Stores, Inc.*, 893 F.2d 216, 219 (9th Cir. 1990) ("We interpret a federal statute by ascertaining the intent of Congress . . . . [I]f the statutory language gives rise to several different interpretations, we must adopt the interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.") (cleaned up).

The government's proposed interpretation — reading "charged" generically to mean "accused" — resolves the conflict straightforwardly. The petitioner's solution — interpreting "charged" and "sought for prosecution" to mean "formally charged" — is strained. First, it requires ignoring the reasoning from *Emami* and *Assarsson* that "charged" was used as a verb meaning "accused." Second, it requires overlooking the expansiveness of the phrase "sought for prosecution." The inclusion of a requirement to produce "the charging document" in Article VI seemingly supports

the petitioner's view, but the requirement does not list a specific "charging document" or even provide examples of documents that satisfy the "charging document" requirement. This omission supports the view that persons "charged" or "sought for prosecution" does not include only persons who have been "formally charged" by way of a specific document such as an *Orden de Enjuiciamiento*.

Furthermore, the Supreme Court and the Ninth Circuit have both held that any ambiguities in treaties should be construed to enlarge the rights of the parties. *Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933) ("[I]f a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431 (1943) ("Of course treaties are construed more liberally than private agreements."); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 n.3 (9th Cir. 1981) ("This broad interpretation [of the extradition treaty between the United States and Canada] also comports with the principle that treaties should be construed to enlarge the rights of the parties."). Therefore, even if the solutions proposed by the petitioner and the government to resolve the conflict between Articles I and VI were equally viable, the government's broader interpretation would be prefered.[63]

The Treaty's drafting history also supports the government's position. One part of the petitioner's theory — that the Treaty's drafters would have known of the *Emami* and *Assarsson*

---

[63] The government is correct (Opp'n – ECF No. 9 at 19, 21) that the court may rely on interpretations of earlier versions of the Treaty. *Narayanan v. Brit. Airways*, 747 F.3d 1125, 1127 n.2 (9th Cir. 2014) ("[I]n interpreting the Montreal Convention, courts have routinely relied upon Warsaw Convention precedent where the equivalent provision in the Montreal Convention is substantively the same."). This rule, however, is not helpful here. In *Garcia-Guillern v. United States*, the court did not hold that the predecessor version of the Treaty used the term "charged" in a broad or generic sense to mean "accused." 450 F.2d 1189, 1192–93 & n.1 (5th Cir. 1971). Rather, the court held that: "Appellant's contention that he has never been properly or legally charged with a crime in accordance with the treaty is also not appropriate for consideration. A petition for the writ of habeas corpus is not to be used as a means for rehearing what a committing court has already decided." *Id.* at 1192 n.1. In other words, the *Garcia-Guillern* court did not address the meaning of the term "charged" because it held that the issue was not appropriate for habeas review. *Id.* The Ninth Circuit has held that issues concerning the meaning of treaty terms are properly addressed through a habeas petition. *Emami*, 834 F.2d at 1448 ("Whether a treaty conditions extradition upon the filing of formal charges is a question cognizable on appeal from the denial of a petition for habeas corpus."). Thus, the *Garcia-Guillern* decision does not illuminate the meaning of "charged" for purposes of the Treaty.

United States District Court
Northern District of California

decisions when they added the charging-document requirement in 2001 — is certainly plausible. *Aguasvivas*, 984 F.3d at 1060 ("[T]he State Department is presumably familiar with the various treaty forms that it has adopted and with circuit law construing those forms[.]"); *see also Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."). But the second part of the petitioner's argument goes too far. Even assuming for the sake of argument that the drafters were familiar with the *Emami* and *Assarsson* decisions, it does not necessarily follow that they intended the addition of a generic charging-document requirement to limit extradition to those formally charged.

As noted above, the critical aspect of the *Emami* and *Assarsson* decisions is the holding that "charged" encompasses those "accused" not only because "charged" was used as a verb, but also because the extraditing country could still comply with the treaty's document requirements when seeking to extradite a person "accused" of a crime. *See Emami*, 834 F.2d at 1448 ("[A]ll the documents that the treaty with Germany required the German authorities to submit with its request to extradite Emami were before the district court."); *Assarsson*, 635 F.2d at 1243 (relying on the fact that the subject treaty did not require the production of a "formal document called a charge" when finding that "charged" was used as a verb and not a noun). If the drafters of the Treaty intended to limit the definition of a person "charged" with an extraditable offense to those "formally charged," as the petitioner contends, then it seems that they would have identified specific charging documents that could only be produced for those formally charged.[64]

The drafters did not do this and instead included only a generic charging-document requirement in both the English and Spanish versions of the Treaty. Treaty, art. VI (English); Treaty, art. VI (Spanish), https://www.state.gov/wp-content/uploads/2019/04/03-825-Peru-Extradition-Treaty.pdf. In this regard, both the Spanish and English versions of the Treaty are "equally authentic." Treaty, art. XIX. Thus, the inclusion of the generic charging-document

---

[64] The same reasoning applies to the petitioner's argument that the addition of the charging-document requirement was made in response to alleged human rights abuses by the Fujimori Administration in Peru. Pet. – ECF No. 1 at 22–23. If the drafters had wanted to limit extradition to those "formally charged" in response to human-rights abuses, they could have specifically identified acceptable charging documents or defined the term "charged" with more precision.

United States District Court
Northern District of California

requirement does not imply that the term "charged" means "formally charged" only. If anything, the drafters' failure to specify that only certain documents, like the *Orden de Enjuiciamiento*, could satisfy the charging-document requirement despite their presumed familiarity with the *Emami* and *Assarsson* decisions supports the government's position that the term "charged" means "accused." *See Assarsson*, 635 F.2d at 1243 ("If the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided.").

Moreover, the views of the U.S. and Peru are entitled to deference. *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) ("It is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight.") (cleaned up); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982) ("When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation."). Here, both U.S. and Peruvian authorities agree that pending criminal proceedings against the petitioner mean that he has been "charged" for purposes of the Treaty.[65] The official views of the treaty parties are, of course, entitled to more deference than the views of the petitioner's former attorney, even if he served as Chief Republican Counsel to the Senate Foreign Relations Committee when it considered the Treaty.[66]

In sum, the Treaty's text and drafting history provide ample support for the view that the term "charged" (as used in Articles I and VI of the Treaty) means "accused" or "sought for prosecution" and does not apply only to those who are "formally charged."

### 3.2   Document Requirement

Concerning the requirement in Article VI of the Treaty to include "a copy of the charging document," the government has satisfied this requirement. Peru has submitted Prosecutor's Decision Nos. 6 and 8 and an *Acusacion Fiscal*.[67] The government included Prosecutor's Decision

---

[65] Pet. – ECF No. 1 at 17; Ltr. from G. Bonifaz, Embassy of Peru in the U.S., Ex. G to Pet. – ECF No. 1-7 at 2–3; Opp'n – ECF No. 9 at 25–26, 31.

[66] Douglas Decl., Ex. A to Pet. – ECF No. 1-1 at 2, 7–8 (discussing his role on the committee and his views on the intention of those who drafted the Treaty).

[67] Prosecutor's Decision No. 6, Ex. D to Pet. – ECF No. 1-4; Prosecutor's Decision No. 8, Ex. L to Pet. – ECF No. 1-12.

1   Nos. 6 and 8 with its Extradition Request and the *Acusacion Fiscal* with its Supplemental

2   Extradition Request.[68]

3       The Prosecutor's Decisions list the charges asserted against the petitioner and summarize the

4   evidence against him.[69] The extradition court characterized the Prosecutor's Decisions as "a

5   combination of a criminal complaint (with no requirement to indict in 30 days), an arrest warrant,

6   and a detention order."[70] The *Acusacion Fiscal* is 1,269 pages long and in the words of a Peruvian

7   diplomatic official, "replace[d] the prosecutor's decisions as the operative charging document for

8   the case at the current stage in the criminal process."[71] The petitioner's contention — that these

9   documents do not satisfy the "charging document" requirement and that only an *Orden de*

10  *Enjuiciamiento*, which has not been submitted, will satisfy that requirement — is untenable.[72]

11      The Treaty requires "a copy of the charging document" but does not identify any specific form

12  that the document must take. The petitioner points out that this is unsurprising because, of course,

13  the charging document is different depending on whether the United States or Peru is the country

14  seeking an individual's extradition.[73] Nonetheless, if the drafters had wanted to strengthen the

15  requirement by specifying that only certain kinds of documents are acceptable, they could have

16  done that by identifying specific U.S. and Peruvian charging documents. Moreover, the fact that

17  the term "the charging document" (*documento de imputación* in the Spanish version of the Treaty)

18  generically encompasses different "charging documents" used by the United States and Peru

19  supports the view that "the charging document" refers to a category of documents and not a

20  specific document. Accordingly, the Treaty's text and structure suggest that the charging-

21  document requirement can be satisfied by documents other than an *Orden de Enjuiciamiento*.

22

23

24  _____

    [68] Pet. – ECF No. 1 at 15, 28.

25  [69] Opp'n – ECF No. 9 at 9–10, 28–33.

    [70] Order – XR ECF No. 147 at 4.

26  [71] Ltr. from G. Bonifaz, Embassy of Peru in the U.S., Ex. G to Pet. – ECF No. 1-7 at 2; Opp'n – ECF
    No. 9 at 14.

27  [72] Pet. – ECF No. 1 at 24–25.

28  [73] Reply – ECF No. 15 at 7.

United States District Court
Northern District of California

Furthermore, the petitioner's reliance on *Aguasvivas* is not helpful. The core holding in *Aguasvivas* is that a warrant cannot serve "double duty" and satisfy both a warrant and charging–document requirement. 984 F.3d at 1058 (holding that the government's theory — that a warrant could satisfy both a warrant and charging–document requirement — would render "the entirety of paragraph 3(b) [of the subject treaty] (requiring 'the document setting forth the charges') . . . entirely superfluous."). Here, the government submitted several documents satisfying the charging-document requirement that are separate from the other categories of documents identified in Article VI of the Treaty.[74] The government is not relying on certain documents to do "double duty." Holding that the Decisions and the *Acusacion Fiscal* satisfy the "charging document" requirement does not turn the other provisions (requiring a warrant and evidence) into surplusage. Treaty, art. VI. Therefore, the *Aguasvivas* decision does not help the petitioner.

The Treaty's drafting history also suggests that the term "charging document" refers to a generic category of documents and not specific documents. As the government points out, the Technical Analysis associated with the Treaty states that: "the negotiating delegations intended that 'charged' persons include those who are sought for prosecution for an extraditable offense based on an outstanding warrant of arrest, regardless of whether such warrant was issued pursuant to an indictment, complaint, information, affidavit, or other lawful means for initiating an arrest for prosecution under the laws in Peru or the United States." S. Exec. Rep. No. 107-12, at 4 (2002) (available at https://www.congress.gov/107/crpt/erpt12/CRPT-107erpt12.pdf). This excerpt from the Technical Analysis supports a broad reading of the "charging document" requirement and courts routinely rely on technical analyses when interpreting treaties. *See, e.g.*, *Patterson*, 785 F.3d at 1282 (relying on the Senate Report and the technical analysis contained therein to interpret the extradition treaty between the U.S. and South Korea); *In re Premises Located at 840 140th*

---

[74] Prosecutor's Decision No. 6, Ex. D to Pet. – ECF No. 1-4; Prosecutor's Decision No. 8, Ex. L to Pet. – ECF No. 1-12; Arrest Warrant, Ex. K to Pet. – ECF No. 1-11; Opp'n – ECF No. 9 at 33 ("To demonstrate probable cause, the government offered, and the extradition court admitted, the *Acusacion Fiscal*, as well as other summaries of the case against Toledo and much of the underlying evidence itself, including the testimony of two key witnesses, Barata and Maiman."); Maiman Dep., Ex. S to Pet. – ECF No. 1-19; Barata Dep., Ex. W to Pet. – ECF No. 1-23.

1    *Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 569–70 (9th Cir. 2011) (relying in part on technical

2    analysis to interpret the U.S.–Russia mutual legal assistance treaty or MLAT).

3        The rules for interpreting and applying treaties also support the government's position that it

4    has satisfied the "charging document" requirement. The Ninth Circuit has held that "[j]udicial

5    inquiry into foreign criminal procedural issues is limited in the extradition context." *Fejfar v.*

6    *United States*, 724 F. App'x 621, 622 (9th Cir. 2018). Therefore, absent specific instructions in the

7    Treaty, it would be inappropriate to hold that the "charging document" requirement can only be

8    satisfied by the *Orden de Enjuiciamiento* and not the documents submitted by Peruvian authorities

9    (*i.e.*, the Prosecutor's Decisions and *Acusacion Fiscal*), which are roughly consistent with a

10    criminal complaint.

11        For the same reason, it would be inappropriate to rely on the petitioner's submission of

12    (apparently unsigned) declarations from Peruvian attorneys suggesting that a person is not

13    "charged" until a Peruvian judge issues an *Orden de Enjuiciamiento*.[75] Notably, even these

14    attorneys appear to concede that prosecutors may "seek a formal charge" before an *Orden de*

15    *Enjuiciamiento* is issued.[76] To the extent the petitioner contends that the Prosecutor's Decisions

16    and *Acusacion Fiscal* do not satisfy the "charging document" requirement because they "seek to

17    formally charge" but do not actually "charge," this is a hairsplitting argument that fails because

18    treaties are interpreted broadly. *See, e.g.*, *Cucuzzella*, 638 F.2d 107 n.3. The argument also fails

19    because it contradicts the view of the parties to the Treaty. *See, e.g., Sumitomo*, 457 U.S. at 185.

20    Moreover, the government cites evidence suggesting that the petitioner's Peruvian attorneys have,

21    in the course of defending the petitioner in Peruvian court, implicitly conceded that the petitioner

22    has been charged despite the lack of an *Orden de Enjuiciamiento*.[77]

23        Thus, the documents submitted by the government satisfy the Treaty's charging-document

24    requirement.

25

26    [75] Lucero Decl., Ex. C to Pet. – ECF No. 1-3; Apumayta Decl., Ex. I to Pet. – ECF No. 1-9; Manchego
      Decl., Ex. J to Pet. – ECF No. 1-10.

27    [76] Lucero Decl., Ex. C to Pet. – ECF No. 1-3 at 3.

28    [77] Opp'n – ECF No. 9 at 25.

United States District Court
Northern District of California

### 4. Probable Cause and Evidence

The petitioner's second main challenge to the extradition order is that there is no probable cause to believe that the petitioner committed collusion or money laundering.[78] The petitioner also contests the extradition court's exclusion of certain evidence.[79]

In extradition proceedings, probable cause does not mean "guilt beyond a reasonable doubt," rather, it is a "lesser" standard: "any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." *Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir. 1988) (cleaned up). Probable cause exists where there is "evidence sufficient to cause a person of ordinary prudence to entertain a reasonable belief of the accused's guilt." *Matter of Extradition of Rodriguez*, No. CR 95-6007 MISC JW, 1995 WL 312099, at *2 (N.D. Cal. May 17, 1995) (citing *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C. Cir.1973)); *Republic of France v. Moghadam*, 617 F. Supp. 777, 782 (N.D. Cal. 1985). "While conclusory statements alone will not suffice [to establish probable cause], all that is required is sufficient evidence from which an inference may be drawn that the elements of the foreign crime have been met." *In re Extradition of Trinidad*, 754 F. Supp. 2d 1075, 1082 (N.D. Cal. 2010) (cleaned up). The court may even consider hearsay and unsworn statements when evaluating probable cause. *Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cir. 1984).

To contest probable cause before the extradition court, the petitioner may rely on "explanatory evidence," but may not rely on "contradictory evidence." *Santos,* 830 F.3d at 992. In this respect, "explanatory evidence is evidence that explains away or completely obliterates probable cause, whereas contradictory evidence is that which merely controverts the existence of probable cause, or raises a defense." *Id.* (cleaned up). For example, evidence proving an alibi, establishing an affirmative defense like insanity, or impeaching witnesses is disallowed "contradictory evidence." *Id.* at 993. But the accused may present evidence "explain[ing] ambiguities or doubtful elements." *Id.* (cleaned up). The line between explanatory and contradictory evidence is not clear cut, but

---

[78] Pet. – ECF No. 1 at 36–46.

[79] *Id.* at 33–36.

courts in this district have generally admitted evidence in extradition proceedings where the evidence would completely negate probable cause. *Republic of France v. Moghadam*, 617 F. Supp. 777, 783 (N.D. Cal. 1985) (considering witness-recantation evidence because it went "to more than just the credibility of a witness, it negates the only evidence of probable cause.").

In sum, the extradition court's task is to determine "whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Barapind*, 400 F.3d at 752 (quoting *Collins v. Loisel*, 259 U.S. 309, 316 (1922)). On habeas review, the extradition court's decision "must be upheld if there is any competent evidence in the record to support it." *Quinn*, 783 F.2d at 791 (cleaned up).

### 4.1    Admissibility Rulings

The extradition court declined to admit the following material: (1) Maiman's Effective Collaboration agreement with Peruvian prosecutors, (2) the Nominee Agreement between Ecoteva Consulting, S.A. and the Merhav Group, (3) certain financial documents submitted by the petitioner, and (4) certain portions of a complete transcript of Maiman's January 22, 2020, deposition.[80] The petitioner challenges the exclusion of the Effective Collaboration agreement, the Nominee Agreement, and the portions of Maiman's January 22, 2020 deposition that he asked the extradition court to admit.[81]

Regarding the Effective Collaboration agreement, the extradition court excluded the agreement because it indicated that Maiman received and was forced to return substantial amounts of the bribe money and contradicted the government's evidence that Maiman did not benefit from the bribery scheme.[82] The petitioner claims that the agreement is explanatory because the Peruvian prosecutors, by entering the agreement with Maiman, determined that Maiman's contradictory admissions are credible.[83] The petitioner also contends that the agreement "explain[s] ambiguities" and conforms to Maiman's admission that Odebrecht agreed to pay Maiman "a commission, on a

---

[80] Order – XR ECF No. 188 at 6–12.

[81] Pet. – ECF No. 1 at 33–36.

[82] Order – XR ECF No. 188 at 7–8.

[83] Pet. – ECF No. 1 at 33.

United States District Court
Northern District of California

1    percentage for services."[84] The agreement sheds light on Maiman's motivations and credibility,

2    but it contradicts other evidence Peru submitted and does not negate probable cause. Accordingly,

3    the extradition court appropriately declined to consider it.

4         The extradition court also declined to admit the Nominee Agreement.[85] The petitioner asked

5    the court to admit the Nominee Agreement because it tends to support Maiman's 2013 testimony

6    over his 2017 testimony regarding who had actual control over Ecoteva, a company owned by the

7    petitioner's mother-in-law that received bribe money.[86] Like the Effective Collaboration

8    agreement, the Nominee Agreement goes to witness credibility, contradicts Peru's evidence, and

9    does not negate probable cause. Thus, the extradition court properly excluded it.

10        The extradition court also excluded portions of a complete transcript from Maiman's January

11   22, 2020 deposition. The portion at issue include sections where the petitioner's defense counsel

12   obtained Maiman's admission that he received some of the bribe money, counsel's legal

13   arguments and objections, and the judge's evidentiary rulings.[87] This evidence, like the Nominee

14   Agreement and Effective Collaboration agreement, is relevant to Maiman's credibility and is akin

15   to impeachment evidence that the Ninth Circuit has categorized as "contradictory evidence."

16   *Santos,* 830 F.3d at 993.

17        The evidence the petitioner seeks to admit is also unlike recanting statements involving claims

18   that original statements were obtained by torture or coercion, which the Ninth Circuit has held are

19   admissible in extradition proceedings. *Id.* at 1003. The problem with the petitioner's evidence is

20   that while it may undermine Maiman's credibility, it contradicts the government's evidence and

21   does not negate probable cause or undermine the reliability or competence of Peru's evidence. *Cf.*

22   *id.* at 1002–05 (holding that it is proper to refuse to consider recantations that are simply contrary

23   to prior statements but that "evidence that a statement was obtained under torture or other coercion

24   constitutes 'explanatory' evidence [and is] generally admissible in an extradition proceeding. . . .

---

26   [84] *Id.* at 34.

27   [85] Order – XR ECF No. 188 at 9.

     [86] Pet. – ECF No. 1 at 34–35.

28   [87] Order – XR ECF No. 188 at 11–12.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

[E]ven when the claim of coercion is intertwined with a recantation[.]"). Thus, the extradition court properly excluded both agreements and portions of Maiman's 2020 deposition transcript.

### 4.2   Probable Cause

The petitioner is charged with collusion and money laundering. To establish collusion under Peruvian law, the prosecutors must establish the following elements: "(1) the defendant was a government official or civil servant; (2) by reason of his or her position, the defendant participated at any stage in contracts, supplies, tenders, competitive biddings, auctions, or any other similar operations conducted by the government; and (3) in connection therewith, the defendant defrauded the State of Peru or state-supported bodies or entities by making arrangements with the concerned parties in agreements, adjustments, liquidations, or supplies."[88] The money-laundering charge requires proof of the following: "(1) the defendant converted or transferred money, goods, effects, or earnings; (2) the defendant was aware or presumed that the money or other items had illegal origins; (3) the defendant sought to prevent the money or other items from being seized or confiscated, or to prevent their illegal origins from being identified."[89]

The extradition court determined that there was probable cause for these crimes based on the following: (1) testimony from Barata and Maiman and (2) the petitioner's "admissions in this extradition proceeding that he ultimately received approximately $500,000 in Odebrecht bribe money and concerning the path that money and other money took to get to him and to a company and real estate in his mother-in-law's name."[90]

The petitioner challenges probable cause of collusion based on contentions that (1) evidence concerning the November 4, 2004 meeting in Rio de Janeiro is not credible, (2) his purported expectation of a $20 million donation is inconsistent with a $34 or $35 million bribery scheme, and (3) his failure to modify the bidding requirements as the illicit agreement allegedly required.[91] Regarding money laundering, the petitioner cites (1) inconsistencies concerning the bribe amount,

[88] *Id.* at 12; Prosecutor's Decision No. 8, Ex. L to Pet. – ECF No. 1-12 at 34–39.
[89] Order – XR ECF No. 188 at 12; Prosecutor's Decision No. 6, Ex. D to Pet. – ECF No. 1-4 at 39–44.
[90] Order – XR ECF No. 188 at 25.
[91] Pet. – ECF No. 1 at 38–41.

1    (2) Maiman's purported ownership of the entities that received the illicit funds, (3) his claim that

2    properties purchased for him by Fernenbug (the petitioner's mother-in-law) were actually

3    investments for Maiman, (4) the lack of evidence that the petitioner asked for money, and (5) his

4    claim that Maiman was the true beneficiary of the bribery scheme.[92]

5        The petitioner's arguments amount to a general attack on the accuracy of the Peruvian

6    prosecutors' theory and the credibility of witnesses. The petitioner has not rebutted the basic

7    evidence establishing a reasonable inference of the petitioner's guilt. The exact amount of the

8    bribe is a factual issue that does not defeat probable cause and, as the extradition court noted, the

9    possibility that Maiman skimmed off a substantial portion of the bribe establishes Maiman's

10   motive for participating in the scheme and supports the Peruvian prosecutors' theory.[93] The

11   evidence from Peru easily satisfies the "any evidence" standard for upholding the extradition

12   court's probable cause determination. *Mirchandani*, 836 F.2d at 1226.

13       Testimony from Maiman and Barata plainly support the collusion charge. Barata and Maiman

14   essentially testified that the petitioner, while president in 2004, participated in the bribery scheme

15   negotiations.[94] Barata also testified that the petitioner used his position to further the scheme by

16   expediting the bidding process to help Odebrecht and using his position by communicating

17   requests to the Peruvian Ministry of Economy and Finance that purportedly furthered the

18   scheme.[95] Contemporaneously with the 2004 bribery negotiations, the petitioner discussed

19   donations to his foundation with Maiman and Barata and has admittedly received bribery funds.[96]

20   This evidence, along with Maiman's testimony regarding the transfer of funds between various

21   business accounts, supports the money laundering charge. Overall, the evidence provides a

22   reasonable basis to infer that prosecutors can establish the elements of collusion and money

23

24

25   [92] *Id.* at 42–46.

26   [93] Order – XR ECF No. 188 at 29.

27   [94] Maiman Dep., Ex. S to Pet. – ECF No. 1-19 at 8; Barata Dep., Ex. W to Pet. – ECF No. 1-23 at 12, 17.

     [95] Barata Dep., Ex. W to Pet. – ECF No. 1-23 at 10–11, 18–19.

28   [96] Maiman Dep., Ex. S to Pet. – ECF No. 1-19 at 9.

laundering. Thus, there is probable cause to believe the petitioner committed the alleged crimes. *In re Extradition of Trinidad*, 754 F. Supp. 2d at 1082.

Concerning the petitioner's argument that it is "implausible" that he would risk prison and his career for a $500,000 loan, the petitioner's claim that Maiman was investing in Peruvian real estate through the petitioner's elderly mother-in-law appears equally implausible.[97] More importantly, the issue is not whether the Peruvian theory is plausible or implausible. The issue is whether there is "any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." *Mirchandani*, 836 F.2d at 1226.

Under the applicable standard, the petitioner's admissions and the testimony of Barata and Maiman provide reasonable grounds to find that the petitioner participated in the bribery scheme and committed collusion and money laundering. It is up to a Peruvian court to evaluate the petitioner's defenses, weigh the credibility of witness testimony, and ultimately decide whether the evidence is sufficient to convict him.

## CONCLUSION

For the foregoing reasons, the court denies the petition for a writ of habeas corpus.

**IT IS SO ORDERED.**

Dated: April 22, 2022

_____
LAUREL BEELER
United States Magistrate Judge

---

[97] Pet. – ECF No. 1 at 44–45.